UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-40114-FDS

| | |
|---|---|
| TIMOTHY L. LaFRENIER,<br><br>    Plaintiff<br>v.<br><br>MARY ANNE KINIREY, DANIEL MORRISON, The CHIEF OF POLICE "John Doe" and the TOWN OF TOWNSEND,<br><br>    Defendants | DEFENDANTS' L.R. 56.1 STATEMENT OF MATERIAL FACTS OF RECORD AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED |

1. In this action, plaintiff Timothy LaFrenier ("LaFrenier") asserts civil rights and common-law tort claims arising from his arrest by police officers Mary Kinirey ("Kinirey") and Daniel Morrison ("Morrison) in the Town of Townsend on June 15, 2001.  Complaint.

2. LaFrenier, who was suffering from a medical condition at the time of his arrest, has no memory of the circumstances of his arrest, and therefore cannot dispute the facts of the arrest as set forth by Kinirey and Morrison.  Deposition Testimony of Timothy LaFrenier ("Exhibit A"), p.55, l.1-18; p.56, l.5-22.  There are no known witnesses to the arrest.

3. On June 15, 2001, LaFrenier had been suffering from a bad head cold for two to three weeks.  Exhibit A, p.42, l.18-22.  LaFrenier had been taking non-prescription medication (Nyquil) to treat his cold at night.  Exhibit A, p.43, l.3-13.  Due to the cold, he had been sleeping just two to three hours a night.  Exhibit A, p.44, l.19-p.45, l.3.

4. The week prior to June 15, 2001, LaFrenier had discontinued use of Klonopin, a prescription drug he took to treat Meniere's disease.[1] Exhibit A, p.39, l.15-21; p.40, l.8-11. According to LaFrenier's primary care physician, discontinuing use of Klonopin, combined with taking large doses of cold medicine "could easily cause … confusion and somewhat combativeness." Letter from Thomas J. Scornavacca, Jr. ("Exhibit B").

5. On June 15, 2001, LaFrenier left his place of work in Nashua, N.H. at 11 a.m. for a doctor's appointment. Exhibit A, p.49, l.17-p.50, l.4. As he left he felt "very ill, very weak, very tired." Exhibit A, p.44, l.8-12.

6. LaFrenier's recollection of the events leading up to his arrest end with him reaching Route 13 and trying to take a deep breath. Exhibit A, p.46, l.23-p.47, l.1. He does not recall pulling his car over to the side of Route 13. Id., p.54, l.7-9.

7. At approximately 12:40 p.m. on June 15, 2001, Kinirey was at the dispatch center in the Townsend Police Station when a motorist came in to report that a car was on the side of the road, with its driver slumped over the wheel. Deposition Testimony of Mary Anne Kinirey ("Exhibit C"), p.18, l.6-17; p.20, l.11-15.

8. Kinirey left to investigate the report, informing the dispatcher that she would call back to the police station if an ambulance were needed. Exhibit C, p.21, l.14-22. Kinirey drove to the site of the report in a marked cruiser and was in full uniform at the time. Id., p.21, l.20-24.

9. When she arrived, Kinirey saw LaFrenier's vehicle stopped on the side of Route 13, which is a two-lane highway with no breakdown lane. Exhibit C, p.22, l.4-9.

---

[1] Meniere's Disease causes ringing in the ears and unsteadiness.

2

10. After parking her cruiser, Kinirey approached LaFrenier's vehicle and observed that the vehicle was running, the windows were rolled up, and the driver was sweating profusely, with his head down on his chest. Exhibit C, p.22, l.1-3; p.23, l.19-24; p.24, l.13-18.

11. Kinirey knocked on the window of the vehicle and LaFrenier looked up, at which point Kinirey observed that his eyes were glassy. Exhibit C, p.24, l.19-24; p.25, l.7-9. Kinirey asked LaFrenier to roll down the window. LaFrenier did not respond, but instead attempted, unsuccessfully, to open a cigarette pack that was in his lap. Id., p.29, l.10-14; p.29, l.20-p.30, l.5.

12. Kinirey again knocked on the window and asked LaFrenier to roll down the window, and again, LaFrenier did not respond. Exhibit C, p.30, l.6-17. After a couple of knocks by Kinirey, LaFrenier opened the window. Id., p.30, l.17-24.

