UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-40114-FDS

TIMOTHY L. LaFRENIER,

        Plaintiff

v.

MARY ANNE KINIREY, DANIEL
MORRISON, The CHIEF OF POLICE "John
Doe" and the TOWN OF TOWNSEND,

        Defendants

ATTACHMENTS TO DEFENDANTS' L.R.
56.1 STATEMENT OF MATERIAL FACTS
OF RECORD AS TO WHICH THERE IS
NO GENUINE ISSUE TO BE TRIED

**Attachments A through F to Defendants' L.R. 56.1 Statement of Material Facts of Record as to Which There is no Genuine Issue to be Tried are to be filed by First Class Mail with the Court on January 27, 2006.**

DEFENDANTS,

By their attorneys,

/s/ Joseph L. Tehan, Jr.
Joseph L. Tehan (BBO# 494020)
Jackie Cowin (BBO# 655880)
Kopelman and Paige, P.C.
31 St. James Avenue
Boston, MA 02116
(617) 556-0007

272466/METG/0549

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by (hand) (mail) on 1/27/06

/s/ JC

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-40114-FDS

TIMOTHY L. LaFRENIER,

        Plaintiff

v.

MARY ANNE KINIREY, DANIEL MORRISON, The CHIEF OF POLICE "John Doe" and the TOWN OF TOWNSEND,

        Defendants

AFFIDAVIT OF JACKIE COWIN

I, JACKIE COWIN, under oath do hereby depose and state as follows:

1. I am licensed to practice law in the Commonwealth of Massachusetts and in the United States District Court for the District of Massachusetts, and am an associate at the law firm of Kopelman and Paige, P.C.

2. I was involved in preparing the Defendants' Motion for Summary Judgment in the above-captioned case.

3. Each of the deposition excerpts attached as Exhibits to this affidavit are true and accurate copies of pages from the transcript of the referenced deposition.

Signed under the pains and penalties of perjury this 24th day of January, 2005.

