# EXHIBIT C

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
                     FOR THE
 2              DISTRICT OF MASSACHUSETTS

 3                        .

 4   TIMOTHY L. LA FRENIER,
             Plaintiff
 5
     VS.                    NO. 04-40114-FDS
 6
     MARY ANNE KINIREY, DANIEL
 7   MORRISON, THE CHIEF OF
     POLICE, "JOHN DOE", and
 8   THE TOWN OF TOWNSEND,
             Defendants
 9

10

11

12       DEPOSITION of MARY ANNE KINIREY, taken at the

13   request of the plaintiff, pursuant to Rule 30 of

14   the Federal Rules of Civil Procedure, before

15   Michael Gruber, a notary public in and for the

16   Commonwealth of Massachusetts, on July 18, 2005,

17   commencing at 10:10 a.m., at the offices of Sean

18   Gallagher, Esq., 74 Elm Street, Worcester,

19   Massachusetts.

20

21

22

23

24
```

Page 2

```
 1   A P P E A R A N C E S:

 2   FOR THE PLAINTIFF:

 3   SEAN J. GALLAGHER, ESQ.
     74 Elm Street
 4   Worcester, Massachusetts 01609

 5   FOR THE DEFENDANTS:

 6   JOSEPH L. TEHAN, JR., ESQ.
     KOPELMAN AND PAIGE, P.C.
 7   31 St. James Street
     Boston, Massachusetts 02116
 8

 9

10

11   Also Present: Daniel T. Morrison

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 3

```
 1                   I N D E X

 2         DEPONENT: MARY ANNE KINIREY

 3                                      PAGE

 4   EXAMINATION BY MR. GALLAGHER          4

 5   EXAMINATION BY MR. TEHAN             97

 6   FURTHER EXAMINATION BY MR. GALLAGHER 131

 7   FURTHER EXAMINATION BY MR. TEHAN     139

 8   FURTHER EXAMINATION BY MR. GALLAGHER 141

 9

10

11

12

13

14              EXHIBITS

15                                      PAGE

16

17     1    Complaint, with Attachments  17

18     2    Registry of Motor Vehicles

19          Form                         84

20

21

22

23

24
```

Page 4

```
 1        MR. TEHAN: I think we can agree that

 2   all objections except as to form and motions to

 3   strike will be reserved until the time of trial.

 4        We will waive notarization and filing,

 5   but I would like each defendant to have the

 6   opportunity to read and sign the transcript, and

 7   I believe we could agree that the transcript will

 8   be deemed signed as transcribed if no changes are

 9   made within 30 days of counsel's receipt.

10        Would that be acceptable?

11        MR. GALLAGHER: That's agreeable, sure.

12

13

14        MARY ANNE KINIREY,

15   having been satisfactorily identified

16   by the production of her State-issued

17   photo identification, and duly sworn by

18   the Notary Public, was examined and

19   testified as follows:

20

21   EXAMINATION BY MR. GALLAGHER:

22

23     Q. My name is Sean Gallagher. I represent

24   the plaintiff in this case. His name is Timothy
```

Page 13

1      You may answer. Give him your
2  understanding.
3      A. It's my understanding that probable
4  cause is the knowledge -- or, after viewing or
5  watching a person, or statements made by a
6  person, that I have probable cause to move --
7  either make an arrest, do field sobriety tests or
8  bring it to the next level up.
9      Q. Okay. What's the next level up?
10     A. It depends what the situation is.
11     Q. Okay.
12     A. Place him under arrest, ask him to
13  perform field sobrieties. If it's not an OUI
14  case, something -- summons them. I mean, whatever
15  the crime is.
16     Q. Okay. Can you give a more precise
17  definition of what probable cause is?
18         MR. TEHAN: He's asking you in a
19  general sense, not linked to a particular crime,
20  I believe.
21     Q. Yes, in a general sense.
22     A. My belief or knowledge that a crime
23  had been committed.
24     Q. The academy occurred in 1995?

Page 14

1      A. In 1994.
2      Q. 1994. You successfully completed the
3  academy?
4      A. Yes.
5      Q. How soon after that were you hired as
6  a Townsend police officer?
7      A. I was sworn in in February of 2005 --
8  I mean, I'm sorry, 1995.
9      Q. What would the gap have been between
10  finishing the academy and being sworn in,
11  time-wise?
12     A. The town -- the --
13         MR. TEHAN: He's asking the duration.
14     A. How long? I'm sorry.
15     Q. You finished the academy, and then a
16  certain time went by before you were sworn in as
17  a police officer. So I want to know how much time
18  went by.
19     A. I believe it was two months.
20     Q. After being sworn in as a police
21  officer periodically did you receive further
22  training and instruction in how to be a police
23  officer?
24     A. Yes.

Page 15

1      Q. How often would that occur?
2      A. Couple of times a year.
3      Q. How would that be done? Would it be
4  formal classes? Would you go someplace to receive
5  further training and instruction?
6      A. Classroom training? Yes.
7      Q. And that would be twice a year?
8      A. Couple of times a year, yes.
9      Q. Where would those training sessions
10  be?
11     A. As of late -- our police department.
12     Q. Do you know who would be the
13  instructors?
14     A. Yes.
15     Q. Who would those be?
16     A. The last class was Lieutenant Bozikas,
17  Fitchburg P.D.. I don't know if I said his name
18  correctly. Lieutenant Bozikas.
19     Q. During those training sessions,
20  instruction sessions, there would be an officer
21  who would be higher up in rank, more experienced?
22     A. Yes.
23     Q. I want to call your attention to June
24  15, 2001. I would ask you to take a look at this

Page 16

1  document, and I'll provide one to your counsel.
2         MR. TEHAN: Thank you.
3         (Handed to witness.)
4      Q. I would ask you to take a look at it.
5         MR. GALLAGHER: Here's one for you. I
6  believe they're the same document.
7         (Handed to Mr. Tehan.)
8         MR. TEHAN: Thank you.
9         Just look it over and let him know
10  when you're done.
11         (Witness examining document.)
12     Q. Do you recognize that document?
13     A. Yes.
14     Q. And that's a police report written by
15  you, page 2 through page --
16     A. 5.
17         MR. TEHAN: I think that her report
18  states on it pages 1 to 4, but they are pages 2
19  to 5 with the exhibit she's got in front of her.
20     Q. Do you recognize what the first page
21  is of that collection?
22     A. Yes.
23     Q. And what is that?
24     A. It's a complaint, a criminal

Page 17

1　complaint.
2　　　　MR. GALLAGHER: Can that be marked as
3　an exhibit, her document?
4　　　　(Document marked.)
5　　Q. With regard to the police report, have
6　you had an opportunity to review that in the
7　recent past, last couple of weeks or something
8　like that?
9　　A. Yes.
10　　Q. When is the last time you looked at
11　it?
12　　A. Monday. Last Monday.
13　　Q. You read the whole thing last Monday?
14　　A. Reviewed it.
15　　Q. All right. Did you read it from
16　beginning to end, last Monday?
17　　A. No, I did not.
18　　Q. I want to ask you some questions based
19　upon what I read in the police report, okay?
20　　　　On June 15, 2001, you were working
21　that day, correct?
22　　A. Yes.
23　　Q. And do you remember the time of your
24　shift?

Page 18

1　　A. I worked the day shift.
2　　Q. It began at eight a.m.?
3　　A. Yes.
4　　Q. And it ended at four p.m.?
5　　A. It was supposed to, yes.
6　　Q. I want to draw your attention to
7　approximately 12:40 on June 15. Do you recall
8　where you were at that time?
9　　A. Yes.
10　　Q. And where was that?
11　　A. Dispatch center.
12　　Q. What happened at that approximate
13　time, while you were at the dispatch center?
14　　A. A motorist came in to report a car on
15　the side of the road with a gentleman who wasn't
16　feeling well -- looked like he wasn't feeling
17　well -- in it.
18　　Q. And who else was there when that
19　report was made, other than you?
20　　A. The dispatcher.
21　　Q. Do you recall the dispatcher's name?
22　　A. Diane.
23　　Q. Do you recall the last name?
24　　A. I can't think of her last name.

Page 19

1　　Q. Does she still work at the Townsend
2　Police Department?
3　　A. Yes, she's the head dispatcher.
4　　Q. When this motorist came in and said
5　there was someone who didn't look well, was the
6　motorist talking to you in particular or talking
7　to the dispatcher or both of you?
8　　A. Both of us.
9　　Q. When this motorist said that what did
10　you think about that at that point in time, when
11　the motorist said there's somebody who doesn't
12　look well?
13　　A. What did I -- I don't understand what
14　you mean.
15　　Q. Did that cause any immediate thoughts,
16　when you heard that?
17　　A. That I should go check on them.
18　　Q. Okay. Any other thoughts?
19　　A. Just go check on them, see what the
20　situation was.
21　　Q. Did you think at that point in time
22　that that motorist was ill or sick?
23　　A. I didn't know. I didn't see him. I
24　don't know what that other motorist considered

Page 20

1　not feeling well meant, or didn't look well.
2　　Q. Did you ask the motorist any questions
3　after the motorist said there was a person who
4　didn't look well on the road?
5　　A. Yes.
6　　Q. And what questions were those?
7　　A. What did he mean by that.
8　　Q. Okay. And it was a male motorist who
9　came in?
10　　A. Yes.
11　　Q. When you say, "What do you mean by
12　that?" what was his response?
13　　A. That as he drove by he saw someone
14　slumped over the wheel of the vehicle on the side
15　of the road.
16　　Q. When he told you there was somebody
17　slumped over the wheel on the side of the road
18　did you think that that person was ill or sick?
19　　A. It was one of my thoughts, yes.
20　　Q. What were your other thoughts?
21　　A. I tried to think of everything it
22　could have been. He could have been sick, he
23　could have been sleeping, he could have been just
24　picking something up and the motorist -- he could

Page 21

1  have been -- the motorist could have been
2  completely wrong. He could have been just picking
3  something up off the floor. It just went -- if
4  this happens I was just trying to figure out what
5  my plan was going to be.
6      Q. At that point in time, when it was at
7  least one of your thoughts that the motorist
8  might have been sick or ill, did you contemplate
9  calling for medical assistance?
10     A. Yes.
11     Q. And did you talk to anybody about
12  that?
13     A. Yes.
14     Q. Who did you speak to?
15     A. The dispatcher.
16     Q. And what was that conversation?
17     A. That I would go check, and if I need
18  an ambulance I would let you know over the air.
19  Not to start it.
20     Q. You drove out there. Was it in a
21  marked cruiser?
22     A. Yes.
23     Q. Were you in full uniform?
24     A. Yes.