13. Kinirey asked LaFrenier if he were alright a couple of times. LaFrenier did not respond at first, then said he was fine. Exhibit C, p.31, l.4-8; p.36, l.2-8. When he spoke, Kinirey observed that his speech was slow. Id., p.36, l.9-11. Kinirey then asked LaFrenier if he needed medical attention, and he again said he was fine. Id., p.36, l.14-16.

14. Kinirey asked LaFrenier to shut off the car engine, which was running. LaFrenier responded that the engine was off. Kinirey told him that the engine was still running, and he again told her it was off. Exhibit C, p.37, l.7-17.

15. LaFrenier then said he had to leave, to which Kinirey responded that he wasn't going anywhere. Exhibit C, p.38, l.20-24. LaFrenier asked Kinirey if she had a problem, and she told him she was trying to figure out if he needed any help. LaFrenier then

said again that he had to get going, and turned as if to drive away. Kinirey asked him to shut the vehicle off again, and he did not respond. Exhibit C, p.39, l.1-21.

16. Kinirey then called for backup. Exhibit C, p.46, l.1-11.

17. Kinirey then opened the vehicle door and asked LaFrenier to step out; LaFrenier asked again if there was a problem, and again said he had to get going. Exhibit C, p.39, l.22-24; p.41, l.4-11. Kinirey put her hand on his arm and requested two more times that he step from the vehicle. After her third request, LaFrenier complied. Id., p.41, l.12-15; p.42, l.3-9, l.17-18.

18. When LaFrenier exited the car, Kinirey observed that he was "staggering." Exhibit C, p.44, l.22-24. After exiting the car, he fell against it. Id., p.43, l.9-12.

19. LaFrenier continued to ask Kinirey why he was being stopped "and what the problem was," to which Kinirey repeatedly responded, "just want to make sure you're OK." Exhibit C, p.44, l.7-15.

20. Kinirey asked that LaFrenier lean against the trunk of the vehicle to keep from falling down; as LaFrenier attempted to comply he missed the trunk, so Kinirey grabbed him and guided him to the trunk. Exhibit C, p.45, l.18-24; p.47, l.1-3.

21. LaFrenier then stated he wanted to go home. Kinirey asked him if he felt sick, if he had been drinking, if he was on medication, or if he had a medical condition. Exhibit C, p.48, l.6-15. LaFrenier responded that he didn't understand why he was being stopped, and that he had to get going. Id., p.48, l.16-21.

22. Kinirey then asked LaFrenier if he knew where he was and he responded that he was in the parking lot of his business in Nashua, N.H. Exhibit C, p.49, l.6-17. Kinirey

told him that they were in Townsend, Massachusetts, and he asked if she was sure. Id., p.49, l.17-22.

23. Kinirey asked him more questions about his condition, and LaFrenier said that he had to get going and tried to get past her to get to his car. Exhibit C, p.51, l.3-8. When Kinirey told him "he wasn't going anywhere," he pushed her out of his way. Id., p.51, l.22-p.52, l.1.

24. Kinirey then took hold of LaFrenier's arms, and he continued to push her. Exhibit C, p.53, l.14-17; p.53, l.23-p.54, l.1. At this point, traffic was "flowing" on Route 13, and when LaFrenier pushed Kinirey, he pushed her in the direction of the traffic. Exhibit C, p.62, l.14-17; p.107, l.22-p.108, l.6.

25. Kinirey then decided to place LaFrenier under arrest. Exhibit C, p.54, l.2-3. She turned him to the car, brought one of his arms behind his back, and applied handcuffs to one hand. Exhibit C, p.56, l.3-8; p.57, l.2-4.

26. As Kinirey attempted to apply the other handcuff, LaFrenier struggled, repeatedly standing up and attempting to flee, as Kinirey kept pushing him back down with one hand, while holding the open handcuff with the other. Exhibit C, p.57, l.8-12; p.58, l.1-22.

27. As they struggled, LaFrenier was able to work free of Kinirey's grasp, swing around, and face her. Exhibit C, p.58, l.21-23; p.59, l.8-15. Plaintiff proceeded to "flail around," pushing and hitting Kinirey. Id., p.91, l.14-19. As he flailed, the loose handcuff, with its hook open, also flailed around. Id., p.92, l.1-5.