                                                  /s/ Jackie Cowin
                                                  Jackie Cowin

272233/METG/0594

# EXHIBIT A

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
-------------------------------------
TIMOTHY L. LaFRENIER,                :
            Plaintiff                :
                                     :
       VS.                           : Civil Action
                                     : No. 04-40114-FDS
MARY ANNE KINIREY,                   :
DANIEL MORRISON, THE CHIEF OF        :
POLICE, "JOHN DOE," AND THE          :
TOWN OF TOWNSEND,                    :
            Defendants               :
-------------------------------------
```

       DEPOSITION OF **TIMOTHY L. LaFRENIER**, taken on behalf of the Defendants, pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before Linda J. Modano, CSR No. 121093, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Kopelman & Paige, P.C., 31 St. James Avenue, Boston, Massachusetts, on Wednesday, July 20, 2005, commencing at 10:00 a.m.

APPEARANCES:

JOSEPH L. TEHAN, JR., ESQ., of Kopelman & Paige, P.C., 31 St. James Avenue, Boston, Massachusetts, 02116-4102, for the Defendants.

SEAN J. GALLAGHER, ESQ., 74 Elm Street, Worcester, Massachusetts, 01609, for the Plaintiff.

LEAVITT REPORTING, INC.

### Page 37

1 with me.
2    Q. Let me stop you there please. As I asked you
3 a moment ago, would you give me the first name and
4 address of Doctor Ervin and spell his last name?
5    A. His address is in Westminster, Mass. His
6 first name I cannot remember. Ervin is E R V I N.
7    Q. What is his specialty?
8    A. Ears, nose and throat doctor.
9    Q. What has Doctor Ervin told you in that
10 regard?
11    A. He -- I shake my head because there was a lot
12 of talk in regards to the Meniere's and the symptoms,
13 but there was nothing he could really do at this
14 point.
15       But we did some work as far as the
16 middle ear. There was a little thing placed in there
17 to open it up for pressure and so forth to see if
18 that would alleviate some symptoms.
19    Q. I appreciate your response. The actual
20 question was, though, has Doctor Ervin ever told you
21 that your arrest has made your Meniere's worse.
22       MR. GALLAGHER: Objection to the form of
23 that.

### Page 38

1    Q. You could answer, sir.
2       MR. GALLAGHER: Yes. I'm sorry.
3    A. This is all new to me.
4    Q. No judge to rule on it so --
5       MR. GALLAGHER: I'm sorry about that.
6    A. I'll say no.
7    Q. Is it accurate to say that prior to your
8 arrest on June 15, 2001, you were afflicted with
9 depression?
10    A. They were basically telling me that. I
11 didn't feel that.
12    Q. When did a doctor first diagnose you as being
13 depressed?
14    A. Well, when I saw Doctor Danlevich, the doctor
15 in Worcester, he says, I'm not saying you're
16 depressed but along with this type of diagnosis,
17 cervical radiculopathy, it's not unusual that
18 depression does fit into it based on the symptoms
19 associated.
20       So he recommended at that point that I
21 try -- I forget the name of the actual pill, but I
22 declined because I said I was fine.
23    Q. Now, once again, please, would you spell the

### Page 39

1 last name of that doctor and add his first name and
2 address.
3    A. I forget his first name. Danlevich.
4 D A N L E V I C H, I believe.
5    Q. What town did you see him in?
6    A. Health Alliance of Fitchburg. I mean
7 Leominster, Mass.
8    Q. When did Doctor Danlevich raise the issue of
9 depression with you?
10    A. At that initial visit with him.
11    Q. I appreciate that. When was that?
12    A. I cannot remember that exact date.
13    Q. Certainly it did predate --
14    A. It was previous to the incident in Townsend.
15    Q. Thank you. Now, have you ever taken
16 medication for depression?
17    A. Yes.
18    Q. And was that a drug called Klonopin?
19    A. It wasn't really for depression. It was --
20 Now I'm catching myself. I was trying to think about
21 the drugs associated or for the Meniere's symptoms.
22       That was in relation to the Meniere's to
23 help with the ringing, because the ringing --

### Page 40

1 sometimes the Klonopin can bring the sound down and
2 alleviate some of those symptoms.
3    Q. Thank you. Why don't I ask you this. On
4 June 15, 2001 what medications were you taking?
5    A. None at that point.
6    Q. None. So you ingested no medications that
7 day, correct?
8    A. For a week previous to that I had stopped
9 taking Klonopin because of my feeling sick and I
10 didn't want to take it along with the Vick's Nyquil
11 and everything for the cold symptoms and so forth.
12    Q. I'll get to that in a minute. So your answer
13 is that on the date June 15, 2001 you were on no
14 medication of any type?
15    A. None.
16    Q. I should ask you as well today, are you on
17 any medications?
18    A. No.
19    Q. Fine. Were you prescribed at some point some
20 drug other than Klonopin for depression?
21    A. Serzone.
22    Q. Can you spell that?
23    A. S E R Z O N E, I believe.

**41**

1  Q. Who prescribed that to you?
2  A. That was -- What was his name? I cannot
3  remember his name right now.
4  Q. When were you prescribed that drug?
5  A. That was years back. Around 98 maybe or
6  something.
7  Q. When did you stop taking it?
8  A. About maybe six months later.
9  Q. Before 2000 certainly?
10 A. Yuh, I would say so.
11 Q. Have you ever been prescribed any other
12 medication for depression?
13 A. No.
14 Q. Have you ever been prescribed any other drug
15 for any other emotional or mental health issue?
16 A. No.
17 Q. Have you ever taken any mental health
18 therapy?
19 A. Yes.
20 Q. With whom did you do so?
21 A. That was as an outpatient at Health Alliance
22 Hospital in Fitchburg.
23 Q. And who was your clinician?

**42**

1  A. I cannot think of her name right now.
2  Q. When did you take that therapy?
3  A. That was around the same time as the Serzone
4  in 98. I believe that's the date. I'm not quite
5  exactly sure.
6  Q. As a result of taking that medication and the
7  therapy that you took did you feel somewhat better at
8  that point?
9  A. Somewhat.
10 Q. Have you taken -- Strike that. Have you been
11 prescribed by any physician any drug for your
12 emotional state after or as a result of your arrest
13 on June 15, 2001?
14 A. No.
15 Q. Have you taken any mental health therapy
16 since that date?
17 A. No.
18 Q. As I understand it, sir, for roughly a week
19 prior to your arrest on June 15, 2001, you had a bad
20 head cold, is that correct?
21 A. It's more than a week. I had been sick for
22 at least two weeks, pushing three.
23 Q. Thank you. And prior to June 15, 2001 had

**43**

1  you seen any doctor for that condition?
2  A. No.
3  Q. Were you self-treating in any way?
4  A. Yes. I was using Vick's -- I believe Vick's
5  Nyquil gelcaps to help alleviate the coughing and so
6  forth.
7  Q. What was the extent of your consumption?
8  A. I was on that for at least the week -- all
9  the week prior to that incident.
10 Q. That's part of the extent. How about the
11 daily consumption?
12 A. Only at night I needed it. That's the only
13 time I took it.
14 Q. Were you staying within the prescribed
15 dosages?
16 A. Absolutely.
17 Q. And do I understand that you stopped the
18 Klonopin while you were taking the Nyquil?
19 A. Yes.
20 Q. Was that at the recommendation of any doctor?
21 A. No.
22 Q. Your choice.
23 A. It was my choice.

**44**

1  Q. What was the basis for that choice?
2  A. I didn't want any interactions or anything
3  associated with the medication that I was trying to
4  alleviate with the cold.
5  Q. As a result of stopping the Klonopin and
6  taking the Nyquil, just as a layperson, did you
7  observe any change in your emotional state?
8  A. It was hard to perceive any change because of
9  the way I was feeling. I was very ill, very weak,
10 very tired. Not getting much sleep from the coughing
11 and everything, the fever, chills associated with the
12 way I was feeling.
13 Q. Did it add to your Meniere's symptoms?
14 A. At that point I was very lethargic but I
15 would have to say no.