Page 22

1      Q. And did you pull your motor vehicle in
2  back of the motor vehicle that was stopped?
3      A. Yes.
4      Q. And could you describe the area where
5  this motor vehicle was stopped?
6      A. Side of the road -- side of Route 13.
7  It was on the outbound side.
8      Q. Is there a breakdown lane there?
9      A. No.
10     Q. Route 13, how many lanes and --
11     A. Two-lane highway. Runs north and
12  south.
13     Q. One lane in each direction?
14     A. Yes.
15     Q. He was in the southbound lane?
16     A. Yes.
17     Q. Was the vehicle off the roadway?
18     A. Yes.
19     Q. How it was parked, did you take any
20  particular notice to how it was parked?
21     A. It was just off the side of the road.
22     Q. There was nothing indicative in how it
23  was parked in relation to whether or not the
24  person had been driving under the influence of

Page 23

1  alcohol.
2      MR. TEHAN: Just by that factor?
3      MR. GALLAGHER: Just by that factor.
4      MR. TEHAN: All right. If you
5  understand that, go ahead.
6      A. I don't understand what you mean.
7      Q. It wasn't parked crooked? It wasn't
8  parked awry? It was --
9      A. It was parked on the side of the road.
10 I wouldn't say it was perpendicular to the road
11 completely. It was off the side of the road as if
12 somebody had just turned off to the side of the
13 road.
14     Q. I take it you approached the driver of
15 the vehicle.
16     A. Yes.
17     Q. And at this point you were alone.
18     A. Yes.
19     Q. And as you approached the vehicle what
20 observations did you make?
21     A. That the motor vehicle was running,
22 the windows were rolled up, the operator was
23 sweating profusely, and he seemed a little
24 confused.

Page 24

1      Q. These are observations you made. Where
2  were you standing in relation to the driver of
3  the vehicle?
4      MR. TEHAN: At the point of making the
5  observations she just described?
6      MR. GALLAGHER: That's correct.
7      MR. TEHAN: Go ahead.
8      A. Walking up, I noticed that the vehicle
9  was on -- walking up, I noticed that the windows
10 were rolled up. When I got to the door jamb
11 behind the driver I looked in. That's where  I
12 was standing.
13     Q. Now, was the driver slumped over at
14 that point in time?
15     A. He was head-down. He wasn't slumped
16 over the steering wheel, no.
17     Q. His head was down against his chest?
18     A. He was down, looking at his lap area.
19     Q. At what point in time could you tell
20 whether his eyes were open or closed?
21     A. When I knocked on the window.
22     Q. Was there a response by the driver
23 when you knocked on the window?
24     A. He turned his head and looked up.

Page 25

1   Q. At that point in time you could see
2  that he was sweating profusely.
3   A. Yes.
4   Q. And the window was still rolled up at
5  this time.
6   A. Yes.
7   Q. And with regard to his eyes, they
8  weren't red or bloodshot, were they?
9   A. They were glassy.
10   Q. That was something you didn't note in
11  your police report?
12       MR. TEHAN: I object to it. It speaks
13  for itself.
14       If you care to confirm that.
15       (Witness examining document.)
16   A. At that time, no, I didn't.
17   Q. When you see him as you've described
18  him, head down, looking into his lap, sweating
19  profusely, in connection with the other
20  information you had -- for example, the motorist
21  saying that there was a driver on the side of the
22  road who didn't look well -- at that point in
23  time did you think you had a person who was sick
24  or ill?

Page 26

1   A. It was one of my thoughts, yes.
2   Q. What were your other thoughts?
3   A. That perhaps he'd be under -- he was
4  under the influence.
5   Q. And you based that thought on what
6  facts or observations?
7   A. His confused state. Simple tasks.
8   Q. I would like to back up a second,
9  though.
10       While the window was still rolled up,
11  you can see that he's sweating at that point in
12  time, right?
13   A. Yes.
14   Q. And you had already seen that his head
15  was down, facing into his lap, correct?
16   A. Yes.
17   Q. Now, just at that point in time did
18  you have an opinion as to whether this person was
19  sick or ill?
20       MR. TEHAN: Excuse me. That's before
21  she knocked on the window, correct?
22       MR. GALLAGHER: That's correct.
23       MR. TEHAN: All right, go ahead.
24   A. It was one of my concerns, yes.

Page 27

1   Q. And at that point in time did you
2  think about calling and asking for medical
3  assistance?
4   A. No.
5   Q. And why is that?
6   A. I wanted to talk to him first.
7   Q. You knocked on the window.
8   A. (Nodding.)
9   Q. And he turned and faced you?
10   A. Yes.
11   Q. And was he pale?
12   A. Yes.
13   Q. As a police officer you had some
14  training in detecting whether a motorist or
15  driver had been or was operating under the
16  influence of alcohol.
17   A. Yes.
18   Q. And I take it that was done at the
19  academy.
20   A. Yes.
21   Q. And you had some subsequent training,
22  as well?
23   A. Yes.
24   Q. In that training was one of the

Page 28

1  indications that a person was under the influence
2  of intoxicating liquor that they would be
3  sweating profusely?
4   A. I don't recall that being a
5  prerequisite.
6   Q. Let me ask you, in regard to being
7  pale, in your training or instruction in
8  detecting a motorist who was under the influence
9  of intoxicating liquor, was that a factor in
10  looking at or determining whether or not somebody
11  was under the influence of alcohol?
12   A. Looking pale?
13   Q. Looking pale.
14   A. I don't recall that.
15   Q. You said you had some thought that the
16  person might have been sick or ill at the point
17  you're standing at the window, and you also said
18  that you had some other thoughts apart from that.
19   A. (Nodding.)
20   Q. Is that correct?
21   A. Yes.
22   Q. And those other thoughts were what?
23   A. Besides being ill?
24   Q. Right.

Page 29

1     A. Tired, confused, medical condition.
2     Q. At that point in time, while you were
3   at the window and the window was still rolled up,
4   there was no factor at that point in time that
5   would indicate to you that this person was under
6   the influence of intoxicating liquor.
7     A. At that point?
8     Q. At that point.
9     A. Correct.
10    Q. After you knocked on the window and he
11  looked at you, what happened then?
12    A. I asked him to roll down the window.
13    Q. And did he respond to that?
14    A. No.
15    Q. When you asked him to roll down the
16  window I take it you said it in a loud enough
17  voice so that he would hear you even though the
18  window was rolled up.
19    A. I would have to assume, yeah.
20    Q. He didn't respond by rolling down the
21  window. What did he do?
22    A. He went back to his task, which was on
23  his lap.
24    Q. And that task would be what?

Page 30

1     A. Attempting to open a cigarette pack.
2     Q. And what did you see with regard to
3   that, what he was doing with his hands?
4     A. He was trying to open the pack, and he
5   couldn't get it open.
6     Q. What did you do after that?
7     A. Knocked on the window.
8     Q. For a second time.
9     A. (Nodding.)
10        MR. TEHAN: You have to answer
11  verbally.
12    A. I'm sorry. Knocked on the window, yes.
13    Q. And that was the second time.
14    A. Yes.
15    Q. What happened then with regard to him?
16    A. He looked up and went back to his
17  task. I believe it took me a couple of knocks for
18  him to roll down the window.
19    Q. Each time you're asking him to roll
20  down the window.
21    A. I -- yes.
22    Q. And at some point he rolls down the
23  window, true?
24    A. Yes.

Page 31

1     Q. And then what happens between you and
2   him?
3     A. We had a conversation.
4     Q. What do you say and what does he say?
5     A. I ask him if he's all right.
6     Q. And what did he respond to that?
7     A. He didn't -- he looked confused. He
8   just was staring at me.
9     Q. Still sweating?
10    A. Sweating.
11    Q. Still pale?
12    A. Still pale.
13    Q. At that point in time, when he doesn't
14  respond to your question, did you think he was
15  ill or sick?
16    A. Yes.
17    Q. Did you speculate on what that illness
18  or sickness might have been?
19        MR. TEHAN: He's asking if you did so
20  at that time.
21    Q. At that time.
22    A. At that time? Yes.
23    Q. What were your thoughts on that?
24    A. Maybe he was a diabetic.