28. LaFrenier then began to hit Kinirey in the stomach with a closed fit. Id., p.59, l.16-24; p.60, l.10-14. Kinirey pushed him back towards the car, and struck him in the

5

       thigh area with her knee, as she had been trained to do. Exhibit C, p.60, l.15-p.61, l.8. LaFrenier continued to struggle, and Kinirey continued to attempt to subdue him, and they both fell to the ground. Id., p.61, l.9-p.62, l.4.

29. The pair continued to exchange blows on the ground, with LaFrenier attempting to punch Kinirey with both hands, and she trying to restrain him with knee blows to the leg. Exhibit C, p.63, l.4-18. As they struggled, LaFrenier's arm flailed around with the open cuff still on it. Exhibit C, p.63, l.12-15.

30. At that point, Morrison arrived, responding to Kinirey's earlier call for backup. Exhibit C, p.63, l.9.

31. Upon arriving at the scene, Morrison saw Kinirey "rolling around, wrestling" with LaFrenier on the ground. Deposition Testimony of Daniel Morrison ("Exhibit D"), p.20, l.1-7.

32. Morrison ran to the pair, picked LaFrenier up off the ground, identified himself as a police officer, and started to walk LaFrenier towards his vehicle. Exhibit D, p.26, l.2-5, l.13-16; p.27, l.13-16; p.28, l.1. At that point, LaFrenier began to flail his arms, twice elbowing Morrison in the chest and breaking a pair of sunglasses in Morrison's shirt pocket, and slipped out of Morrison's grasp. Exhibit D, p.27, l.19-21; p.29, l.11-16; p.39, l.10-24.

33. Morrison gained control of LaFrenier by grabbing his arms, placing him over the vehicle, bringing his arms behind him, and applying handcuffs, after which he placed LaFrenier into a cruiser. Exhibit D, p.30, l.7-18; p.31, l.20-21; LaFrenier remained "combative" as Morrison placed him into the cruiser. Id., p.32, l.2-5.

34. Kinirey did not punch, kick, use a chemical agent, or draw a gun on LaFrenier during their encounter. Exhibit C, p.94, l.7-11. LaFrenier testified that Kinirey told him, after the encounter, that she used her nightstick on him. Exhibit A, p.66, l.1-9. Kinirey denies using her nightstick on LaFrenier, Exhibit C, p.94, l.15-17, however she concedes this fact for purposes of summary judgment only.

35. Morrison did not punch, kick, use a nightstick, use a chemical agent, or draw a gun on LaFrenier during their encounter. Exhibit D, p.41, l.4-21.

36. Following the arrest, Kinirey returned to the police station with LaFrenier in her cruiser. Exhibit C, p.67, l.2-7. While he was being booked, Kinirey, Morrison and a supervising officer questioned plaintiff about his medical condition, and asked him if there was "somebody we could call" for him. Exhibit C, p.69, l.6-12; p.96, l.23-p.97, l.6. Plaintiff responded that "he didn't have a medical condition and he wasn't on any medication." Id., p.70, l.16-17.

37. LaFrenier's first memory of his encounter with any member of the Townsend Police Department is that he was seated in the police station with four officers standing around him. Exhibit A, p.63, l.19-22. LaFrenier testified that the officers were "basically screaming" at him, "coming at me at one time with a lot of questions," and asking him to take a breathalyzer test. Exhibit A, p.57, l.4-8, l.13-14, l.18-20.

38. LaFrenier agreed to take a breathalyzer test, and the test indicated that his blood alcohol content was 0.00. Exhibit C, p.72, l.12-15.

39. After the breathalyzer test, the officers again asked if he wanted medical assistance, and suggested that an ambulance be called. Exhibit C, p.73, l.9-21. Plaintiff declined

7

an ambulance, and suggested the officers speak with his wife, a nurse. Id., p.73, l.24-74, l.1, p.97, l.21-24.[2]

40. Although plaintiff could not provide a phone number for his wife, Kinirey tracked her down by telephone and spoke with her at length about her husband's condition. Exhibit C, p.98, l.7-9; p.98, l.22-p.99, l.11; p.99, l.17-24. After Kinirey finished speaking with plaintiff's wife, plaintiff agreed to have an ambulance called, and one was summoned. Id., p.74, l.1-3, p.102, l.5-6; Exhibit A, p.61, l.1-5; p.63, l.4-9.