16 Q. And when you say at that point, are we
17 talking about roughly the week prior to your arrest?
18 A. Yes.
19 Q. Was your illness keeping you from sleeping
20 properly?
21 A. Yes, definitely.
22 Q. Can you recall how many hours sleep a night
23 you were getting during that week prior to June 15,

Page 45

1  2001?
2      A. If I was averaging two to three hours, that
3  was good.
4      Q. Did you continue to work at Hewlett Packard
5  through the illness?
6      A. Yes.
7      Q. If I understand correctly, prior to June 15,
8  2001, however, you hadn't conferred with a physician
9  about these symptoms, is that true?
10     A. I called my doctor that week previous to that
11  and they recommended an over-the-counter cold
12  medication which I did not -- I took the Vick's
13  Nyquils instead and they said to get something else
14  but I can't remember exactly what it was called.
15     Q. Did you apprise your doctor that you were
16  taking the Nyquil?
17     A. I never personally talked to my doctor. I
18  just talked to I believe it was the nurse
19  practitioner that was there on the phone.
20     Q. Did you tell that nurse practitioner that you
21  were taking the Nyquil?
22     A. Yes. Yes.
23     Q. And did you tell her that you had

Page 46

1  discontinued the Klonopin?
2      A. No.
3      Q. Has any doctor told you or opined that the
4  medication that you were on, the Nyquil, and the
5  medication that you were off, the Klonopin,
6  contributed in any fashion to your behavior on June
7  15, 2001?
8      A. I believe there was a letter that my primary,
9  Doctor Scornavacca, had wrote in relation to that
10  question and explained in a little more detail what
11  he thought -- how it would react at that point.
12     Q. Was that a letter that you requested from him
13  in connection with your criminal trial?
14     A. Yes.
15     Q. Directing your attention to June 15, 2001,
16  can we agree that that was the date of your arrest?
17     A. Yes.
18     Q. By the Townsend police?
19     A. Yes.
20     Q. And did it occur some time after 1 o'clock in
21  the afternoon?
22     A. I know I left work around noontime. I'm not
23  sure the exact time. On the way home when I hit

Page 47

1  Route 13, that's when I don't remember anything.
2      Q. Let me ask you this. Do you have any memory
3  of waking up and going to work that day?
4      A. Yes.
5      Q. And what did you do when you woke up?
6      A. I got dressed, showered, shaved, and
7  continued to go to work.
8      Q. Did you eat anything for breakfast?
9      A. No. Not that morning.
10     Q. Do you usually take a breakfast?
11     A. Not too much. Just usually a drink or
12  something.
13     Q. Do you recall the ride to work?
14     A. Yes.
15     Q. Anything unusual happen on the ride to work?
16     A. Around that time frame I -- it's not unusual
17  but I did have my daughter's car as opposed to my
18  vehicle. I don't know how important that may be.
19     Q. Was that a Pontiac LeMans?
20     A. Yes.
21     Q. What year was that?
22     A. Oh, I forget the exact year, sir.
23     Q. Apart from that you were driving a different

Page 48

1  vehicle, was there anything problematic about the
2  drive to work?
3      A. No.
4      Q. How did you feel going to work that day?
5      A. Very sick still, very tired. Lethargic. Not
6  feeling well at all.
7      Q. Did you do any work that day?
8      A. Yes.
9      Q. What type of work did you do?
10     A. Stock keeping.
11     Q. And is that the same type of work that you
12  described to me that you generally did at Digital,
13  Compaq, and Hewlett Packard?
14     A. That changed at the very end before I left.
15  They put me in another area. I just remembered that.
16     Q. Thank you. When did you get a different
17  assignment at those computer companies from which you
18  already told me?
19     A. I would have to say it was maybe a year
20  before I took the actual buyout package.
21     Q. 2001 to 2002?
22     A. Probably, yes, around 2001, 2002.
23     Q. What was the change in your duties at that

**49**

1  point?
2      A. I was receiving material to be put into stock
3  and basically inventorying everything to make sure it
4  was on balance accuracies.
5      Q. I didn't understand your last phrase. It
6  seems like a technical term. What does it mean? To
7  ensure what?
8      A. To make sure that everything that was put
9  into stock was exactly the counts that it was
10 supposed to be in regards to balance accuracy.
11     Q. What's a balance accuracy?
12     A. If you go in and look in your computer and
13 there's supposed to be X amount of items there, if
14 you notice there isn't and you're adding to it,
15 you've got to correct the issue and make sure the
16 balance accuracies are up to date also.
17     Q. Did you do that type of work on the morning
18 of June 15, 2001?
19     A. Yes.
20     Q. What time did you leave work?
21     A. It was around 11 or a little after from what
22 I remember.
23     Q. And certainly that was cutting your workday

**50**

1  short, true?
2      A. Yes.
3      Q. Why did you leave early?
4      A. I was going to a doctor's appointment.
5      Q. To which doctor were you headed?
6      A. He was a bacterial specialist. I'm not sure
7  of his name. I cannot remember it but it was in
8  Fitchburg.
9      Q. Who had referred you to that bacterial
10 specialist?
11     A. My primary, Doctor Scornavacca.
12     Q. On what basis, if he told you?
13     A. They weren't sure at that point why I have
14 this white film, which I still have today, on my
15 tongue and I was on different types of medication in
16 regards to a yeast infection, body infections, to see
17 if it would alleviate the symptoms.
18         But at that point Doctor Scornavacca had
19 mentioned to me, I'll be sending you to this
20 bacterial specialist to have him take a look at it
21 because this doesn't seem to be working, whatever is
22 going on, and I'd like to have him have a look at you
23 also.

**51**

1      Q. Now, when were you first prescribed drugs for
2  infection?
3      A. I really wasn't prescribed -- I don't know if
4  you caught that. I'm not an expert as far as
5  nystatin.
6      Q. When were you prescribed nystatin?
7      A. Roughly a few times during the year previous
8  to the incident. Let's say 2000. Around there.
9      Q. That was by your primary doctor?
10     A. Yes.
11     Q. When prior to June 15, 2001 had you last
12 taken nystatin?
13     A. I can't remember the exact date.
14     Q. I appreciate that. Can you -- Would it help
15 you if I asked you, was it more than a month prior?
16     A. I can't remember exactly when I had taken
17 that.
18     Q. You took no nystatin on June 15, 2001, true?
19     A. No. I wasn't on any of that, sir.
20     Q. Were you on any drug for the coating on your
21 tongue on June 15, 2001?
22     A. No.
23     Q. As I understand correctly then, you had a

**52**

1  prescheduled appointment with a specialist for the
2  coating on your tongue on June 15, 2001, is that
3  true?
4      A. Yes.
5      Q. And you had left work for that appointment?
6      A. Yes, sir.
7      Q. To your understanding was that appointment
8  also going to address your ongoing viral or cold
9  symptoms?
10     A. It wasn't really related at that time.
11     Q. Now --
12     A. To my knowledge.
13     Q. Thank you. Do you do punch cards at work?
14     A. No.
15     Q. What did you do to check out of work that
16 day?
17     A. You just let your boss know that you're going
18 to be leaving at a certain time.
19     Q. And you did that.
20     A. Yes.
21     Q. And do you remember telling your boss you
22 were leaving?
23     A. Yes.

53

1  Q. Do you remember leaving?
2  A. Yes.
3  Q. Do you remember driving home?
4  A. Yes, to a certain point.
5  Q. What point was that?
6  A. When I was leaving, the first thing I noticed
7  is when I walked outside I immediately started
8  sweating. And the next thing you know it was coming
9  down like I was in a shower, and what is going on?
10 What is this?
11      So I got in the car and I just wiped it
12 off and just continued to drive towards home and the