Page 32

1     Q. After you had that thought that maybe
2   he was a diabetic, did you call for medical
3   assistance?
4     A. At that point, no.
5     Q. Did you have some training as a police
6   officer with regard to the possibility that a
7   motorist might be a diabetic, and how that would
8   manifest itself?
9         MR. TEHAN: I'll object to the form.
10        I caution you that it would be
11  training prior to that date.
12    A. I don't understand.
13    Q. At some point during your training
14  prior to that date did you receive some training
15  on how to differentiate between a person, a
16  motorist, who might be a diabetic as opposed to a
17  motorist who might be under the influence of
18  intoxicating liquor?
19    A. In first responder.
20    Q. Okay. And --
21    A. There were signs to look for.
22    Q. What's first responder?
23    A. It's -- first responder is like -- a
24  first aid class. Because you're the first one to

Page 33

1  arrive at the scene prior to an ambulance.
2      Q. Was that at the academy or after the
3  academy?
4      A. Both.
5      Q. What were you taught in regard to
6  making some distinction between whether a
7  motorist is a diabetic or a motorist is under the
8  influence of intoxicating liquor?
9      A. The sweating of the person, the daze
10  and confusion, and I -- there is an odor that
11  emanates through that you can smell on the person
12  who is having a diabetic reaction.
13      Q. All right. So what you had seen of the
14  driver, he had some signs that would be
15  consistent with being a diabetic. Would that be
16  true?
17      A. Some of the signs, yes.
18      Q. Some of the signs. And that would be
19  sweating and that would be confusion.
20      A. Yes.
21      Q. What signs did he have that would be
22  inconsistent with being a diabetic?
23      A. What sign did he not show?
24          MR. TEHAN: Well --

Page 34

1          MR. GALLAGHER: Let me withdraw that
2  question.
3      Q. I'll ask you another one.
4          The driver of the vehicle was Timothy
5  LaFrenier, correct?
6      A. Yes.
7      Q. What difficulty is a diabetic having
8  when you see him and he's sweating profusely and
9  he appears to be confused?
10          MR. TEHAN: I'll object. I don't
11  understand the question.
12          If you do, you may answer.
13      A. I don't. I'm sorry.
14          MR. TEHAN: My question is what
15  difficulty is he having. I don't know if you're
16  seeking a medical opinion.
17      Q. Just in your emergency training, you
18  received some training with regard to whether or
19  not the driver might be a diabetic as opposed to
20  somebody who is under the influence of
21  intoxicating liquor, right?
22      A. Yes.
23      Q. And during that training did they tell
24  you what problem a diabetic might be having

Page 35

1  health-wise?
2      A. I don't understand what you -- the
3  whole medical --
4      Q. Well, diabetics certainly can be
5  people who look perfectly healthy, correct?
6      A. Correct.
7      Q. And so when there's a diabetic who
8  doesn't look perfectly healthy, where he's
9  sweating and he's confused, you would agree with
10  me the diabetic is having some sort of problem.
11      A. Yes.
12      Q. In your training did you learn what
13  that problem might be? Did somebody tell you,
14  "Well, this might be the problem the diabetic is
15  having"?
16      A. Their sugar levels.
17      Q. Okay. Sugar levels being too low, too
18  high?
19      A. It would depend on the circumstance.
20      Q. When he doesn't respond to your first
21  inquiries as to whether or not he's okay or needs
22  help, what happens at that point?
23      A. The initial -- my initial contact with
24  him?

Page 36

1      Q. Right.
2      A. I asked him if he was all right. He
3  looked up to me -- looked up at me and went back
4  to his task. And I asked him a couple more times
5  before I could get an answer from him.
6      Q. And what was the answer?
7      A. That he was fine. I asked him if he
8  was all right and he said he was.
9      Q. You had no difficulty understanding
10  his speech at that point?
11      A. It was slower than -- it was slow.
12      Q. He said he was fine. Then what did you
13  do?
14      A. I asked him if he was sure, did he
15  need medical attention, was he all right. And he
16  told me that he was fine.
17      Q. Was it your opinion that he was fine?
18      A. No.
19      Q. If he said that he wanted medical
20  attention what would you have done?
21      A. Called the ambulance.
22      Q. So he says he's fine. What happens
23  after that?
24      A. I asked for backup.

Page 37

1  Q. And what was your reason for asking
2  for backup?
3  A. Because I didn't want him to leave
4  under these conditions.
5  Q. Was the engine still running?
6  A. Yes.
7  Q. At any point in time did you ask him
8  to shut the engine off?
9  A. Yes, I did.
10  Q. How did he respond to that?
11  A. It was off, was his statement.
12  Q. When he told you it was off what did
13  you do?
14  A. I explained to him that it was still
15  running.
16  Q. And how did he respond to that?
17  A. He told me it was off.
18  Q. When he tells you twice that it was
19  off what thoughts did you have in regard to those
20  comments with respect to him?
21  MR. TEHAN: I'll object. You'll forgive
22  me, but that is encompassing everything that had
23  occurred prior, as well, correct?
24  MR. GALLAGHER: Yes.

Page 38

1  MR. TEHAN: Thank you.
2  A. Can you ask --
3  MR. TEHAN: Now we've cleared it up,
4  he'll ask you another one.
5  Q. When he says for the second time that
6  it is off, the car is off, now taking everything
7  that had happened prior to that, that you had
8  observed, what thoughts did you have with regard
9  to Mr. LaFrenier?
10  A. That something was going on with Mr.
11  LaFrenier.
12  Q. And what thought did you have as to
13  what was going on with him?
14  A. That he was either having a medical
15  condition or he was under the influence of
16  something.
17  Q. When you say "something" you're
18  referring to what?
19  A. At the time I thought it was alcohol.
20  Q. After he says that the engine is off
21  the second time, what happens?
22  A. I -- he said he had to leave.
23  Q. How did you respond to that?
24  A. I told him he wasn't going anywhere.

Page 39

1  Q. How did he respond to that?
2  A. He asked me if I had -- what -- some
3  type of problem.
4  Q. How did you respond to that?
5  A. I told him that I was trying to figure
6  out if he was feeling well, if he needed my help.
7  Q. Did he respond to that?
8  A. Said he had to get going, and was
9  trying to leave the scene.
10  Q. How was he trying to leave the scene?
11  A. He turned -- we were having a
12  conversation. He turned as if he was going to
13  take -- drive away, because the car was still
14  running.
15  Q. What did you do at that point?
16  A. I asked him to shut the vehicle off,
17  again.
18  Q. And what did he do, if anything?
19  A. He turned to me and just went back --
20  like he was going to -- he turned back towards --
21  facing the front of the car.
22  Q. What happened next?
23  A. Opened the door and asked him to step
24  from the car.

Page 40

1  Q. Was the vehicle still running?
2  A. Yes.
3  Q. When you opened the door and asked him
4  to step from the car what indications did you
5  have, if any, that Mr. LaFrenier was under the
6  influence of an intoxicating liquor?
7  A. He was not steady on his feet.
8  Q. Let me just back up a little bit.
9  When you opened the door he's still
10  sitting in the vehicle, correct?
11  A. Yes, sir.
12  Q. So when you opened the door and asked
13  him to step from the vehicle what indications did
14  you have that he was under the influence of an
15  intoxicating liquor?
16  A. Just his dazed, confused state, some
17  inability to get out of the car, and light on his
18  feet.
19  Q. All right. But light on his feet and
20  inability to get out of the car, those wouldn't
21  be a factor while he's still sitting in the car,
22  correct?
23  A. Correct.
24  Q. And when you opened the door and asked

Page 41

1  him to get out of the car, obviously he was still
2  sitting in the car.
3      A. Yes.
4      Q. After you asked him to get out of the
5  car did he get out of the car?
6      A. Not at first.
7      Q. What did he do?
8      A. Hesitated. Asked me if there was a
9  problem, again.
10     Q. Yes?
11     A. And, again, he had to get going.
12     Q. Then what did you do?
13     A. I placed my arm on him and asked him
14  to step from the vehicle so I could determine if
15  he was all set before he drove off.
16     Q. I apologize, but is the engine off at
17  this point in time?
18     A. No.
19     Q. So what arm do you use to grasp his
20  arm?
21     A. I believe it to be my right.
22     Q. Do you recall where you put your hand
23  on his body?
24     A. (Indicating.)

Page 42

1      MR. TEHAN: You have to say verbally.
2      A. Left upper arm.
3      Q. How did Mr. LaFrenier respond to that?
4      A. He again asked me if there was a
5  problem.
6      Q. How did you respond to him?
7      A. I told him I wanted to check and see
8  if he was okay, and see what his confusion was
9  about.
10     Q. At some point was the engine shut off?
11     A. Yes.
12     Q. Who did that?
13     A. I did.
14     Q. Where was Mr. LaFrenier when you shut
15  the engine off?
16     A. Leaning against the car.
17     Q. At some point he gets out of the car.
18     A. Yes.
19     Q. Do you assist him in getting out of
20  the car?
21     A. Yes.
22     Q. How do you do that?
23     A. As I say, I placed my hand on his arm.
24     THE WITNESS: Can we break?

Page 43

1      MR. TEHAN: Yes, we could.
2      (Short recess.)
3      MR. TEHAN: For the record, I believe
4  the witness would supplement a prior answer.
5      Would you go ahead?
6      A. The dispatcher's last name, Diane
7  Babineau.
8      Q. Thank you.
9      When Mr. LaFrenier exited his vehicle
10  he stood up and fell towards the motor vehicle,
11  is that correct?
12     A. Yes.
13     Q. When he did that were you holding onto
14  him?
15     A. No.
16     Q. So at some point when he got out of
17  the vehicle you released your hand from his arm.
18     A. As he started to get out of the
19  vehicle he did the rest on his own. Got out. He
20  didn't need my help.
21     Q. When he fell towards the vehicle,
22  could you describe what you saw when he did that?
23     A. He was facing the rear of the vehicle,
24  and he fell towards the left-hand side -- his

Page 44

1  left side, which would be the driver's side of
2  the car.
3      Q. And did he hit the car?
4      A. He -- and the car stopped his fall.
5      Q. What did you do at that point?
6      A. Reached for him. Grabbed his elbow.
7      Q. Did he say anything to you at that
8  time?
9      A. He just kept asking me why he was
10  being stopped and what the problem was.
11     Q. Did you respond to that?
12     A. I kept -- the conversation kept going
13  between us both having the same questions and the
14  same response. "Just want to make sure you're
15  okay."
16     Q. When he fell against the car or, as
17  you stated, the car stopped his fall, after that,
18  immediately after that, did you call for medical
19  assistance for Mr. LaFrenier?
20     A. No, I asked him, and he said, "No,
21  thank you." Well, he said, "No."
22     Q. How was he walking when he got out of
23  the car?
24     A. Unstable on his feet. Staggering.