41. Plaintiff confirms that he was asked if he wanted medical attention, and he said that he would. Exhibit A, p.63, l.4-9.

42. At the hospital, the doctor who examined plaintiff diagnosed nothing wrong with him, Exhibit A, p.69, l.4-7, and suggested that his condition was the result of his having taken cold medicine. Id., p.67, l.15-21; p.70, l.1-2. LaFrenier was not rendered any medical treatment, other than intravenous fluid. He was not prescribed any medication. Exhibit A, p.66, l.14-16; p.75, l.18-20; p.76, l.7-11.

43. At no time did plaintiff require or receive any medical treatment, either for the alleged condition he was suffering at the time of his encounter with the officers, or any alleged injuries he received during the encounter. Exhibit A, p.76, l.7-11; p.91, l.13-22; p.106, l.16-19.[3]

44. Plaintiff's adult son, Keith, arrived at the hospital after having been informed by his mother that plaintiff had been arrested and taken there. Deposition Testimony of

---

[2]Plaintiff testified he does not remember giving the officer his wife's name. Exhibit A, p.58, l.4-6. However, it is undisputed that plaintiff's wife told their adult son that the police had contacted her about taking plaintiff to the emergency room. Deposition Testimony of Keith LaFrenier ("Exhibit E"), p.21, l.15-p.22, l.1.

[3]After plaintiff's release, plaintiff was diagnosed with a high white cell count which, according to plaintiff, indicated a viral infection. Exhibit A, p.122, l.12-23. He did not receive treatment for this condition.

8

Keith LaFrenier ("Exhibit E"), p.5, l.8-9; p.7, l.16-17; p.20, l.4-6; p.21, l.15-p.22, l.1. Keith LaFrenier, who had seen his father drunk before, testified that when he saw his father in the hospital shortly after the arrest, "he definitely was showing signs of being drunk." Exhibit E, p.30, l.12-19. Keith LaFrenier further testified that, as he drove his father home later that day, his father remained confused, failing to recognize a familiar landmark near his home. Exhibit E, p.49, l.10-p.50, l.3.

45. As a result of his encounter with the police, LaFrenier was charged with two counts of assault and battery on a police officer, resisting arrest, and disorderly conduct. Exhibit A, p.94, l.15-20. After consulting with her supervising officers, Kinirey determined the charges to be brought against LaFrenier, and initiated the criminal complaint against him. Exhibit C, p.77, l.4-7; p.77, l.20-p.78, l.21; p.104, l.24-p.105, l.2. The complaint was signed by Morrison in his administrative capacity as court prosecutor only. Id., p.105, l.3-12.

46. All Townsend officers, including Kinirey and Morrison, are trained in the "force continuum," a guide to the proper amount of force to be used in effecting a lawful arrest. Exhibit C, p.92, l.6-12. The continuum, which is incorporated into the Townsend Police Department's Use-of-Force policy, is based on the principle that an officer should use only the minimum force necessary for self-defense and to effect a lawful arrest. The continuum instructs officers on the different types of force available and when it is appropriate to use each type of force. Townsend Police Department Use of Force Policy ("Exhibit F"), p.3, ¶¶3, 5.

47. Pursuant to the continuum, an officer attempting to subdue a resistant suspect starts with verbal commands, then escalates to physical maneuvers, including knee strikes,

9

and then, if the suspect is still resisting, use of a nightstick.  Exhibit C, p.92, l.13-24;

Exhibit F, p.3, ¶5.  Pursuant to the Department's Use-of-Force policy, a nightstick

may be used "when it is necessary to subdue a person violently resisting arrest."

Exhibit F, p.4, ¶4.

>                        DEFENDANTS,
>
>                        MARY ANNE KINIREY, DANIEL
>                        MORRISON and TOWN OF TOWNSEND,
>
>                        By their attorneys,
>
>                        /s/Joseph L. Tehan, Jr.
>                        Joseph L. Tehan, Jr. (BBO # 494020)
>                        Jackie Cowin (BBO# 655880)
>                        Kopelman and Paige, P.C.
>                        31 St. James Avenue
>                        Boston, MA  02116
>                        617-556-0007

268978/METG/0594