13 appointment near home.
14 Q. Did you use the air conditioner in the car?
15 A. That started to cross my mind when I got --
16 Being my daughter's car and not familiar and so
17 forth -- it's kind of an old model -- I wasn't even
18 sure if it even worked. I didn't know.
19      But when I got to Route 13 and turned on
20 to 13, I started to think about using it at that
21 point because the sweating was not stopping.
22 Q. Were you driving with the windows down prior
23 to the point where you considered using the air?

54

1  A. The last I remember, the window was down on
2  my side that I remember.
3  Q. Do you have any memory of closing the window?
4  A. None.
5  Q. Do you have any memory of turning on the air?
6  A. I don't believe I ever turned it on.
7  Q. Now, at some point do you remember pulling
8  your car off to the side of Route 13?
9  A. No.
10 Q. What is the last thing you remember in terms
11 of your trip to the doctor's office that day? Strike
12 that. Let me ask you a different question.
13 A. I was going to answer it if you wanted.
14 Q. It wasn't so bad when I think about it, so
15 I'll restate it. What is the last thing you remember
16 in terms of your trip to the doctor's that day?
17 A. The last thing I remember is putting my head
18 back and trying to take a deep breath. And then as I
19 was trying to relax so to speak, that's all I
20 remember was a deep breath. That's all I remember.
21 Q. Do you recall pulling the car off to the side
22 of the road?
23 A. No.

55

1  Q. Do you recall anything about your encounters
2  with a female Townsend officer who is now a
3  defendant, Mary Anne Kinirey, that day?
4  A. After the police station, yes. At the
5  hospital.
6  Q. With that in mind, let me be a little more
7  precise. Do you recall being initially approached by
8  Officer Kinirey?
9  A. No.
10 Q. Do you recall any discussion that you had
11 with her at the roadside before you were brought to
12 the police station?
13 A. No.
14 Q. Do you recall getting out of your car?
15 A. No.
16 Q. Do you recall any physical touching between
17 yourself and Officer Kinirey?
18 A. No.
19 Q. Do you have any memory -- Strike that. Have
20 you ever read the police report about this encounter?
21 A. Yes.
22 Q. And based on that, is it your understanding
23 that Officer Kinirey indicated that there was a

56

1  physical encounter between her and you on the
2  roadside of Route 13?
3  A. I remember her stating something in that
4  report in regards to that, yes.
5  Q. Are you able from your own personal memory to
6  deny or rebut Officer Kinirey's version of events as
7  set forth in that report?
8  A. I have no memory of any of the incident.
9  Q. I appreciate that. I'll stick with it just
10 for a moment more if I could.
11 A. Yes.
12 Q. Do you have any memory of being handcuffed?
13 A. No.
14 Q. Do you have any memory of the arrival of a
15 second officer at roadside?
16 A. No.
17 Q. Do you have any memory of being transported
18 to the police station?
19 A. No.
20 Q. Do you have any memory of verbally insisting
21 to Office Kinirey that you had to get going?
22 A. No.
23 Q. Do you recall any discussion concerning a

**57**

1 Breathalyzer at the police station?
2   A. Yes.
3   Q. What do you recall of that discussion?
4   A. I was at the police station. Well, I
5 remember this from everything coming into focus.
6 There was four officers, four police officers. I was
7 sitting down and they were all huddled in front of me
8 basically screaming at me.
9   Q. What were they saying?
10   A. You keep thinking you're in New Hampshire.
11 You keep thinking you're at work. You keep thinking
12 this. You know. Are you with us?
13       And they kept all coming at me at one
14 time with a lot of questions basically like, Where do
15 you -- you know -- What are you thinking and why are
16 you doing this or doing that?
17       I was very confused, and the only thing
18 I was trying to ask them is, What happened? They
19 said, Never mind what happened. We want you to take
20 a Breathalyzer and every time you say you understand
21 this and this and that, you drift off again.
22       And they asked again, Do you understand
23 what we're saying? I said, Yuh, I do, but what

**58**

1 happened here? What's going on? And they again
2 said, Never mind. And the next thing was I agreed,
3 Yes, I'll take the Breathalyzer.
4   Q. At any point do you recall providing the
5 officers with your wife's name as a contact?
6   A. No.
7   Q. Would it be fair to characterize -- Strike
8 that. Did any officer that you remember say
9 something to the effect or ask you something to the
10 effect, What's wrong with you?
11   A. I would assume that was asked, yes.
12   Q. Do you remember at any point declining to
13 take a Breathalyzer?
14   A. No. I was completely complying. As a matter
15 of fact, when I blew that first time into the
16 Breathalyzer, the next thing I heard -- and it was
17 dead silence -- was zero. And after that, Blow it
18 again, which I complied and did.
19   Q. Did you speak with your wife from the police
20 station at any point that day?
21   A. No. Not that I remember there, no.
22   Q. Do you remember any officer telling you that
23 they had spoken with your wife?

**59**

1   A. It's a little confusing still, no, not that I
2 remember.
3   Q. Now, as of June 15, 2001, is it accurate to
4 say your wife was a nurse?
5   A. Yes.
6   Q. And at that point was she working at U Mass.
7 Medical Center?
8   A. Yes. I believe someone called her and
9 alerted her to the fact that Tim had been arrested
10 and he was at the police station. And she in turn
11 called my brother-in-law Roy Bourque of Westminster,
12 Mass. to inform him of it, who was a good friend of
13 the family.
14   Q. What is the source of that belief?
15   A. This was after the fact I heard all this.
16 Not at the time.
17   Q. Did Mr. Bourque have any encounter with you
18 that day?
19   A. No.
20   Q. Did he have any encounters with the police to
21 your knowledge?
22   A. Yes.
23   Q. When did that take place and how did it take

**60**

1 place?
2   A. From what I was told after, he was talking
3 with my wife and the police at the same time and
4 trying to help out.
5   Q. Has he ever told you about any discussion he
6 had with the police?
7   A. Yes.
8   Q. What did -- To whom did he say he spoke, if
9 you recall?
10   A. I was never really given a name.
11   Q. But he told you he'd spoken with some police
12 official, correct?
13   A. Yes.
14   Q. What did he tell you he had said to that
15 person and the person had said to him?
16   A. He was trying to explain to them -- The way I
17 remember hearing some of it is that Tim is not a
18 violent person first of all. This isn't him.
19 Something's wrong. Trust me on this.
20       And then one of the responses back I
21 believe he had said to me was that that person stated
22 that this should have never happened, meaning
23 whatever.

Page 61

1  Q. Do you have any memory of being taken to
2  Leominster Hospital from the Townsend police station?
3  A. Yes.
4  Q. And were you taken in an ambulance?
5  A. Yes.
6  Q. Did you have any discussions with any EMTs or
7  paramedics involved with the ambulance that you
8  remember?
9  A. I was basically quiet.
10  Q. Do you have any memory of their conducting
11  any tests on you?
12  A. They were taking vitals at that point I
13  believe. Blood pressure and so forth.
14  Q. By the way, just to backtrack, I think you
15  did indicate that you had no memory of the arrival of
16  a second officer at the spot where you had stopped
17  your car, is that true?
18  A. No memory.
19  Q. Again, given that, it is fair to say, is it
20  not, that from your own personal memory you are
21  unable to deny or rebut the version of events that
22  that officer, Officer Morrison, recently provided
23  under oath?

Page 62

1  A. Yes.
2  Q. Okay.
3      MR. GALLAGHER: Objection to that.
4      THE WITNESS: I don't know if it --
5      MR. GALLAGHER: I'm just saying he has no
6  idea what he said.
7      MR. TEHAN: That's a good point.
8  Q. Do you have any memory of any encounter
9  between yourself --
10  A. That's what I thought you were asking.