Page 45

1    Q. After he fell against the car, did you
2    then assist him physically?
3        A. Yes. I held his elbow.
4    Q. Did you direct him to a certain spot?
5        A. Yes.
6    Q. Returning back to the time when Mr.
7    LaFrenier first rolled down his window and you're
8    at the side of the car, you didn't smell any odor
9    of alcohol at that point?
10       A. I did not.
11   Q. And you didn't see any alcohol
12   containers in the car?
13       A. No, I did not.
14   Q. And at no point when Mr. LaFrenier was
15   walking from the car did you smell an odor of
16   alcohol.
17       A. No, I did not.
18   Q. And you requested him to lean against
19   the trunk lid of his motor vehicle.
20       A. Yes.
21   Q. And did you do that because you
22   thought if he wasn't leaning against it he'd fall
23   down?
24       A. Yes.

Page 46

1    Q. And at some point you asked for
2    assistance from another officer?
3        A. Yes.
4    Q. Could you put that in context of what
5    was happening at that time, when you asked for
6    assistance?
7        A. At what point did I ask for
8    assistance?
9    Q. Yes.
10       A. At -- before Mr. LaFrenier got out of
11   the vehicle I asked for backup.
12   Q. And were you told you were going to
13   get backup?
14       A. Yes.
15   Q. Were you told who your backup was
16   going to be?
17       A. My backup responded over the air
18   direct.
19   Q. Did you assist Mr. LaFrenier in
20   leaning him against the trunk lid of his car?
21       A. Yes.
22   Q. How did you do that?
23       A. I held his arm.
24   Q. What did he do?

Page 47

1        A. He -- at first he almost missed the
2    trunk, so I grabbed him and guided him to the
3    trunk.
4    Q. Which side of the vehicle is he
5    closest to when he almost misses the trunk?
6        A. If you were to split the trunk up, you
7    mean? Because we're in the rear.
8    Q. You're in the rear. So it wasn't to
9    the left side of the vehicle and it wasn't to the
10   right side of the vehicle.
11       A. It was more towards the passenger
12   side, the right side.
13   Q. Okay. And when you say he almost
14   missed it, then that means he would have fallen
15   somewhere in front of the trunk.
16       A. He was -- the way he was positioned --
17   Q. Right.
18       A. -- if he would have kept going he
19   would have -- if you're facing the vehicle, he
20   would have fallen on the ground on the passenger
21   side.
22   Q. Face first?
23       A. Back side first.
24   Q. Were you able to actually get him to

Page 48

1    lean against --
2        A. Yes.
3    Q. How did you do that?
4        A. When he was falling I grabbed his arm
5    and guided him to the back of the trunk.
6    Q. Then what happened next?
7        A. He wanted to go home. He stated he
8    wanted to go home. He stated he had to get going.
9    I asked him some more questions.
10   Q. What were those questions?
11       A. I asked him if he was feeling well. I
12   asked him if he was -- felt sick. I asked him if
13   he had been drinking that day. I asked him if he
14   was on any medication. I asked him if he had a
15   medical condition.
16   Q. And what were his responses to those
17   questions?
18       A. He had to get going. He doesn't
19   understand why he was being stopped. He had to
20   get -- at some point he had to go home and at
21   another point he had to go to work.
22   Q. Did you ask him where his home was?
23       A. Yes.
24   Q. What did he respond to that?

Page 49

1     A. He told me Fitchburg.
2     Q. Did you ask him where his work was?
3     A. Yes, he did.
4     Q. What did he tell you?
5     A. Nashua.
6     Q. Did you ask him if he knew where he
7  was at that point in time?
8     A. Yes, I did.
9     Q. And what was his response to that?
10    A. He stated he was in Nashua.
11    Q. And that's Nashua, New Hampshire.
12    A. Yes.
13    Q. Did you respond to him when he said he
14  was in Nashua, New Hampshire?
15    A. I explained -- I asked him again, and
16  he told me he was in the parking lot of his
17  business in Nashua, New Hampshire. I asked him if
18  he realized that he was in Townsend,
19  Massachusetts.
20    Q. What did he respond to that?
21    A. He asked -- he said he wasn't. He
22  asked me if I was sure.
23    Q. And you said you were sure.
24    A. I was pretty sure.

Page 50

1     Q. When Mr. LaFrenier was at the back of
2  the vehicle, at that point in time is Officer
3  Morrison there yet?
4     A. Not yet.
5     Q. So after you got Mr. LaFrenier to lean
6  up against the vehicle, what happened next?
7     A. We had conversation.
8     Q. That conversation that you just spoke
9  about?
10    A. We just talked about.
11    Q. When he was leaning up against the
12  vehicle was he leaning back-wise or front-wise?
13  Is his fanny on the back of the vehicle?
14    A. His rear, posterior, is on the back of
15  his car.
16    Q. How about his hands? Do you recall
17  where his hands were at that point?
18    A. He talked with them.
19    Q. What was happening between you and Mr.
20  LaFrenier when Officer Morrison arrived on the
21  scene?
22    A. We were wrestling.
23    Q. To back up a little bit, after you
24  told Mr. LaFrenier that he's in Townsend, not

Page 51

1  Nashua, what happened next?
2     A. Again, he asked me if I was sure.
3  Explained to him I was. I asked him some more
4  medical questions. Then he told me he had to get
5  going.
6     Q. Then what happened?
7     A. He tried to get by me and get into his
8  car and go.
9     Q. Was he able to walk?
10    A. He was unsteady on his feet.
11    Q. Did you have to hold him up?
12    A. To walk to his car?
13    Q. Mm-hmm.
14    A. I don't understand.
15    Q. He's walking towards his car and he's
16  unsteady. He's walking towards the driver's seat.
17    A. He turned toward the driver's seat, to
18  go, and I was right there. It wasn't a long walk.
19    Q. Did you assist him in his walk towards
20  the driver's seat?
21    A. No.
22    Q. What did you do?
23    A. I told him he wasn't going anywhere,
24  he had to stay there. He then pushed me out of

Page 52

1  his way.
2     Q. Let me ask you this: How close were
3  the two of you when Mr. LaFrenier attempted to
4  push you out of his way?
5     A. Under a foot. We were in close
6  contact.
7     Q. At that point in time had he said
8  anything to you that indicated to you that he
9  knew that you were a police officer?
10    A. Yes.
11    Q. What did he say to you?
12    A. He wanted to know the reason for the
13  stop, why he was being stopped.
14    Q. With regard to the push that you just
15  testified about, if you had stepped back would
16  Mr. LaFrenier have fallen on his face?
17        MR. TEHAN: I'll object as potentially
18  speculative.
19        If you can answer it, go ahead.
20    A. I don't understand. Is it my belief
21  that if I was not standing there, do I think he
22  would have fallen?
23    Q. Yes.
24    A. Yes.

Page 53

1  Q. What part of his body struck your
2  body?
3  A. His hand.
4  Q. And where on your body?
5  A. He pushed my arm and my side.
6  Q. Do you recall which arm?
7  A. Which arm did he strike?
8  Q. Correct.
9  A. My left.
10  Q. And do you recall which side of your
11  body?
12  A. Left, because of the way I was
13  standing.
14  Q. What happened after that?
15  A. I took hold of Mr. LaFrenier.
16  Q. And where on his body?
17  A. His arms.
18  Q. Both of your hands grasping both of
19  his arms?
20  A. Yes.
21  Q. What was your purpose in doing that?
22  A. Preventing him from leaving.
23  Q. After you had grasped his arms, what
24  happened next?

Page 54

1  A. He started to push -- we started to
2  push. I decided at that point to place him under
3  -- to place him in handcuffs.
4  Q. When you say "we started to push" at
5  any point in time did his arms break free of your
6  grasp?
7  A. Yes.
8  Q. Can you describe how that happened?
9  A. He was slippery, so when I was
10  grabbing him my hands would slip, and --.
11  Q. Was he slippery because of sweat?
12  A. Yes.
13  Q. And your decision to put handcuffs on
14  him was in order to help you make sure he didn't
15  leave.
16  A. Part of it, yes.
17  Q. And what would be the other part?
18  A. 1 was placing him under arrest.
19  Q. And you were placing him under arrest
20  at that point in time for what?
21  A. At that time, A&B on a P.O.,
22  resisting, and suspicion of OUI.
23  Q. Could you explain what you mean by
24  suspicion of OUI?