11  Q. Should have. Do you have any memory of any
12  encounter between yourself and any police officer at
13  the side of Route 13 on June 15, 2001?
14  A. No.
15  Q. Do you have any memory of your ambulance
16  being followed by a police cruiser?
17  A. I thought I heard a siren but I don't know if
18  it was the ambulance, now that you're asking this
19  question, or a cruiser or being followed. I don't
20  remember.
21  Q. Did you have an understanding as to why you
22  were going to the hospital?
23  A. Yes, because at the police station after the

Page 63

1  second blow into the Breathalyzer it got extremely
2  quiet and the officers were quiet and just standing
3  there.
4      And then all of a sudden somebody else
5  came around the corner and approached me and said,
6  Sir, would you like to go to the hospital? And I
7  said, Yes, I would. I believe something is wrong
8  here and I'd like to be seen. And he said, Yes,
9  we're going to call an ambulance.
10  Q. Can you describe physically the officer who
11  asked you that question?
12  A. I can't.
13  Q. Was he polite to you in making that question?
14  A. It was pretty amazing as far as the way I was
15  being treated versus his so-called politeness.
16  Q. Well, I'll give you a chance to explain that
17  but was he polite to you?
18  A. At that point, yes.
19  Q. Is your first memory today being seated in
20  the police station with certain officers standing
21  around you?
22  A. Yes. That's when everything came into focus
23  at that police station with those four officers in my

Page 64

1  face.
2  Q. When you say focus, are you referring to a
3  mental focus, a visual focus?
4  A. Visual and mental, total. Just like a
5  picture. Boom. Here I am. (Indicating.)
6  Q. Do I understand that as you sit here today
7  and reflect upon that moment in time, you have some
8  concerns about the way you were treated?
9  A. Yes.
10  Q. What were those concerns? What are those
11  concerns? What happened?
12  A. Well, when I'm sitting there it was amazing
13  to me coming out of this so-called state of mind that
14  I don't remember anything. And the next thing you
15  know, you're sitting there with four people screaming
16  at you.
17      And first of all, I had no idea why they
18  were screaming at me, and I had to piece together all
19  this. The only thing I was asking them is, Can you
20  tell me what's going on? Can you explain it to me?
21      All I could think about by seeing the
22  police like this in this situation is that I hope I
23  didn't hurt anybody or do anything wrong here. I was

Page 65

1 extremely, extremely in shock and upset.
2     And I just wanted a little compassion
3 for a second just to alleviate something and show
4 them that, yes, I do understand the question; yes, I
5 am seeing you; yes, I understand you; yes, I will
6 take the Breathalyzer.
7     But it was such a sporadic, you know,
8 demand, and I just couldn't collect myself to give
9 them everything all at once. I wanted some questions
10 answered too if it was okay but --
11   Q. I understand.
12   A. It's an emotional feeling I think.
13   Q. To jump ahead just for a moment, after your
14 evaluation at the hospital did Officer Kinirey at
15 your request tell you what had happened?
16   A. She never really told me directly as far as a
17 long conversation. There was bits and pieces. She
18 was mentioning to me that it was quite the scene,
19 whatever that meant.
20     I think she explained a little bit as
21 far as they had to block the road, they had to stop
22 all traffic, they had to do this, that.
23     And I was just like in shock still

Page 66

1 trying to piece together all this, but I just
2 couldn't remember any of this stuff.
3     And then she mentioned -- I asked her
4 about why I'm so sore, why are my legs like really --
5 I'm hurting everywhere. And she said she had to use
6 the nightstick on me to get me down.
7     And it's just like a lot of those
8 questions were coming together little by little, you
9 know, at the hospital.
10   Q. And I'll get back to that in a moment. Do
11 you recall being evaluated in the hospital?
12   A. Yes. I was -- Go ahead. I'm sorry.
13   Q. Do you recall who evaluated you?
14   A. The doctor's name I do not recall. But I
15 just remember being on the bed and they hooked me up
16 to an IV which a nurse -- I assume a nurse was
17 hooking me up to an IV, and that immediately felt
18 like cold water rushing through my entire body and
19 feeling much better all of a sudden.
20     And I never really saw the doctor
21 himself. Basically I just talked to the nurse and
22 she said to, Just relax, honey, and you'll be okay.
23   Q. Did any medical personnel -- and that was at

Page 67

1 Leominster Hospital?
2   A. Yes.
3   Q. -- that day, June 15, 2001, suggest to you
4 that you were dehydrated?
5   A. I don't remember them saying anything. It
6 was just my assumption that obviously I was.
7   Q. Did you have any discussion with any medical
8 personnel that day as to the results of their
9 examination of you?
10   A. The only thing I remember is the doctor
11 coming in -- Officer Kinirey was there, the nurse was
12 there, and I was on the bed, and my son standing out
13 in the hall -- was him saying, I can't find anything
14 wrong at this point.
15     And he all of a sudden said, I know what
16 it is. It's speed. And I immediately looked at him
17 and said, I don't take drugs and I don't take speed.
18 The only thing I've been taking in the past week is
19 stuff for my cold, Vick's Nyquil gelcaps or whatever
20 they were called. He said, Oh, that will do it.
21 Pseudophedrine.
22   Q. The last --
23   A. Pseudophedrine I believe he said.

Page 68

1   Q. When he said the word speed, that's slang for
2 amphetamines, is that correct?
3   A. I believe that's what he was accusing me of
4 at that point. Taking drugs.
5   Q. And is it your memory that the doctor in the
6 emergency room, when you told him you had been taking
7 the Nyquil, stated that the contents of that drug
8 could explain your behavior? Is that a fair
9 statement of --
10   A. No, I don't --
11   Q. I'll give it to you a little clearer. Please
12 tell me once again, what did the doctor say in the
13 emergency department in terms of a possible link
14 between the Nyquil and your behavior?
15   A. He never said anything that I remember.
16   Q. Did you say a moment ago that he said
17 something to the effect that that might be it?
18 That's what I'm following up on.
19   A. I'm not following the question I believe.
20   Q. I'm sorry. We'll go back to square one.
21   A. Right.
22   Q. At some point after your examination at the
23 hospital was complete there was a discussion at which

## Page 69

1  yourself, Officer Kinirey, and the examining
2  physician were present, correct?
3     A. Yes.
4     Q. Forgive me for this but tell me again front
5  to back what the doctor said at that point.
6     A. All I remember is the doctor came in and he
7  says, I can't find anything wrong. Something to that
8  effect. And then he stopped for a second; I know
9  what it is. It's speed.
10        He said it in a derogatory way as far as
11 I was concerned. And also at that point I did have a
12 flash, mental flash, where I was thinking to myself,
13 This is a weird situation because is there anybody
14 here that wants to protect and serve and help me? I
15 mean, guys, what is this all about?
16        It's like thank God it wasn't in a town
17 in the olden days and, you know, I stole a horse or
18 something and there was a tree around. I hate to say
19 it this way but that's the feeling I was getting.
20        Anyways, to get back to it, that's
21 basically what he had said. And then my response
22 back to him immediately was, I don't take drugs and I
23 don't take speed or any of whatever you're saying.

## Page 70

1        And he said, Oh, pseudophedrine, that
2  will do it, after I had mentioned the Vick's Nyquil.
3     Q. Thank you. Did Officer Kinirey make any
4  response or comments after the doctor spoke?
5     A. The only response I saw in her was she lit up
6  like -- I'll describe it like a Christmas tree when
7  he said that.