Page 55

1  A. His behavior led me to believe that he
2  was under the influence of something, but he was
3  unable to provide me with field sobrieties on the
4  side of the road.
5  Q. When you say suspicion of OUI, that's
6  suspicion of operating under an intoxicating
7  liquor.
8  A. Some type of -- some type of
9  influence. I didn't know if it was alcohol or
10  drugs.
11  Q. Do you recall when you wrote your
12  police report in connection with this arrest?
13  MR. TEHAN: You can refresh your
14  memory.
15  (Witness examining document.)
16  A. Okay. Yes.
17  Q. When, time-wise, when did your write
18  this report?
19  A. When I returned to the station.
20  Q. Your handcuffs, are those handcuffs
21  that would be used in making an arrest regardless
22  of the size of the person?
23  A. Yes.
24  Q. So does that mean they're adjustable,

Page 56

1  given the size of a person's wrists?
2  A. Yes.
3  Q. Describe how you went about trying to
4  put the handcuffs on Mr. LaFrenier.
5  A. Turned him to the car, stomach
6  forward, and took one of his hands -- one of his
7  arms, and brought it behind him, and put the
8  handcuffs on.
9  Q. When you put the handcuffs on him did
10  you think that they were put on in an appropriate
11  manner, given the size of his wrists?
12  A. Do I think they were put on in an
13  appropriate manner?
14  MR. GALLAGHER: Let me withdraw that.
15  Q. Did you put the handcuffs on too
16  tightly, given the size of his wrists?
17  A. I don't believe I did.
18  Q. Once the handcuffs were on him what
19  happens next?
20  MR. TEHAN: I'll object, just as a
21  matter of foundation. She only spoke to cuffing
22  one hand at that point.
23  MR. GALLAGHER: I apologize.
24  MR. TEHAN: You may have jumped ahead a

Page 57

1 little bit, but it's your depo.
2   Q. You were only able to get one handcuff
3 on him?
4   A. Yes.
5   Q. Did you just testify that you put both
6 handcuffs on him?
7   A. No, I said one.
8   Q. After you got the one handcuff on him
9 what happened?
10   A. Ones I got the one handcuff on his one
11 arm he decided to get up, and he was going to
12 leave.
13   Q. What was his position when he had the
14 one handcuff on him?
15   A. Up against the trunk of the car.
16   Q. Was his torso bent over?
17   A. At one point, yes.
18   Q. And was that something he did on his
19 own or was that something you did?
20   A. I placed him on the trunk that way.
21   Q. Was his chest touching the trunk?
22   A. At one point.
23   Q. Was his face touching the trunk?
24   A. Yes.

Page 58

1   Q. After you get the one handcuff on him
2 he wants to leave.
3   A. Yes.
4   Q. And what does he do?
5   A. He stands up straight, taking his
6 chest and face off the trunk of the car.
7   Q. As he's standing up straight did you
8 do something to him?
9   A. I push him back down.
10   Q. You do that with one hand or two
11 hands?
12   A. One hand.
13   Q. What is your other hand doing?
14   A. Holding the open cuff.
15   Q. When you push him back down does he go
16 back down?
17   A. Yes, and then back up.
18   Q. When he's going back up what do you
19 do?
20   A. Push him back down.
21   Q. Then what does he do?
22   A. He gets back up and he tries to get
23 his arm free and swings towards me.
24   Q. He tries to get the arm that's cuffed

Page 59

1 free?
2   A. Yes.
3   Q. At this point is he facing away from
4 you?
5   A. No.
6   Q. And how is it that he was able to turn
7 around and face you?
8   A. When I pushed him down, while we were
9 struggling for him to stay down, and holding the
10 cuff, he squirmed and turned, facing me.
11   Q. What hand is the cuff on?
12   A. Left.
13   Q. When he turns to face you did you let
14 go of the hand that you had on the cuff?
15   A. Eventually.
16   Q. So he turns and faces you, and then
17 what happens?
18   A. I tried to get him back under control,
19 back onto the -- onto the trunk of the car.
20   Q. And how do you do that?
21   A. I try to grab his wrist, try to grab
22 the top of his shoulders and push him back down.
23   Q. And what happened at that point?
24   A. He starts hitting me.

Page 60

1   Q. Before he starts to hit you are both
2 hands of his free of your grasp?
3   A. When he starts hitting me?
4   Q. Yes.
5   A. Yes.
6   Q. Which arms or hands does he hit you
7 with?
8   A. His left hand -- no, strike that. His
9 right hand. The free hand. Free from the cuff.
10   Q. All right. And where does his hand
11 strike your body?
12   A. In the stomach area.
13   Q. And closed fist?
14   A. Closed fist.
15   Q. How do you respond to that?
16   A. I push him away, push him back towards
17 the car.
18   Q. And you were successful in
19 accomplishing that?
20   A. A couple of times.
21   Q. And after you push him away, after he
22 struck you in the stomach, what happens then?
23   A. Put my hands back on him the way I had
24 them before. He tries to get up, and I strike him

Page 61

1  again.
2  Q. Where do you strike him?
3  A. In -- I don't know what this is
4  called. The calf? The thigh area?
5  Q. Somewhere in the leg?
6  A. Yes, with my knee.
7  Q. Had you been trained to do that?
8  A. Yes.
9  Q. When you strike him somewhere in the
10  leg with your knee what happens to him?
11  A. He stops for seconds. Then he starts
12  up again.
13  Q. When he stopped what do you do?
14  A. Try to finish cuffing him.
15  Q. And did you try to turn him away from
16  you?
17  A. Yes.
18  Q. Were you successful in that?
19  A. Couple of times.
20  Q. Did you strike him again in the leg?
21  A. Couple of times.
22  Q. Same leg?
23  A. Yes.
24  Q. What happens next?

Page 62

1  A. He gets up from the vehicle, tries to
2  strike me again. We end up falling on the ground.
3  Q. Both of you fell on the ground?
4  A. Yeah.
5  Q. What's in the immediate vicinity of
6  where his car was parked? Is it residential? Is
7  it business?
8  A. It's residential. There's a house a
9  couple of yards away.
10  Q. Just one house?
11  A. And there's a house across -- there's
12  a couple of houses across the street, and then
13  there's a police station.
14  Q. Do you know whether or not there was
15  anybody witnessing what's happening between you
16  and Mr. LaFrenier in the back of the vehicle?
17  A. The traffic is flowing.
18  Q. Did anybody stop?
19  A. No.
20  Q. Did anybody tell you that they had
21  witnessed what was going on?
22  A. No one came forward.
23  Q. Were you able to eventually get the
24  cuffs on him?

Page 63

1  A. By myself?
2  Q. Yes.
3  A. No.
4  Q. So you were both on the ground.
5  A. (Nodding.)
6  Q. From that point forward what happens
7  next?
8  A. We wrestled a bit. Blows were
9  exchanged. And my backup arrived.
10  Q. When you say blows were exchanged,
11  explain what Mr. LaFrenier did and what you did?
12  A. Mr. LaFrenier was trying to punch at
13  me with both hands. One was more of a punch
14  towards the stomach area and others were just
15  flailing of his arm with the cuff on it. And I
16  was trying to restrain him, trying to grab the
17  cuff, the free cuff, and trying to get some knee
18  blows into his leg area.
19  Q. Were you successful in getting those
20  knee blows in?
21  A. A couple.
22  Q. As a result of this confrontation with
23  Mr. LaFrenier did you go to the hospital?
24  A. Yes.

Page 64

1  Q. For yourself?
2  A. No.
3  Q. Did you receive medical care at a
4  doctor's office?
5  A. No.
6  Q. Did you receive any injuries?
7  A. No.
8  Q. Did you receive any bruises?
9  A. No.
10  Q. Did you receive any scraps?
11  A. No.
12  Q. When Officer Morrison arrived, what
13  happened at that point in time?
14  A. From my perspective? We were still on
15  the ground wrestling, and then when Dan came in
16  he got him up on his feet and off me, and we
17  continued to cuff.
18  Q. When he got him up off his feet what
19  did Officer Morrison do with Mr. LaFrenier?
20  A. Placed him against --
21  MR. TEHAN: Excuse me. I'll object. I
22  may not have heard you correctly, but I thought
23  you said when he got him off his feet. Perhaps I
24  didn't --

Page 65

1    MR. GALLAGHER: I didn't mean -- let me
2 rephrase it.
3    MR. TEHAN: Thank you.
4    Q. What did Officer Morrison do with Mr.
5 LaFrenier that you witnessed after Officer
6 Morrison first arrived at the scene?
7    A. He took hold of Mr. LaFrenier and
8 picked him up and placed him on the side of the
9 car.
10    Q. The side of the car?
11    A. I believe it was the front of the car.
12    Q. Did you watch Officer Morrison and Mr.
13 LaFrenier go into the front of the car?
14    A. I was right there. I was with them.
15    Q. Where was Officer Morrison holding Mr.
16 LaFrenier as they're going to the front of the
17 car?
18    A. I don't understand what you mean.
19 Where was he --
20    Q. Did he have his hands on Mr. LaFrenier
21 as he was going to the front of the car?
22    A. Yes.
23    Q. Did he have both hands on him?
24    A. I believe he did, yes.

Page 66

1    Q. Where were Mr. LaFrenier's arms when
2 Officer Morrison had both hands on Mr. LaFrenier?
3    A. I believe they were in his -- towards
4 his back area.
5    Q. And what happened after Officer
6 Morrison got Mr. LaFrenier to the front of the
7 car?
8    A. I continued to -- he put his arms
9 behind him and I cuffed him. I finished the
10 cuffing procedure.
11    Q. Was Mr. LaFrenier's body placed on the
12 car, touching the car?
13    A. Yes.
14    Q. And would his chest be over the front
15 of the car?
16    A. Yes.
17    Q. And would his face be over the front
18 of the car?
19    A. Yes.
20    Q. Would his chest be touching the car?
21    A. I believe it was, yes.
22    Q. Would his face be touching the car?
23    A. Yeah.
24    Q. After the handcuffs were placed on Mr.