8     Q. What does to light up mean?
9     A. Her eyes and her emotions and her attention
10 immediately became more attentive for a second. And
11 she looked at him -- When he said -- basically was
12 talking -- I know what it is, it's speed, she seemed
13 to what I describe as light up.
14    Q. Did she say anything?
15    A. No. I don't believe there was anything said
16 because right after he said it I said, I don't take
17 drugs, and so forth like I had stated.
18       And then when he said, Oh,
19 pseudophedrine, that will do it, she immediately --
20 back to her regular look so to speak. (Indicating.)
21    Q. Your son was at the hospital?
22    A. Yes.
23    Q. Do you recall when he arrived?

## Page 71

1     A. Oh, yes.
2     Q. Where were you when he arrived?
3     A. I was in the room and he was out by --
4  adjacent to the door of the room I was in, talking to
5  Officer Kinirey.
6     Q. Now, you're referring to an examination room?
7     A. Yes.
8     Q. Do you know how your son knew where to find
9  you?
10    A. I don't know.
11    Q. What is your boy's name?
12    A. Keith
13    Q. And where does Keith live now?
14    A. Right now he's living in Uxbridge, Mass.
15    Q. Do you know his street address?
16    A. I don't.
17    Q. With whom does he live there?
18    A. He's living with his wife's mother right now.
19 They're in transition of finding a new home. They
20 sold their other home.
21    Q. Keith is how old today?
22    A. About 29.
23    Q. Did your son -- Did Keith enter your room to

## Page 72

1  greet you when he arrived at the hospital?
2     A. I believe he did.
3     Q. Do you remember anything he said to you or
4  that you said to him?
5     A. I kept telling him, Keith, it's okay. I'm
6  fine. I'll be all right. Because I could see that
7  he was very, very concerned and he just seemed very
8  upset for some reason because he was detecting, from
9  what I could see from a distance, some attitude from
10 Officer Kinirey.
11       Because when he was trying to ask her
12 questions relative to the situation like, What
13 happened, can you explain to me anything, her
14 response to all this was basically, You got the
15 money? You got the money for the bail? That's all I
16 want. You got the money or not?
17       And he says, Is that an issue right now?
18 Can I find out exactly what happened to my dad here?
19 Look at him. He does not look good at all.
20       And I kept trying to yell out to Keith,
21 Keith, relax. Take it easy. I'm okay. Relax.
22 Basically that was it.
23    Q. Thank you. Let me backtrack and try to be

### Page 73

1 precise with you if I could. The initial question
2 was do you remember any discussion that you had with
3 Keith in the room.
4    A. That was my discussion.
5    Q. That you were reassuring him that things were
6 okay?
7    A. Reassuring him that everything was okay.
8    Q. When you say your son seemed upset and
9 concerned, did he appear angry to you?
10    A. Not angry. Just confused. Very confused
11 over the situation.
12    Q. Now, did you overhear any discussions between
13 Keith and Officer Kinirey while you were in the
14 examination room?
15    A. No. No.
16    Q. How is it then that you just testified that
17 there was a discussion about money?
18    A. That was loud. They were yelling at that
19 point.
20    Q. So did you hear any portion of the discussion
21 between Kinirey and Keith?
22    A. That part, yes.
23    Q. State it for the record, please, what you

### Page 74

1 heard.
2    A. I heard my son talking to Kinirey in regards
3 to he was asking her questions over what happened.
4 And her response to him was, Do you have the money?
5       And that's all I remember at that point
6 basically. And I kept reassuring my son that
7 everything was okay.
8    Q. Has Keith at any later time told you anything
9 additional that he and Officer Kinirey discussed?
10    A. I don't remember at this point if he ever
11 said anything.
12    Q. Did you hear raised voices?
13    A. It seemed to be getting at that point.
14    Q. On both the part of your son and Officer
15 Kinirey?
16    A. From what I could detect, she was raising her
17 voice and he was pleading with her in some way. They
18 were just gesturing at that point at each other.
19       And I'm not sure exactly. I couldn't
20 hear everything. I was being attended to and so
21 forth.
22    Q. Did you overhear any discussion between your
23 son and Officer Kinirey concerning whether or not he

### Page 75

1 could take you home directly from the hospital?
2    A. No. That was after they released me. I
3 started to come out of the room slow but sure and he
4 thought I was going to be able to go home.
5       But she started to explain to him, I
6 believe, that, No, he's under arrest. He's going
7 back to the police station.
8       And he was asking if it was -- Is this
9 necessary? Look at him. Look at his condition. He
10 can't even walk.
11       And she proceeded to put the cuffs on me
12 and he says, Is this necessary? Is this really
13 necessary? Please. Please. And I couldn't even get
14 in the police cruiser because my legs weren't
15 functioning at all, but I did eventually get them
16 into the cruiser and he followed us back to the
17 station.
18    Q. Okay. Were you prescribed any medications
19 upon discharge from the emergency room that day?
20    A. No. Just to follow up with fluids and see my
21 doctor.
22    Q. And did you see your doctor as follow-up?
23    A. I believe -- Yes. That was a couple days

### Page 76

1 later.
2    Q. What doctor was that, sir?
3    A. Dr. Thomas Scornavacca, Fitchburg, Mass.
4    Q. Now, if you can do this, distinguishing the
5 examination that was done of you at the hospital
6 which led the doctor to initially say he couldn't
7 find anything wrong, do you recall whether any
8 treatment of any type was given to you at the
9 hospital apart from the IV?
10    A. I don't recall any other treatment but the
11 IV.
12    Q. Okay. Now, were you handcuffed in the
13 examination room?
14    A. No.
15    Q. Were both hands free?
16    A. I believe so, yes.
17    Q. After your examination was concluded was it
18 at that point that the discussion between -- the
19 discussion at which you, Kinirey, and the doctor were
20 present occurred?
21    A. Could you ask that one again?
22    Q. Sure.
23    A. I'm trying to think of the exact times.

## Page 89

1 enlightened me with I believe.
2  Q. Is it fair to say that when you were asked
3 whether the officers involved with you had used
4 excessive force, that you did not claim at that point
5 that they had done so? Is that true?
6  A. I had no memory that they did.
7  Q. Okay.
8  A. No memory.
9  Q. Who paid the bail?
10  A. I believe my son had the money.
11  Q. How much was it, do you recall?
12  A. I don't recall, sir.
13  Q. How and when were you told that you would
14 have to go to court over this matter?
15  A. I can't remember exactly. I believe they
16 gave me the paperwork, something associated with it,
17 and some officer had maybe mentioned something. I
18 don't remember for sure because I was, like I say,
19 very sick and tired. I just needed to go home and
20 lay down.
21  Q. How did you get home?
22  A. My son took me.
23  Q. Did you learn that your car had been towed?

## Page 90

1  A. At that point I don't remember that. I
2 didn't ask anything.
3  Q. Who picked your car up or your daughter's car
4 up?
5  A. I have no idea. I believe, if I remember, it
6 was towed. So they had it impounded maybe.
7  Q. Eventually your daughter got her car back,
8 correct?
9  A. Yeah, she got it back. I didn't know all the
10 details involved in that.
11  Q. At some point did you make a decision to
12 engage a lawyer in connection with the criminal
13 charges against you?
14  A. Yeah. I had no choice.
15  Q. I understand. Whom did you engage?
16  A. McEvilly out of Leominster, Mass.
17  Q. What is that person's first name?
18  A. I just know him as McEvilly at this point.
19  Q. Why was it that you chose that particular
20 attorney?
21  A. He's a friend of the family. My wife's side.
22 Her sisters.
23  Q. And in your answer to interrogatory number 7