Page 67

1 LaFrenier, what happened next?
2    A. He took him and put him in the rear of
3 the cruiser.
4    Q. And once he was in the rear of the
5 cruiser what happens?
6    A. I just transported him back to the
7 station.
8    Q. Does Officer Morrison also go back to
9 the station?
10    A. Yes.
11    Q. And who is back at the station when
12 you arrive back at the station with Mr.
13 LaFrenier?
14    A. At that time?
15    Q. Yes.
16    A. The dispatcher's in dispatch. I arrive
17 with Mr. LaFrenier. Officer Morrison is right
18 behind me in his cruiser.
19    Q. There was no police officer back at
20 the station?
21    A. Not at that time.
22    Q. At that point in time?
23    A. No.
24    Q. At a later point in time was there a

Page 68

1 police officer there when you were there and Mr.
2 LaFrenier was there?
3    A. Yes.
4    Q. And who was that police officer?
5    A. There was Officer Johnson and Officer
6 Gomes.
7    Q. Would there be a supervisor among the
8 various officers back at the station?
9    A. Senior officer would be in charge.
10    Q. And who would that be?
11    A. Officer Johnson.
12    Q. Do you know how it is that Officer
13 Johnson came to the station?
14    A. I don't know.
15    Q. Do you know whether or not anyone
16 called him, asking him to come to the station?
17    A. I don't honestly know.
18    Q. Once back at the station was Mr.
19 LaFrenier afforded a breathalyzer test?
20    A. Yes.
21    Q. When you take Mr. LaFrenier back to
22 the station you take him to a particular place
23 within the station?
24    A. Yes.

Page 69

1    Q. And where would that be?
2    A. The booking area.
3    Q. Was he asked to respond to booking
4  questions?
5    A. Yes.
6    Q. Did you ask him to respond to booking
7  questions?
8    A. I asked some questions. Officer
9  Johnson asked some questions, also.
10   Q. What questions did you ask?
11   A. Asked him about his medical condition.
12 Asked him if there was somebody we could call.
13   Q. Did he understand you at that point in
14 time?
15       MR. TEHAN: I'll object.
16       You can say whether he appeared to.
17       I think it's speculative.
18   A. He seemed more understanding than he
19 had in the past.
20   Q. Let me ask you this: Did he respond to
21 your questions verbally?
22   A. Yes.
23   Q. Do you recall what he said?
24   A. Each question was different, so --.

Page 70

1    Q. Did his responses to you make sense in
2  relation to the question that was being asked of
3  him?
4    A. At that time, yes.
5    Q. Do you recall what Officer Johnson
6  asked him?
7    A. I believe Officer Johnson asked him
8  about the breathalyzer and any medical condition
9  he might have, and if he was on medication.
10   Q. Were you present when those questions
11 and perhaps responses were made?
12   A. Yes.
13   Q. And do you recall what Mr. LaFrenier
14 said to Officer Johnson?
15   A. He stated that he hadn't been
16 drinking. He stated that he didn't have a medical
17 condition. And he wasn't on any medication.
18   Q. Is the breathalyzer in a separate
19 room?
20   A. Yes.
21   Q. After those various questions were
22 asked of Mr. LaFrenier, was he then taken to that
23 room for the breathalyzer?
24   A. Yes.

Page 71

1    Q. Who took him to the room for the
2  breathalyzer? Or who accompanied him?
3    A. We all did.
4    Q. And how many officers would that be?
5    A. Officer Morrison was in the room to
6  give the breathalyzer. Officer Johnson and myself
7  escorted him into the room.
8    Q. So the three officers were there. What
9  about Mr. Gomes?
10   A. He was more or less in training, so he
11 was watching.
12   Q. Were there any other officers on duty
13 at that point in time?
14   A. That was it.
15   Q. Do you recall whether or not any
16 officer at the station in the room where the
17 breathalyzer was, after Mr. LaFrenier was taken
18 there, demanded that he take a breathalyzer test?
19   A. No.
20   Q. What was told to him by whom with
21 regard to the breathalyzer?
22   A. Officer Johnson explained the
23 procedure to him.
24   Q. Did any officer, while Mr. LaFrenier

Page 72

1  is in the breathalyzer room, ask him whether or
2  not any officer used excessive force on him?
3    A. I don't understand. Can you --
4    Q. Did Officer Johnson ask Mr. LaFrenier
5  whether or not any officer used excessive force
6  on him in making the arrest?
7    A. I don't recall him saying anything
8  like that.
9    Q. Did Mr. LaFrenier have to sign
10 anything with regard to the breathalyzer test?
11   A. At that point? No.
12   Q. Did he take the test?
13   A. Yes.
14   Q. And it was a zero zero?
15   A. Yes.
16   Q. Was there any reaction among the
17 officers in the room to the fact that it was a
18 zero zero?
19   A. I don't understand what you mean by
20 "reaction".
21   Q. Did anybody say anything to anybody
22 else concerning the fact that the test result was
23 a zero zero?
24   A. We then -- Officer Johnson and I had a

Page 73

1 conversation about him maybe having a medical
2 condition, and then we tried to talk to him about
3 it.
4    Q. At any point in time did any medical
5 personnel arrive at the scene on the roadway?
6    A. On the road?
7    Q. Yes.
8    A. No.
9    Q. What was the conversation between you
10 and Officer Johnson with regard to whether or not
11 he had a medical problem?
12    A. Mr. LaFrenier was involved in the
13 conversation.
14    Q. Okay. You recall the conversation?
15    A. Some of it, yeah.
16    Q. Can you tell us what you recall?
17    A. It was explained to him he blew a
18 point 00, which means he wasn't intoxicated, but
19 he had something going on, maybe we should call
20 the ambulance, did he wish to seek medical
21 attention.
22    Q. Okay. How did he respond to that?
23    A. At first he didn't think he needed the
24 medical attention, suggested that we talk to his

Page 74

1 wife, and eventually wanted the ambulance.
2    Q. And the ambulance arrived and took him
3 to a hospital.
4    A. Yes.
5    Q. Which hospital was that?
6    A. Leominster.
7    Q. Which officers went to the hospital?
8    A. I did.
9    Q. Any other officers?
10    A. No.
11    Q. What was your purpose in going to the
12 hospital?
13    A. Mr. LaFrenier was still under arrest.
14    Q. Did you talk to any medical personnel
15 at the hospital?
16    A. I spoke briefly to his doctor. Or the
17 ER doctor.
18    Q. And what was that conversation?
19    A. To ascertain if he was going to be
20 released or admitted, what kind of tests were
21 being done.
22    Q. Was any request by you made that blood
23 be drawn from Mr. LaFrenier and tested?
24    A. No.

Page 75

1    Q. Do you know whether or not that was
2 done?
3    A. I have no idea. Whatever they did --
4 they did close the curtain. It was patient
5 privilege. I stood outside the curtain.
6    Q. So at no point in time did you ask any
7 doctor, any medical personnel, as to whether or
8 not they had drawn blood from Mr. LaFrenier?
9    A. At that time, no.
10    Q. At some point in time did you do that?
11    A. I didn't ask about the drawing of
12 blood, no.
13    Q. Did you ask about whether or not there
14 was anything found in his blood that would be
15 indicative of an illness or drugs or anything
16 like that?
17    MR. TEHAN: You're asking her did she
18 ask anyone that at any time?
19    MR. GALLAGHER: Yes.
20    MR. TEHAN: Okay.
21    A. Regarding being under the influence of
22 drugs, no. I did not.
23    Q. Did you have any conversation as to
24 whether or not the medical people at the hospital

Page 76

1 made a determination as to whether or not Mr.
2 LaFrenier was suffering from any illness?
3    A. Yes, I did.
4    But now can we have a break?
5    MR. TEHAN: Absolutely.
6    Q. Sure.
7    (Short recess.)
8    Q. Did you have conversation with Mr.
9 LaFrenier when he was at the hospital?
10    A. Yes.
11    Q. Where did that conversation take
12 place?
13    A. Where?
14    Q. Yes.
15    A. In one of those little cubicle rooms
16 in the emergency room.
17    Q. What did you say and what did he say?
18    A. He asked questions, I answered.
19    Q. Do you recall what his questions were?
20    A. He asked -- he wanted to know what
21 happened, he wanted to know why he was there. He
22 wanted to know why he was sore. He wanted to know
23 why he was handcuffed to the gurney.
24    Q. What did you say in response to those

Page 77

1 questions?
2   A. I explained to him what had happened
3 prior to being at Leominster Hospital.
4   Q. At some point in time you made a
5 determination as to what crimes you thought that
6 Mr. LaFrenier had committed?
7   A. Yes.
8   Q. When did that occur in the sequence of
9 events?
10   A. Before we left the station in the
11 ambulance.
12   Q. Before you left the station in the
13 ambulance.
14   A. Yes.
15   Q. At that moment you made a
16 determination as to what you were going to charge
17 him with?
18   A. I had formed the idea of what he was
19 going to be charged with, yes.
20   Q. Did you discuss, prior to that point
21 in time, with any other officer, what the charges
22 should be, based upon what happened?
23   A. Yes.
24   Q. And who did you talk to?