## Page 91

1 which appears on page 4 there's a reference that you
2 -- that there were lawyer fees of $2,000, is that
3 true?
4  A. Right.
5  Q. Did you actually pay McEvilly $2,000?
6  A. Yes.
7  Q. Now, after June 15 do I understand correctly
8 that several days later you saw your primary care
9 physician?
10  A. Um-hmm.
11  Q. Is that true?
12  A. Yes.
13  Q. And did you make any specific complaints
14 about any physical ailments to that doctor?
15  A. I had mentioned about the knees, the legs,
16 the swelling, the bruising all over the body, the
17 wrists numb and sore, and tingling in the thumb, of
18 just being very, very sore everywhere in regards to
19 all -- head to toe type of thing.
20  Q. Did the doctor provide any treatment for
21 those complaints?
22  A. No.
23  Q. Did you also discuss with the doctor --

## Page 92

1 Strike that. Is it fair to say that at the time you
2 saw your doctor -- and forgive me. This one is what
3 name please?
4  A. Doctor Scornavacca, my primary in Leominster.
5  Q. Would it be fair to say when you saw Doctor
6 Scornavacca you were also very concerned about your
7 memory lapse?
8  A. We were both concerned.
9  Q. The doctor as well.
10  A. Yes, he was concerned.
11  Q. Had you ever gone through a situation of a
12 blackout or loss of memory such as this prior?
13  A. No. Never in my life.
14  Q. Have you ever since?
15  A. No. I've never been that sick either that I
16 remember.
17  Q. I understand. What did you tell your doctor
18 in terms of your concerns about the memory issue?
19  A. We discussed it a little bit and he said,
20 Believe it or not, sometimes these things do happen.
21 And that's basically what I remember about the
22 conversation. It wasn't really at any length.
23  Q. Did Doctor Scornavacca -- Strike that. At

93

1  the time that you saw him several days after your
2  arrest you didn't, and to this day don't, have a
3  personal memory of the arrest, correct?
4      A. Correct.
5      Q. Did you get the police report to at least
6  learn the police version of events?
7      A. Absolutely.
8      Q. When did you do that?
9      A. I knew you were going to ask that but I can't
10 remember exactly when this was given to me. It was
11 at some point -- It was -- I got ahold of it.
12     Q. Was part of the reason you did that to assist
13 in the preparation of your criminal defense?
14     A. No. No. Not at all. I had no intentions of
15 any kind of like defending thing. I was still at the
16 point where in my mind, in my belief, they made a
17 mistake and they were going to just let it go or
18 something. And then it got to be really serious and
19 so forth.
20     Q. Did you ever present for review by a doctor
21 the police report?
22     A. Yes. I showed it to my primary, Doctor
23 Scornavacca.

94

1      Q. And was your purpose in doing that to say,
2  Look at what they said I did, how did this happen, or
3  something to that effect?
4      A. Yes.
5      Q. And when you said earlier that he made a
6  comment to the effect that, Believe it or not
7  sometimes these things happen, was that after you
8  reviewed the report with him?
9      A. I can't remember now which one was first.
10     Q. In any event, this case proceeded to court,
11 did it not?
12     A. Yes.
13     Q. And was it Ayer District Court?
14     A. Yes.
15     Q. Is it your understanding as you sit here
16 today that the prosecution involved two counts of
17 assault and battery on a police officer, those being
18 Officer Kinirey and Officer Morrison, disorderly
19 conduct, and resisting arrest?
20     A. Sounds right, yes.
21     Q. And you'd agree with me that a charge of
22 operating under the influence was never filed in
23 court against you as a result of the arrest on June

95

1  15, 2001.
2      A. Could you ask that one again?
3      Q. Sure. Let her read it back.
4      A. Because I'm trying to remember all this and I
5  don't have anything in front of me.
6          MR. TEHAN: If it doesn't make sense I'll
7  try again.
8      Q. (The question was read by the Court
9  Reporter.)
10     A. I'm trying to remember -- if I can see the
11 paperwork in front of me -- what the exact charges
12 were. I remember the assault charges and everything,
13 but the driving under the influence I can't -- I
14 think that -- I don't know if that was there. I
15 don't know.
16     Q. The trial was a bench trial, is that true,
17 not involving a jury?
18     A. Right.
19     Q. Was it before Judge Gilmartin?
20     A. That sounds familiar.
21     Q. Was the trial held on March 4th, 2002?
22     A. I believe so. I'm getting a cramp in my leg,
23 sir.

96

1          MR. TEHAN: Off for a second.
2          (Discussion off the record.)
3  (Whereupon at 11:50 a.m. the deposition recessed and
4  reconvened at 12:22 p.m.)
5      Q. Would it be fair to say that you did not
6  testify at the trial?
7      A. I didn't.
8      Q. Were you present at the trial?
9      A. Yes.
10     Q. And is it fair to say that the only witness
11 for the Commonwealth was Officer Kinirey?
12     A. Yes.
13     Q. Did you understand the defense to be
14 presented -- Did you understand the defense that was
15 presented on your behalf in open court that day by
16 your attorney to be that you lacked the necessary
17 intent or criminal intent which was required in order
18 to find you guilty of the crimes in which you were
19 charged?
20         MR. GALLAGHER: Objection to the form of
21 that.
22     Q. If you follow it you may answer, sir.
23         MR. GALLAGHER: Yes.

## Page 105

1  suspended or revoked?
2      A. It was never suspended.
3      Q. Let me ask you, sir, to review interrogatory
4  number 8 and your response to that interrogatory.
5  And when you've done that, let me know and I'll ask
6  you some further questions.
7      A. Okay.
8      Q. I'm going to read into the record the
9  question, and when I've done so would you confirm
10 please that I did that accurately?
11     A. Yes.
12     Q. Interrogatory number 8 states, Please set
13 forth in full and complete detail the nature and
14 extent of all injuries physical, emotional or mental
15 in nature allegedly suffered by you as a result of
16 the occurrences set forth in the complaint, including
17 in your response, A, the name and address of each
18 hospital, medical professional, and mental health
19 professional which rendered treatment to you,
20 providing a complete description of the treatment you
21 received and the inclusive dates thereof, and, B, the
22 dates between which you were absent from your
23 employment and your school as a result of the

## Page 106

1  occurrence as set forth in the complaint.
2          Mr. LaFrenier, did I read the question
3  accurately into the record?
4      A. Yes.
5      Q. And your response was, Wrists pain, including
6  swelling, bruising, tingling, numbness in thumbs, and
7  some loss of strength, arms and elbow pain with
8  swelling and bruising, knee pain with swelling and
9  bruising, jaw pain with tightness, possibly
10 misaligned jaw, increased neck rigidity, ringing in
11 the inner ear, likely bulging disc, overall joint and
12 body aches with bruising.
13         Again, sir, would you confirm that I
14 read your answer into the record accurately?
15     A. Yes.
16     Q. Now, with respect to the wrists pain
17 including swelling, bruising and tingling, did you
18 receive any medical treatment for that condition?
19     A. No.
20     Q. And when did the wrists pain including
21 swelling, bruising, and tingling end?
22     A. It took months before it stopped.
23     Q. The next thing you reference is numbness in

## Page 107

1  the thumbs. Again I would ask you did you take any
2  medical treatment for numbness in thumbs?
3      A. No, but I believe it was associated to the
4  wrist problem also.
5      Q. I understand. Did it resolve within the same
6  time frame?
7      A. They all seemed to subside in their own way.
8  Not really all at once. Within time the wrists
9  started to feel better, the feeling started to come
10 back in the thumb areas and hand.
11         But it was almost like your strength was
12 affected, too, because it was so numb you had no idea