Page 78

1   A. Officer Johnson and Officer Morrison.
2   Q. Did that conversation take place after
3 the breathalyzer was done?
4   A. Yes.
5   Q. Could you please recount that
6 conversation with those officers?
7   A. It was determined that I would go with
8 him to the hospital. Upon my return, it would be
9 after their shift, so I explained to him --
10 explained to both of them what charges I was
11 going to bring against Mr. LaFrenier.
12   Q. Did they respond to that, when you
13 told them, "These are the charges I'm going to
14 bring against Mr. LaFrenier"?
15   A. They agreed.
16   Q. Why was it that you told them that you
17 were going to bring these charges against Mr.
18 LaFrenier?
19   A. Because at that point John was --
20 Officer Johnson was in charge, so I was letting
21 him know what I was doing. And by the time I got
22 back from the hospital I knew it would be after
23 the end of their shift.
24   Q. Was it common practice for you that

Page 79

1 you would talk to a senior officer with regard to
2 what charges you would bring in connection to an
3 arrest?
4   A. That's my common -- that is my
5 practice.
6   Q. Did Officer Johnson ask you on what
7 facts do you base this charge?
8     MR. TEHAN: Well, I'll object as vague
9 with respect to "this charge".
10     MR. GALLAGHER: Let me withdraw that.
11   Q. Say, for example, he was charged, Mr.
12 LaFrenier, with resisting arrest. Correct?
13   A. Yes.
14   Q. When you told Officer Johnson that Mr.
15 LaFrenier should be charged with resisting arrest
16 did Officer Johnson ask you, "On what facts do
17 you base that decision?"
18   A. No.
19   Q. Of course, a decision was made not to
20 charge him with driving under the influence.
21   A. Yes.
22   Q. With regard to the assault and battery
23 on you, did Officer Johnson ask you on what facts
24 do you come to the conclusion that Mr. LaFrenier

Page 80

1 should be charged with that?
2   A. No.
3   Q. And the disorderly person, did Officer
4 Johnson ask you on what facts you come to the
5 determination that Mr. LaFrenier should be
6 charged with that?
7   A. No.
8   Q. In the past, with regard to other
9 arrests, have you spoken to Officer Johnson in
10 regard to what you intend to charge?
11     MR. TEHAN: That's prior to this event?
12     MR. GALLAGHER: Yes, prior to this
13 event.
14     MR. TEHAN: Okay.
15   A. I don't understand. Do you mean do I
16 call Mr. Johnson every time I make an arrest? I
17 don't understand.
18     MR. TEHAN: He'll ask them, you'll
19 answer them. He'll try again.
20     THE WITNESS: Okay.
21   Q. On prior arrests have you spoken to
22 Officer Johnson and told him, "This is what I
23 intend to charge the person with"?
24   A. Not -- no, not that I recall.

Page 89

1    Q. You had mentioned, if my notes are
2 correct, that there was, at least in part, a
3 dazed and confused state of Mr. LaFrenier that
4 comprised the basis for your OUI suspicious, is
5 that correct?
6    A. Yes.
7    Q. Would you state for us, please, in one
8 spot, so to speak, everything he did, didn't do,
9 said or didn't -- I'm sorry. Everything he did,
10 said that led you to that suspicion, and that
11 conclusion, that he was in a dazed and confused
12 state?
13    A. For the entire stop?
14    Q. Yes, please.
15    A. He was dazed and confused, didn't
16 understand where he was. His demeanor, his
17 language was slurred -- his voice was slurred. He
18 was confused when asked a question. Thought he
19 was in one place -- thought he was in New
20 Hampshire, thought he was going to work, thought
21 he was coming home. Didn't know where he was.
22 Unable to open a cigarette pack. His -- he wasn't
23 steady on his feet. Unable to control his
24 walking. Unable to lean up against a car, perform

Page 90

1 simple tasks like leaning up against a car or
2 walking.
3    Q. At the point where you asked Mr.
4 LaFrenier to exit his vehicle what were you
5 planning to do?
6    A. Try to find out why he was in the
7 state that he was.
8    Q. Did you have any plan of administering
9 field sobriety tests?
10    A. If it got to that point, yes.
11    Q. Did you administer them?
12    A. Didn't get to that point, no.
13    Q. And why was that?
14    A. Because Mr. LaFrenier was
15 uncooperative, unable to perform the tests.
16    Q. What was your initial purpose in going
17 to his vehicle that day?
18    A. To see if he was okay, what kind of
19 distress he was under.
20    Q. You mentioned in your direct testimony
21 that Mr. LaFrenier said he wanted to leave. Is
22 that correct?
23    A. Yes.
24    Q. And you did not want him to, is that

Page 91

1 true?
2    A. Correct.
3    Q. Why was that?
4    A. He posed a threat to me, in my
5 opinion.
6    Q. How so? What was that threat?
7    A. I don't believe he was in his right
8 mind to be driving.
9    Q. And why was that a threat to you --
10 was it a threat to you personally?
11    A. No, it was a threat in my mind.
12    Q. A threat toward whom?
13    A. The public. Public safety.
14    Q. After you were able to cuff Mr.
15 LaFrenier's -- I believe you said left hand --
16 but before you were able to cuff his right hand,
17 what was he doing with the unsecured cuff?
18    A. Flailing around, trying to get away,
19 pushing me and hitting me.
20    Q. Was that of concern to you, the
21 flailing around?
22    A. Yes.
23    Q. Would you describe exactly what he was
24 doing?

Page 92

1    A. He was throwing his arms around, which
2 caused the cuff to be spinning, and it was open,
3 so the hook was there, and he was swinging it
4 towards me, so I was concerned I would get hit
5 with it.
6    Q. Did you receive any training
7 concerning dangers posed by that situation?
8    A. Yes.
9    Q. What were you taught?
10    A. To secure and to go up -- as I said,
11 the -- what do you call it -- the continuum
12 force.
13    Q. Is the first step, as you were
14 trained, in the force continuum, verbal commands?
15    A. Yes.
16    Q. Did you use them?
17    A. Yes.
18    Q. Did they get a response?
19    A. No.
20    Q. Is the next step the use of force or
21 physical skills?
22    A. Yes.
23    Q. Did you use that?
24    A. Yes.

Page 93

1    Q. What did you employ in that regard?
2    A. I used knee strikes, I used hand
3  maneuvers to push him back down.
4    Q. Did you testify earlier the knee
5  strikes were part of your training?
6    A. Yes.
7    Q. What were you trained in terms of when
8  to apply such a strike and how to apply it?
9    A. Verbal commands aren't working, you
10  bring it up to the next step. At that point if
11  you need to move on, you do, but you start with
12  the strike.
13    Q. Were you given any training
14  specifically as to how those strikes are to be
15  administered?
16    A. Yes.
17    Q. What were you taught?
18    A. Where to strike them on the leg, what
19  part of the leg to strike for the best effective
20  results.
21    Q. Where were you taught to strike?
22    A. Roughly midway on the left -- on the
23  side of your leg -- I don't remember the name of
24  it, but --

Page 94

1    Q. Is it midway along the thigh?
2    A. Along the thigh.
3    Q. Is that where you administered your
4  strikes to Mr. LaFrenier?
5    A. Some of them were there. That's where
6  they were intended to go, yes.
7    Q. At any point did you kick Mr.
8  LaFrenier?
9    A. Not that I'm aware of.
10    Q. Did you punch him?
11    A. Not that I'm aware of.
12    Q. Did you use any force other than that
13  supplied by your own body?
14    A. No.
15    Q. Did you use a nightstick on Mr.
16  LaFrenier?
17    A. No, I did not.
18    Q. Did Officer Morrison use a nightstick
19  on Mr. LaFrenier?
20    A. No, he did not.
21    Q. Did Officer Morrison kick or punch Mr.
22  LaFrenier?
23    A. No, he did not.
24    Q. Did either of you utilize a so-called

Page 95

1  OC, or pepper spray, on Mr. LaFrenier?
2    A. No.
3    Q. And certainly neither of you
4  discharged or brandished a firearm on this day,
5  is this true?
6    A. That's true.
7    Q. How far away from the police station
8  was the locus of this stop?
9    A. Oh, yards.
10    Q. Did you have any discussion with Mr.
11  LaFrenier en route to the station?
12    A. No.
13    Q. My brother asked you if at any point
14  any officer demanded that Mr. LaFrenier take a
15  breathalyzer test, correct?
16    A. He did ask that, yes.
17    Q. Okay. And did anyone make such a
18  demand?
19    A. No one demanded it, no.
20    Q. Did anyone attempt to persuade Mr.
21  LaFrenier to take a breathalyzer test?
22    A. His options in what the results --
23  each result meant was explained to him, yes.
24    Q. Did he initially express any

Page 96

1  reluctance to take the breathalyzer?
2    A. At first he said -- at first he said
3  that there was -- there was no need, because he
4  hadn't been drinking. So he didn't understand why
5  he would have to take the breathalyzer.
6    Q. Did anyone make a response to that
7  comment?
8    A. It was explained to him that the
9  breathalyzer would show that he hadn't had
10  anything to drink, and it would rule out that he
11  was under the influence of alcohol, and then we
12  could move to find out what was wrong.
13    Q. Did he make any response to that
14  statement?
15    A. That he thought it was a good idea to
16  take the breathalyzer.
17    Q. Who was the person who administered
18  the breathalyzer?
19    A. Officer Morrison.
20    Q. To your knowledge, was he trained in
21  that regard?
22    A. Yes.
23    Q. I believe you mentioned that at some
24  point someone asked Mr. LaFrenier if there was

Page 97

1  anyone they could speak to about him. Is that
2  true?
3      A.  Yes.
4      Q.  And who made that request?
5      A.  It was a group effort. It was Officer
6  Johnson, myself and Officer Morrison.
7      Q.  What was your purpose in that
8  discussion?
9      A.  To determine if he had a medical
10  situation.
11      Q.  Why were you concerned in that regard?
12      A.  Because he just wasn't right. He
13  wasn't under the influence of alcohol, but he
14  just wasn't right.
15      Q.  Did he advise you of a person with
16  whom you might speak?
17      A.  Yes.
18      Q.  Whom did he tell you to call or
19  suggest that you call?
20      A.  His wife.
21      Q.  What information about his wife, if
22  any, did he provide you to facilitate your
23  calling her?
24      A.  That she was a nurse at a hospital in

Page 98

1  Worcester.
2      Q.  Did he provide you with any further
3  information initially?
4      A.  Just the hospital.
5      Q.  Which hospital did he say?
6      A.  UMass.
7      Q.  Did he give you a phone number for
8  her?
9      A.  He didn't know it.
10      Q.  Did he give you a department in which
11  she works?
12      A.  He didn't know it.
13      Q.  Did those instances where he didn't
14  know his wife's phone number at work or her
15  department concern you?
16      A.  I would assume it would be something
17  that a husband and wife would know.
18      Q.  And when he apparently didn't, did
19  that cause you any concern?
20      A.  That added to my suspicion that
21  something was going on with him.
22      Q.  Was anyone ever in contact with Mr.
23  LaFrenier's wife?
24      A.  Yes.