13 and the pain at first that it started out with.
14     Q. I understand. Would it be accurate to say
15 that the numbness in the thumbs and the loss of
16 strength that you referred to, as well as the
17 bruising and tingling of the wrists, resolved within
18 a couple of months of your arrest?
19     A. Within I'd say four months or less.
20     Q. All right. You next reference arms and elbow
21 pain with swelling and bruising, and I would ask you
22 did you take any medical treatment for those
23 conditions?

## Page 108

1      A. When you say medical treatment, things like
2  ibuprofen. I self-treated --
3      Q. Okay.
4      A. -- is what I'm saying.
5      Q. Sure. I appreciate that.
6      A. Taking ibuprofen in the morning, three, and
7  three at night to get an antiinflammatory effect.
8      Q. Apart from that and --
9      A. No.
10     Q. Conceding that that would be medical
11 treatment of some type did you take any other
12 treatment?
13     A. No.
14     Q. And how long did it take for the arms and
15 elbow pain with swelling and bruising to resolve?
16     A. It took a few months for that to get back to
17 normal.
18     Q. You next mention knee pain with swelling and
19 bruising. And as I understood it, you took the
20 ibuprofen for all your pains and aches, correct?
21     A. Yes. Yes.
22     Q. Apart from that did you take any medical
23 treatment for knee pain with swelling and bruising?

**121**

1 between Mr. Bourque and an officer of the Townsend
2 Police Department?
3     A. That's what I found out after, yes.
4     Q. After June 15th of 2001?
5     A. Yes. After that day I believe.
6     Q. And I believe you testified on direct
7 examination that the officer said, This should never
8 have happened.
9     A. Yes.
10    Q. To Mr. Bourque.
11    A. That's what Mr. Bourque had said to me.
12    Q. And what did you take that to mean?
13        MR. TEHAN: Objection. Irrelevant. You
14 can answer.
15    A. It was almost as if to say --
16    Q. Just asking what you took it to mean.
17    A. That's what I'm getting at. What I took it
18 to mean is this whole incident, the arrest, and the
19 way they handled the whole situation was a screw-up
20 on their part and it never should have went down the
21 way it did. It was a simple distress call which
22 turned into a nightmare.
23    Q. At the trial, your trial in Ayer District

**122**

1 Court, was there any mention of whether or not there
2 was an ambulance at the scene on Route 13, Dudley
3 Road?
4     A. Yes. And that was my first time hearing it
5 actually. I had no idea that an ambulance had shown
6 up, but Mr. McEvilly my lawyer at the time was cross
7 examining Kinirey on the stand, and the next thing he
8 mentioned to her after the fact that -- he was asking
9 her if Tim was incoherent basically and he said, By
10 the way, who waved off the ambulance? And her
11 response was, He did.
12    Q. As a result of your examination at the
13 Leominster Hospital on June 15, 2001, did you learn
14 anything with regard to your white blood cell count
15 on that day?
16    A. Yes. It was noticed by a Doctor Parker in
17 Boston, who I had seen for another opinion in regards
18 to my Meniere's problem, that it was very important
19 that I mention to everyone -- which he thought was
20 extremely important -- that my white cell count was
21 17-nine, 17,900, and that normal was in the 5 to 8
22 range or something which I've been told. And that
23 constituted a viral -- a pretty serious infection of

**123**

1 some type.
2     Q. At the hospital did the doctor who treated
3 you rule out that you had been under the influence of
4 speed?
5     A. In my opinion, yes.
6         MR. TEHAN: I'll object. Move to strike.
7     Q. What do you base that opinion on?
8     A. Well, my answer alone to him is that I
9 thought he was talking drugs as in speed drugs,
10 illegal drugs, and I was only taking the required
11 amount of medication at night like I had stated, and
12 it's normal for people in my opinion to take that
13 and, yes, it does show up sometimes, the
14 pseudophedrine, I believe, in it.
15    Q. At some point in time after you were charged
16 with various counts here did you hear that there was
17 a possibility of a jail sentence on the charge of
18 assault and battery on a police officer?
19    A. Yes. I was thinking for a second.
20    Q. The answer is yes?
21    A. Yes.
22    Q. And you learned that from your trial counsel?
23    A. Yes.

**124**

1     Q. And how did that affect your thinking when he
2 told you there's a possibility or the crime alleged
3 allows for the possibility of a judge sentencing you
4 to jail if you're convicted?
5     A. To be honest with you, I was very, very
6 scared and very upset, very emotional over it,
7 because I really deep down inside did not think that
8 they would actually push it that far and prosecute me
9 to that point.
10    Q. And talking to Doctor Scornavacca, would that
11 be within days of June 15, 2001?
12    A. Yes.
13    Q. And at some point did he say something to the
14 effect, Sometimes these things happen?
15    A. Yes. He did mention that to me.
16    Q. And in what context was that said?
17    A. Well, when I was talking to Doctor
18 Scornavacca about it and he could see I was a little
19 upset and nervous over it and worried over what
20 happened, he said, Tim, based on the situation at
21 hand, the Klonopin and the Vick's Nyquil, the cold,
22 the infection, the white blood cell count, and when
23 you add it all up, believe it or not, this sometimes

# **EXHIBIT B**



# TWIN CITY FAMILY PRACTICE

DR. THOMAS J. SCORNAVACCA, Jr.

50 Memorial Drive, Suite 103
Leominster, MA 01453
Telephone: (978) 534-8607
Fax: (978) 840-4670

August 20, 2001

TO WHOM IT MAY CONCERN:    RE: Timothy Lafrenier
                           D/B: 12/18/53

Timothy Lafrenier with the above date of birth is a patient of mine who is very concerned with a most recently episode of confusion. Mr. Lafrenier was seen in the Emergency Dept. on 6/15/01 transported via ambulance from the Townsend Police Department for evaluation of disorientation. From the account from the officer, after reading the police report, it is very evident that Mr. Lafrenier was acutely disoriented and confused, completely unaware of the events of this episode and therefore had no awareness of his actions.

The weekend prior to this event Mr. Lafrenier was complaining of severe upper respiratory infection symptoms "of a head cold." He had voluntarily discontinued his Klonopin 1 mgs. twice a day, as he was concerned that the over-the-counter medications for his cold would interact with this. He stopped the Klonopin on that Sunday evening, had been taking Vicks NyQuil in heavy doses in order to feel better, and attempted to go to work on the day in question. He came home at noontime because of an appointment for medical evaluation for another problem, when this episode occurred.

After reviewing the medical history from the Emergency Department, including tests, both blood and urine, it is clear to me that he had an acute altered mental status unrelated to drug abuse or alcohol abuse. It is quite possible that a combination of discontinuing the Klonopin, as well as large doses of Vicks NyQuil which has heavy sedatives, could easily cause his confusion and somewhat combativeness. He was obviously disoriented, and quite possibly had fevers and chills during the several days prior. Mr. Lafrenier suffers from a disease called Meniere's disease which affects the middle ear on the left, causing ringing, and unsteadiness, and has been fully evaluated by an ENT specialist for this problem. The Klonopin is used to try and treat some of these symptoms, but has sedative effects as well. Acutely discontinuing this medication can cause somewhat of a withdrawal syndrome, which again may be contributing to this prior episode.

After knowing Mr. Lafrenier for nearly 1 year, it is obvious to me that he is not an overly aggressive man, and I cannot imagine that this combativeness was anything intentional. If you need any further information, I would be pleased to answer any questions you may have.

Sincerely,

Thomas J. Scornavacca, Jr., D.O.

TJS:an