Page 99

1      Q.  Who was that?
2      A.  I was.
3      Q.  And did you speak with her over the
4  phone?
5      A.  Yes, I did.
6      Q.  How did you find her?
7      A.  Tracking her down through UMass.
8  Called UMass, and eventually found her.
9      Q.  For about how long did you speak with
10  her?
11      A.  About 20 minutes to a half an hour.
12      Q.  How would you characterize your own
13  tone during that discussion?
14      A.  Concern.
15      Q.  And that of his wife?
16      A.  Not as concerned.
17      Q.  What do you recall saying to Mrs.
18  LaFrenier and her saying to you during that
19  discussion?
20      A.  I explained the situation, and why Mr.
21  LaFrenier and I had met, and I asked if there was
22  any medical condition, was he on any prescription
23  drugs that I should know about, has he had any
24  medical procedures. All along those lines. And

Page 100

1  she was unaware of any medical condition other
2  than a cold. He had taken, I believe it was
3  Nyquil, and he was on a prescription drug, which
4  he decided not to take anymore, but it should
5  have no effect on him, as I described to her,
6  according to her.
7      Q.  Did she tell you the name of the drug?
8      A.  She did.
9      Q.  What was the name that she gave you?
10      A.  I would have to look at the notes.
11      Q.  Would it refresh your memory if I told
12  you it was Cronetin?
13      A.  That sounds right.
14      Q.  Did Mrs. LaFrenier tell you anything
15  else during your discussion?
16      A.  I don't know what you mean.
17      Q.  Is there anything else that she said
18  to you that you haven't yet told us?
19      A.  Not that I recall.
20      Q.  Did you suggest to Mrs. LaFrenier that
21  perhaps her husband should be checked out at a
22  medical facility?
23      A.  Yes.
24      Q.  And did you tell her why you felt that

Page 101

1  would be wise?
2      A.  Yes.
3      Q.  What did you say?
4      A.  I explained that he was confused, not
5  in his right mind. He took the breathalyzer, he
6  passed the breathalyzer, so he wasn't under the
7  influence of alcohol. She tells me he doesn't
8  have a medical condition so, therefore, I was
9  concerned about his medical well-being.
10     Q.  Did she concur with your
11 recommendation?
12     A.  She did.
13     Q.  What did she say?
14     A.  She said that she would agree with
15 that, and that I should call an ambulance, but I
16 would need to speak to him.
17     Q.  To your knowledge, did Mr. LaFrenier
18 speak directly to his wife on the phone from the
19 station that day?
20     A.  I do not recall them having a
21 conversation.
22     Q.  Did you tell Mr. LaFrenier you had
23 spoken with his wife?
24     A.  Yes.

Page 102

1      Q.  Did you tell him that she felt it was
2  a good idea that he be checked out?
3      A.  Yes.
4      Q.  What response, if any, did he make?
5      A.  Eventually he wanted an ambulance, and
6  thought it was a good idea.
7      Q.  When you say "eventually" what are you
8  suggesting in that regard if anything?
9      A.  At first he didn't think it was a good
10 idea, and just wanted to go home.
11     Q.  Did you apprise Mr. LaFrenier before
12 you went to the hospital that there would be
13 charges against him in any event?
14     A.  Not at that time. We were more
15 concerned about getting him medical, and finding
16 out what was wrong.
17     Q.  Who summonsed medical assistance?
18     A.  Well, we called dispatch upstairs, and
19 she dispatched them.
20     Q.  Did someone arrive?
21     A.  Yes.
22     Q.  Do you know what ambulance service
23 arrived?
24     A.  We have our own in town.

Page 103

1      Q.  Who runs your EMS? Is it the fire
2  department?
3      A.  The fire department. It's from the
4  fire department. I don't know who's in charge of
5  it.
6      Q.  Did you ride in the ambulance with Mr.
7  LaFrenier to the hospital?
8      A.  No.
9      Q.  How did you get there?
10     A.  By cruiser. I drove a cruiser.
11     Q.  Did you follow directly behind the
12 ambulance?
13     A.  Yes, I did.
14     Q.  Was Mr. LaFrenier cuffed in the
15 ambulance?
16     A.  To the gurney.
17     Q.  Was he a prisoner in your custody
18 during that trip?
19     A.  Yes.
20     Q.  I believe you mentioned that before
21 you left for the hospital you discussed with
22 Officer Morrison and Officer Johnson your
23 contemplated charges, is that correct?
24     A.  Yes.

Page 104

1      Q.  Were both of those officers more
2  experienced than you?
3      A.  Yes.
4      Q.  And, again, Johnson was your officer
5  in charge, is that correct?
6      A.  On that day, yes.
7      Q.  And you indicated that they agreed
8  with you with respect to the charges you were
9  considering. Is that true?
10     A.  Yes.
11     Q.  What charges did you lodge against Mr.
12 LaFrenier?
13     A.  A&B on a P.O..
14     Q.  Does that mean assault and battery on
15 a police officer?
16     A.  Assault and battery on a police
17 officer for both myself and Officer Morrison,
18 disorderly person and resisting.
19     Q.  As we look at your Exhibit 1, do you
20 see that on the criminal complaint -- that is
21 the first sheet -- the complainant is Daniel
22 Morrison?
23     A.  Yes.
24     Q.  Whose charges are these that we're

Page 105

1  discussing?
2   A.  They're my charges.
3   Q.  Do you know why his name appears as
4  complainant?
5   A.  Because at the time Dan's assignment
6  was the court officer. So he would do that for
7  all cases that came from Townsend P.D..
8   Q.  When you say he was the court officer,
9  what do you understand his duties to be in that
10  regard?
11   A.  He represented the Townsend Police
12  Department in Ayer District Court.
13   Q.  Running through the charges, the first
14  charge is an assault and battery on yourself, is
15  that correct?
16   A.  Yes.
17   Q.  And on what basis or on what facts did
18  you bring that charge?
19   A.  When Mr. LaFrenier put his hands on me
20  and pushed me and started to resist.
21   Q.  With respect to the next assault and
22  battery charge with respect to Officer Morrison,
23  what was the factual basis for you bringing that
24  charge?

Page 106

1   A.  When he was pushing, swinging at Dan
2  with his arms.
3   Q.  Did you see that happen?
4   A.  Yes.
5   Q.  With respect to the crime that you
6  charged Mr. LaFrenier with of being a disorderly
7  person, what conduct of his gave rise to that
8  charge?
9   A.  Just his demeanor. His -- being in a
10  public way, causing great commotion, and public
11  safety issues. Along --
12   Q.  Along those lines?
13   A.  Along those lines.
14   Q.  To backtrack just a minute, this was
15  an arrest that occurred on Route 13, is that
16  correct?
17   A.  Yes.
18   Q.  Is that a state highway?
19   A.  Yes.
20   Q.  And did you indicate earlier that
21  there's one lane in each direction?
22   A.  Yes, north and south.
23   Q.  Is there a breakdown lane?
24   A.  No.

Page 107

1   Q.  Do you know what a fog line is?
2   A.  Yes.
3   Q.  Are there fog lines on that road?
4   A.  They're there, but there's parts that
5  it no longer exists.
6   Q.  Does the fog line on Route 13 traverse
7  or go along the outer edge of the pavement?
8   A.  Yes.
9   Q.  Where was Mr. LaFrenier's car with
10  respect to the fog line in terms of distance from
11  it when you pulled up?
12   A.  About three feet.
13   Q.  And how far, therefore, was his
14  driver's door from the travel lane?
15   A.  When it was closed? About three feet.
16   Q.  Okay. Now, you mentioned that Mr.
17  LaFrenier pushed you, is that correct?
18   A.  Yes.
19   Q.  Did he do so on more than one
20  occasion?
21   A.  Yes.
22   Q.  On one occasion did his push put you
23  in fear?
24   A.  Yes.

Page 108

1   Q.  And why was that?
2   A.  Because my back was towards Route 13,
3  and when he pushed me I was heading in that
4  direction.
5   Q.  Into traffic?
6   A.  Into traffic.
7   Q.  Mr. LaFrenier, in fact, was charged
8  with resisting arrest, is that correct?
9   A.  Yes.
10   Q.  What facts gave rise to your bringing
11  that charge?
12   A.  Because his resisting -- as I was
13  putting the cuffs on, fighting, trying to walk
14  away, trying to leave the scene with the cuff on.
15   Q.  You approached Mr. LaFrenier's car in
16  a marked cruiser?
17   A.  Yes.
18   Q.  Did you have your lights on?
19   A.  Yes.
20   Q.  Were you in full uniform?
21   A.  Yes.
22   Q.  Did you have a patch on your shoulder
23  reflecting the insignia of the Townsend Police
24  Department?