# EXHIBIT D

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
                        FOR THE
 2              DISTRICT OF MASSACHUSETTS

 3

 4   TIMOTHY L. LA FRENIER,
                  Plaintiff
 5
     VS.                    NO. 04-40114-FDS
 6
     MARY ANNE KINIREY, DANIEL
 7   MORRISON, THE CHIEF OF
     POLICE, "JOHN DOE", and
 8   THE TOWN OF TOWNSEND,
                  Defendants
 9

10

11

12       DEPOSITION of DANIEL T. MORRISON, taken at the

13   request of the plaintiff, pursuant to Rule 30 of

14   the Federal Rules of Civil Procedure, before

15   Michael Gruber, a notary public in and for the

16   Commonwealth of Massachusetts, on July 18, 2005,

17   commencing at 1:35 p.m., at the offices of Sean

18   Gallagher, Esq., 74 Elm Street, Worcester,

19   Massachusetts.

20

21

22

23

24
```

Page 2

```
 1   A P P E A R A N C E S:

 2   FOR THE PLAINTIFF:

 3   SEAN J. GALLAGHER, ESQ.
     74 Elm Street
 4   Worcester, Massachusetts 01609

 5   FOR THE DEFENDANTS:

 6   JOSEPH L. TEHAN, JR., ESQ.
     KOPELMAN AND PAIGE, P.C.
 7   31 St. James Street
     Boston, Massachusetts 02116

 8

 9
     Also Present:  Mary Anne Kinirey
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 3

```
 1                  I N D E X

 2        DEPONENT: DANIEL T. MORRISON

 3                                          PAGE

 4   EXAMINATION BY MR. GALLAGHER              3

 5   EXAMINATION BY MR. TEHAN                 37

 6   FURTHER EXAMINATION BY MR. GALLAGHER     42

 7

 8

 9

10

11

12

13              EXHIBITS

14                                          PAGE

15

16

17       1      Diagram                      25

18

19

20

21

22

23

24
```

Page 4

```
 1          MR. TEHAN: I think we can agree that

 2   all objections except as to form and motions to

 3   strike will be reserved until the time of trial.

 4          We will waive notarization and filing,

 5   but I would like each defendant to have the

 6   opportunity to read and sign the transcript, and

 7   I believe we could agree that the transcript will

 8   be deemed signed as transcribed if no changes are

 9   made within 30 days of counsel's receipt.

10          Would that be acceptable?

11          MR. GALLAGHER: That's agreeable, sure.

12

13

14          DANIEL T. MORRISON,

15   having been satisfactorily identified

16   by the production of his State-issued

17   photo identification, and duly sworn by

18   the Notary Public, was examined and

19   testified as follows:

20

21   EXAMINATION BY MR. GALLAGHER:

22

23      Q.  For the record, my name is Sean

24   Gallagher. I represent Timothy LaFrenier in this
```

Page 17

1    Q. Prior to that date would you work out
2    with weights?
3    A. Yes.
4    Q. You would go to a gym to do that?
5    A. No.
6    Q. You do it where?
7    A. My home.
8    Q. How long had you been doing that prior
9    to 6/15/2001?
10    A. Since I was about 15.
11    Q. And how old were you on that date?
12    A. Forty-one.
13    Q. Do you keep track of how much you
14    could bench press, June 15, 2001? Do you keep
15    track of how much you could bench press?
16    A. I know how much I can bench press.
17    Q. How much?
18    A. Over 350.
19    Q. Do you have an estimate as to how
20    much Mr. LaFrenier weighed at the time of his
21    arrest?
22    A. One-seventy.
23    Q. Estimate as to how tall he was?
24    A. About six feet.

Page 18

1    Q. When you were asked to go to the scene
2    what information did you receive?
3    A. Just an officer needs help.
4    Q. Nothing else.
5    A. (Shaking head.)
6    MR. TEHAN: You have to answer
7    verbally.
8    A. No.
9    Q. And you had been asked to assist
10    officers on other occasions prior to June 15,
11    2001.
12    A. Yes.
13    Q. And was it standard that the
14    information you would receive is an officer needs
15    help?
16    MR. TEHAN: Object to "standard".
17    You can answer.
18    A. Yeah, I mean there was different --.
19    Q. When you were told on this date, the
20    fifteenth of June, did you ask the dispatcher
21    what the situation was?
22    A. No.
23    Q. Did you have any speculation as to
24    what the situation might be?

Page 19

1    A. No.
2    Q. Did you know that a motor vehicle was
3    involved?
4    A. No.
5    Q. You were asked to go to a particular
6    location?
7    A. Yes.
8    Q. And did you know who the officer was
9    at that location before you got there?
10    A. Yes.
11    Q. Was that something that was given to
12    you through dispatch?
13    A. No.
14    Q. How did you know?
15    A. I heard the call. I heard her call
16    direct, and I answered directly back to her that
17    I was en route.
18    Q. All right. Now, once you arrived at
19    the scene -- you were in a marked cruiser?
20    A. No.
21    Q. What were you driving?
22    A. Unmarked cruiser. I'm not a road cop.
23    Q. And how were you dressed?
24    A. Full uniform. Excluding the duty belt.

Page 20

1    Q. On approaching the scene what were
2    your first observations of Officer Kinirey?
3    A. Rolling around, wrestling with a male
4    subject.
5    Q. When you say "rolling around", do you
6    mean on the ground?
7    A. Yes.
8    Q. Can you be more descriptive when you
9    say "rolling around"?
10    A. Wrestling. Fighting.
11    Q. When you say "wrestling" are you
12    saying that no punches were being thrown?
13    A. Couldn't tell.
14    Q. Could you tell, was one person on top
15    of the other person?
16    A. No. They were kind of side-by-side.
17    Q. When you saw this did you call for
18    backup?
19    A. No.
20    Q. Is there a reason you didn't call for
21    backup?
22    A. No.
23    Q. Did you think you would need backup?
24    A. At that time, no.

Page 25

1    MR. GALLAGHER: Right.
2    (Document marked.)
3    Q. When you first saw them rolling on the
4    ground, what were you thinking at that point in
5    time?
6    A. "What's going on?"
7    Q. What would you say your state of mind
8    was? Were you upset?
9    A. No.
10   Q. Were you concerned?
11   A. Concerned.
12   MR. GALLAGHER: May we go off the
13   record for one second?
14   (Discussion off the record.)
15   Q. As of June 15, 2001 how long had you
16   known Officer Kinirey?
17   A. Since 1997.
18   Q. From 1997 to the date of this arrest
19   had any other female officer been employed by the
20   Townsend Police Department?
21   MR. GALLAGHER: Strike that.
22   Q. From 1997 to 2001 were there other
23   female police officers working for the Townsend
24   Police Department?

Page 26

1    A. Yes.
2    Q. After your car comes to a stop and you
3    alight do you run to Officer Kinirey and Mr.
4    LaFrenier?
5    A. Yes.
6    Q. Do you have a memory of that?
7    A. Yes.
8    Q. Where do you go in relation to Mr.
9    LaFrenier's car? In other words, do you run
10   around the front of it or do you run around the
11   back of it?
12   A. The back. In-between the two vehicles.
13   Q. What do you do when you get to the two
14   persons? What do you do when you get to them?
15   A. Bend over and pick Mr. LaFrenier up
16   over his armpits.
17   Q. Did you pick him up in the air?
18   A. No, just picked him up off his --.
19   Q. When you did that was he facing you or
20   facing away from you?
21   A. Facing away from me.
22   Q. When you're running toward him do you
23   know whether or not he's facing you?
24   A. He was on his side.

Page 27

1    Q. Was he looking at you, as best you
2    could tell, as you're running towards him?
3    A. I don't know.
4    Q. Was the back of his head towards you?
5    A. No. Profile.
6    Q. Do you say anything as you're
7    approaching the officer and Mr. LaFrenier?
8    A. I don't believe so. I'm not sure.
9    Q. And once you pick Mr. LaFrenier off
10   the ground is he facing you or facing away from
11   you?
12   A. Facing away from me.
13   Q. And did you say anything to him at
14   that point?
15   A. Yeah. At that point I know I announced
16   myself as Officer Morrison.
17   Q. And does he respond to that?
18   A. No.
19   Q. What happens next?
20   A. He starts flailing his arms and
21   elbows, like to try to get away.
22   Q. And what do you do?
23   A. Try to gain -- you know, gain control
24   of him. Because I have my hands under his arms as

Page 28

1    I was walking him towards the vehicle, and he
2    started flailing his arms and elbows.
3    Q. In putting your hands under his arms,
4    is that a technique that you learned as part of
5    your police training?
6    A. Yeah.
7    Q. Do you recall when or where you
8    learned that?
9    A. No.
10   Q. And you're walking him towards the
11   front of the car.
12   A. No, towards the side.
13   Q. Towards the side of the car.
14   A. Yes.
15   Q. Does he say anything while you're
16   doing this?
17   A. I don't recall.
18   Q. Do you lean him over the car, the
19   front of the car?
20   A. Attempt to.
21   Q. And were you successful, ultimately,
22   in doing that?
23   A. Yes.
24   Q. And what was the distance that you had

Page 29

1 to move from the point that you picked him up to
2 the side of the car?
3    A. Three feet.
4    Q. During the three feet what was Mr.
5 LaFrenier doing?
6    A. Flailing his arms as if he was trying
7 to, you know, get away.
8    Q. And did he get away?
9    A. Can you be more specific with the
10 question?
11    Q. Sure. During that three feet did you
12 lose your grip on him?
13    A. Yes.
14    Q. And can you describe how that
15 happened?
16    A. Just slipped off of him.
17    Q. Other than bench pressing there's a
18 lot of other exercises you can do with weights,
19 correct?
20    A. Yes.
21    Q. And what would those exercises be for
22 you, that you actually did?
23      MR. TEHAN: As of that period?
24      MR. GALLAGHER: Yes, prior to June 15,

Page 30

1 2001.
2      MR. TEHAN: I'll object.
3      You can give him your routine.
4    A. Bench press, military press, leg
5 pull-downs, close rip bench. Tricep extensions,
6 reverse tricep extensions. Curls. Squats.
7    Q. After Mr. LaFrenier got out of your
8 grasp what happened next?
9    A. I gained control of him again.
10    Q. How did you do that?
11    A. Grabbing his arms.
12    Q. Then what did you do?
13    A. At that point, placed him over the
14 vehicle, grabbed his arm, because at that point
15 he kind of had his arms kind of tucked in front.
16 Grabbed his arm, held the cuffed hand behind him,
17 and may have grabbed the other arm, and he was
18 cuffed.
19    Q. And did his chest come in contact with
20 the vehicle?
21    A. Yes.
22    Q. And did his head come in contact with
23 the vehicle?
24    A. Yes.

Page 31

1    Q. And is that the side of the vehicle or
2 is that the front hood of the vehicle?
3    A. That would be the fender. I believe it
4 was the fender side, passenger front fender.
5    Q. How high was that fender off the
6 ground?
7    A. I'm not sure.
8    Q. When you're talking the fender you're
9 talking the lower portion of the car in the
10 front?
11    A. Like where the hood is.
12    Q. The hood --
13    A. You've got the front fender, the hood
14 and the fender. That area there.
15    Q. Is the fender below the grille of the
16 car?
17      MR. TEHAN: That's the bumper.
18      But answer the question.
19    A. No.
20    Q. Once the cuffs are on what happens?
21    A. He was placed in the cruiser.
22    Q. And who did that?
23    A. Both of us.
24    Q. And describe what happened while that

Page 32

1 was going on.
2    A. Just walked him over to the vehicle.
3 Still combative. Placed him in the cruiser.
4 Refused to swing his legs over into the vehicle
5 -- inside of the cruiser.
6    Q. When you say he was still combative on
7 the way over, can you describe that, what he was
8 doing physically?
9    A. Just fidgety. Excited.
10    Q. Was it Officer Kinirey who put his
11 feet into the cruiser?
12    A. Yes.
13    Q. You went back to the station?
14    A. Yes.
15    Q. At some point in time these charges
16 against Mr. LaFrenier went to trial.
17    A. Yes.
18    Q. You weren't in the court on the trial
19 date?
20    A. I was two times before that.
21    Q. So it's your understanding that there
22 were two trial dates before the charges were
23 ultimately resolved?
24    A. There were two prior dates. I don't

Page 37

1  file.
2      Q.  And what did she say?
3      A.  Assault and battery, disorderly person
4  and resisting arrest.
5      Q.  Assault and battery against whom?
6      A.  Both of us.
7      Q.  Did you have any opinion of Mr.
8  LaFrenier's intoxication from the time you first
9  saw him up until the time just before he took the
10  breathalyzer?
11      A.  Yes.
12      Q.  And what was that?
13      A.  He appeared to be under the influence
14  of something.
15      Q.  Something.
16      MR. GALLAGHER: I don't have anything
17  else.
18      MR. TEHAN: I have just a few.
19
20  EXAMINATION BY MR. TEHAN:
21
22      Q.  Officer Morrison, do I understand
23  correctly that before you began work as a patrol
24  officer in Townsend you had attended and

Page 38

1  successfully completed both reserve and full-time
2  police academies?
3      A.  Yes.
4      Q.  Were you the so-called Townsend police
5  court officer as of June 15, 2001?
6      A.  Yes.
7      Q.  What were your duties in that regard?
8      A.  To represent the Townsend Police
9  Department down at the Ayer District Court or any
10  other court that I needed to be in.
11      Q.  In fact, at the time you received a
12  call, or heard a call, from Officer Kinirey, you
13  were not in a courtroom, true?
14      A.  No.
15      Q.  What were your duties at that point
16  when you received that call?
17      A.  I believe I was coming back from
18  court.
19      Q.  You were aware before the complaint in
20  this case was applied for that Officer Kinirey
21  intended to bring a charge of assault and battery
22  on a police officer, being yourself, correct?
23      A.  Yes.
24      Q.  And she told you that, true?

Page 39

1      A.  Yes.
2      Q.  And also you saw that on the complaint
3  application that you were bringing to the court
4  for processing, true?
5      A.  Yes.
6      Q.  And you did not indicate at any time
7  to Officer Kinirey that such a charge should not
8  be processed, correct?
9      A.  Correct.
10      Q.  Would you state for the record what
11  acts of Mr. LaFrenier on June 15, 2001, during
12  your encounter with him, were, in your mind,
13  an assault and battery on you as a police
14  officer?
15      A.  After I picked him up he was
16  squirming, flailing his elbows. I lost grip, and
17  he had elbowed me on the side of the chest here
18  twice.
19      Q.  Did you sustain any personal injury
20  from those elbows?
21      A.  Personal or physical?
22      Q.  A personal physical injury?
23      A.  No physical injury, but he did break a
24  pair of sunglasses that were in my pocket.

Page 40

1      Q.  Was it the elbow to the chest that you
2  viewed as being the assault and battery on
3  yourself?
4      A.  Yes.
5      Q.  By the way, by your understanding of
6  the assault and battery on a police officer
7  statute, is it necessary that the officer be
8  injured in some fashion before such a charge can
9  be brought?
10      A.  No.
11      Q.  When did you learn that the ABPO on
12  yourself had been dismissed?
13      A.  Either the day of the trial or, you
14  know, after the trial, or the day after.
15      Q.  Were you consulted by Officer Kinirey
16  before she filed her immediate threat form with
17  the Registry?
18      A.  No.
19      Q.  At the time that Officer Kinirey filed
20  the complaint which contained the charge of
21  assault and battery upon you, was it your
22  intention to testify in court concerning what had
23  happened to you?
24      A.  Yes.

Page 41

1    Q. Would your testimony have been the
2 same as that related today?
3     A. Yes.
4    Q. Did you punch Mr. LaFrenier?
5     A. No.
6    Q. Did you kick him?
7     A. No.
8    Q. Did you use a nightstick on him?
9     A. No.
10    Q. Did Officer Kinirey use a nightstick
11 on him?
12     A. No.
13    Q. Did either of you use any chemical
14 agent on him?
15     A. No.
16    Q. Did either of you draw a firearm?
17     A. No.
18    Q. Apart from grabbing his arms to
19 facilitate handcuffing, did you use any type of
20 submission hold on him?
21     A. No.
22    Q. My brother asked you questions about
23 your fitness. Did you feel that you used that
24 strength appropriately in manipulating Mr.

Page 42

1 LaFrenier's arms for handcuffing?
2     A. Yes.
3    Q. Were you stronger than he?
4     A. Yes.
5    Q. Do you feel that your strength kept
6 the incident from going further along?
7     A. Yes.
8      MR. TEHAN: I have nothing further.
9
10 FURTHER EXAMINATION BY MR. GALLAGHER:
11
12    Q. Were you informed by any source as to
13 why the charge involving you, being the ABPO on
14 you, was dismissed?
15     A. No.
16    Q. Did you inquire of any source why the
17 ABPO on you was dismissed?
18     A. No.
19    Q. Prior to this date, June 15, 2001, had
20 there been other times where you had charged
21 somebody with an assault and battery on you or
22 another officer had charged somebody with an
23 assault and battery on you?
24      MR. TEHAN: I'll object as compound.

Page 43

1      You can answer it.
2     A. No.
3    Q. How many arrests have you made from
4 the time when you were first hired with Townsend
5 until June 15, 2001?
6     A. Fifty.
7    Q. How many?
8     A. Fifty.
9    Q. Five-oh --
10     A. Yeah.
11    Q. -- or one-five? Five-oh?
12     A. Yeah, five-oh, I guess.
13      MR. TEHAN: If it is that, it doesn't
14 help. If you can give him how many arrests --
15      THE WITNESS: No.
16    Q. How many breathalyzer tests did you
17 administer?
18      MR. TEHAN: Prior to that --
19    Q. Prior to June 15.
20      MR. TEHAN: Thank you.
21     A. Fifteen.
22    Q. Did any of those 15 blow zero zero?
23      MR. TEHAN: You're saying other than
24 this one, correct?

Page 44

1      MR. GALLAGHER: Yes, prior.
2      MR. TEHAN: Thank you.
3     A. No.
4      MR. GALLAGHER: I don't have anything
5 else.
6      MR. TEHAN: I have nothing, either.
7      (Deposition concluded.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# EXHIBIT E

TIMOTHY L. LAFRENIER

VS.

MARY ANNE KINIREY, ET AL


U. S. DISTRICT COURT NO. 04-40114-NMG



DEPOSITION OF KEITH LAFRENIER


SEPTEMBER 23, 2005



MINI TRANSCRIPT AND WORD INDEX



LEAVITT REPORTING, INC.

1207 COMMERCIAL STREET

WEYMOUTH, MA 02189

(617)335-6791    1-800-464-1877

FAX (617)335-7911

1    **A.**   My wife and in-laws.

2    **Q.**   Do you have any children?

3    **A.**   One daughter.

4    **Q.**   She's how old?

5    **A.**   One.

6    **Q.**   What is your Social Security number?

7    **A.**   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.

8    **Q.**   Date of birth?

9    **A.**   5-10-77.

10   **Q.**   Please excuse this question, but have you ever

11   been convicted of or pled guilty to a crime?

12   **A.**   No.

13   **Q.**   Would you tell me briefly what your educational

14   history is?

15   **A.**   I'm four classes short of a bachelor's degree.

16   **Q.**   What discipline?

17   **A.**   Business management.

18   **Q.**   Are you presently taking courses?

19   **A.**   Yes.

20   **Q.**   Where?

21   **A.**   Nichols College.

22   **Q.**   Where is that located?

23   **A.**   Dudley, Mass.

1    present address?

2    **A.**   Yes. I will sign for a home this Monday.

3    **Q.**   You're buying a home?

4    **A.**   Yes.

5    **Q.**   Do you know the address where you will be

6    living?

7    **A.**   Yes.

8    **Q.**   Please give it to us.

9    **A.**   35 Highland Street, Northbridge, Mass. I don't

10   know the zip code, though.

11   **Q.**   When will that effectively be your residential

12   address?

13   **A.**   Monday, the, what is that, 26th?

14   **Q.**   Of September?

15   **A.**   Yes.

16   **Q.**   Please tell me for the record what is your

17   relationship to a man by the name of Timothy LaFrenier.

18   **A.**   My father.

19   **Q.**   Prior to coming to this deposition, did you do

20   anything to prepare for it?

21   **A.**   No.

22   **Q.**   Did you review any printed materials associated

23   with this case?

---

6

1    **Q.**   I presume then you're a high school graduate?

2    **A.**   Yes.

3    **Q.**   From what school and when?

4    **A.**   Fitchburg High School, 1995.

5    **Q.**   Are you presently employed?

6    **A.**   Yes.

7    **Q.**   What do you do for a living?

8    **A.**   Project manager.

9    **Q.**   With what business?

10   **A.**   Ima Nova, automated manufacturer and integrator

11   of packaging equipment.

12   **Q.**   You may want to spell the name of the place for

13   the reporter.

14   **A.**   I M A space N O V A Packaging Systems.

15   **Q.**   What are your specific duties there?

16   **A.**   I manage the complete cycle of equipment and

17   line integration.

18   **Q.**   How long have you held that job?

19   **A.**   Five years.

20   **Q.**   Do you have any expectation presently of

21   leaving it?

22   **A.**   No.

23   **Q.**   Do you have any expectation of moving from your

8

1    **A.**   No.

2    **Q.**   Did you review specifically a document called

3    answers to interrogatories which your father signed under

4    oath?

5    **A.**   No.

6    **Q.**   Did you review his deposition transcript?

7    **A.**   No.

8    **Q.**   Did you speak with your father concerning his

9    deposition?

10   **A.**   Briefly.

11   **Q.**   What did he tell you about it?

12   **A.**   He didn't offer any details about his actual

13   deposition. It was more of just the environment because

14   I had never done it before, so.

15   **Q.**   Did you speak with your mother about any facts

16   underlying this case?

17   **A.**   Yes.

18   **Q.**   By the way, for the record, what is her name?

19   **A.**   Maureen LaFrenier.

20   **Q.**   Where does she live?

21   **A.**   19 Jeffrey Keating Road, Fitchburg.

22   MR. TEHAN: Off the record a moment.

23   (Discussion off the record.)

19

1    **A.**   Ima Nova.

2    **Q.**   Was this via telephone call?

3    **A.**   Yes.

4    **Q.**   From whom?

5    **A.**   My mother.

6    **Q.**   What did she tell you in that telephone call?

7    **A.**   She was hysterical, and she told me that my

8    father had been arrested, I believe she said for A and B,

9    yes, I'm certain she said A and B, and he was at

10   Leominster Hospital in the emergency room.

11   **Q.**   Is there anything further she said to you at

12   that point?

13   **A.**   They wanted her to go and bail him out of the

14   emergency room.

15   **Q.**   Did she mention to you whether or not any

16   officer asked her if there was a medical explanation for

17   your father's behavior?

18   **A.**   No, I don't recall that.

19   **Q.**   Did your mother in that discussion or at any

20   time since suggest to you any medical explanation for

21   your father's behavior?

22         MR. GALLAGHER:  I would object to the form of

23   that in regard to behavior.

18

1         MR. TEHAN:  I understand.  Let me try again.  I

2    think it's a well-taken objection.

3    **Q.**   Did your mother ever indicate to you whether

4    she believed there was a medical condition on June 15th,

5    2001, that was affecting your father's mental state?

6    **A.**   She didn't infer that it was affecting his

7    mental state.  I think she suggested that his white blood

8    cell count was extremely high which is an indication of

9    some sort of infection, so physically she felt there was

10   something wrong with him.

11   **Q.**   Thank you.  In the week or weeks prior to

12   June 15th, 2001, do you have any memory of your Dad being

13   ill?

14   **A.**   In the weeks prior?

15   **Q.**   Week or weeks prior.

16   **A.**   I don't.

17   **Q.**   Do you have any memory of his having some type

18   of plaque on his tongue?

19   **A.**   Yes.

20   **Q.**   Do you know what is the case of that?

21   **A.**   I want to say he thought it was from smoking,

22   but I don't know what the cause of it was.

23   **Q.**   Do you have any memory in, perhaps, the week

1    leading up to June 15th, 2001, of your father mentioning

2    to you that he wasn't sleeping well?

3    **A.**   No.

4    **Q.**   Do you have any memory of your father looking

5    tired on June 15th, 2001?

6    **A.**   I didn't see him that day.

7    **Q.**   Is it that you go to work before him?

8    **A.**   Yes.  Or vice-versa.

9    **Q.**   You don't take breakfast with him?

10   **A.**   No.

11   **Q.**   Or didn't that day anyway?

12   **A.**   No.

13   **Q.**   Did your mother go to Leominster Hospital?

14   **A.**   No.

15   **Q.**   Why not?

16   **A.**   I didn't think it was good for her to go there.

17   I had never seen her -- I didn't see her.  Listening to

18   her, I didn't think it would be a good place for her to

19   go.

20   **Q.**   Why, sir?

21   **A.**   Because I don't know she was prepared to handle

22   that emotionally.

23   **Q.**   Did you tell her that?

20

1    **A.**   Yes.

2    **Q.**   Did you volunteer to go?

3    **A.**   Yes.

4    **Q.**   What was the next step that you took concerning

5    your father's situation after your Mom called?

6    **A.**   I left work and drove to the emergency room.

7    **Q.**   Whom did you first encounter there?

8    **A.**   An attendant.  I asked if my father was there.

9    **Q.**   When you say an attendant, can you be more

10   specific?

11   **A.**   I guess the front desk of the emergency room.

12   **Q.**   What did that person tell you?

13   **A.**   Yes, and they instructed me to go through the

14   doors into the emergency room.

15   **Q.**   I presume you did so?

16   **A.**   Yes.

17   **Q.**   What did you next see or hear?

18   **A.**   I next saw, I believe it's Officer Kerney.

19   **Q.**   Would it be Kinirey?

20   **A.**   Kinirey, yes.

21   **Q.**   Can you describe that officer for us, please?

22   **A.**   She was very short, five foot two, five foot

23   three, she had dirty blond hair, bobbed at her shoulders,

1  and she looked very bulky. I presume she had a vest on.

2  **Q.** Was she in uniform?

3  **A.** Yes.

4  **Q.** Can you estimate her age, as you recall?

5  **A.** I would estimate forty.

6  **Q.** Did you make any notation as to the

7  jurisdiction of the police department she worked for?

8  **A.** Did I know at that point?

9  **Q.** Yes.

10  **A.** Yes.

11  **Q.** How did you learn that?

12  **A.** From my mother.

13  **Q.** Did your mother make any comment to you --

14  Strike that.

15  I may have asked you, so forgive me. Did your

16  mother mention to you at all any discussion she might

17  have had with the police prior to your going to the

18  hospital?

19  **A.** Yes.

20  **Q.** What did she say about it?

21  **A.** I think, I believe we already covered it, and

22  it was just her being contacted by the police station and

23  them informing her that her husband had, in fact, been

22

1  arrested and brought to Leominster emergency room.

2  **Q.** Did she identify the officer or officers with

3  whom she spoke?

4  **A.** She did, but I can't recall.

5  **Q.** Did she have any criticism of the approach or

6  tone of the officers on the phone?

7  **A.** I know she was very upset because I believe she

8  was inferring that they were not sympathetic at all to

9  the situation.

10  **Q.** What did she say that led you to think she felt

11  that way?

12  **A.** I can't say exactly what was said. I just know

13  she was very hysterical over the whole situation.

14  **Q.** Let's get back to the hospital. Where was

15  Officer Kinirey when you first saw her?

16  **A.** On the phone. Behind the desk.

17  **Q.** Behind a nurse's desk?

18  **A.** Yes.

19  **Q.** Did you hear anything she said on the phone?

20  **A.** Initially, no. I think we engaged almost

21  immediately from me entering.

22  **Q.** Did she hang up the phone when you met with

23  her?

1  **A.** No.

2  **Q.** Do you know to whom she was speaking?

3  **A.** I believed it was her superior.

4  **Q.** What made you feel that way?

5  **A.** It seemed as if she was getting, briefing him

6  and getting instructions on what to do.

7  **Q.** As best you can, what do you actually recall

8  her saying into the phone?

9  **A.** Into the phone? I remember her saying that I

10  was -- I can't say exactly what was said, but it was

11  something to the effect of me giving her an attitude or

12  giving her a hard time at the hospital.

13  **Q.** Which begs the question, were you giving her an

14  attitude or a hard time?

15  **A.** Initially, no.

16  **Q.** At some point were you?

17  **A.** At some point -- I wouldn't say I was giving

18  her an attitude. I would say I was a little upset.

19  **Q.** Let's build to that, and we'll walk through it

20  bit by bit. She was the phone when you first arrived.

21  Correct?

22  **A.** Um-hmm.

23  **Q.** Would that be yes?

24

1  **A.** Yes.

2  **Q.** Did you introduce yourself to her?

3  **A.** At first, no. I asked for my father. I said,

4  "Is Tim LaFrenier here?" And she said, "Who are you?"

5  And I said, "I'm his son," and she said, the next thing

6  out of her mouth was, "Do you have the money?"

7  **Q.** Did you know what she meant?

8  **A.** I presumed she meant bail money.

9  **Q.** Did you seek to clarify that assumption?

10  **A.** Yes.

11  **Q.** What did you ask her?

12  **A.** I'm sorry. She said, "Do you have twenty-five

13  dollars?" I believe is exactly what she said.

14  **Q.** You thought that referred to bail money?

15  **A.** Yes.

16  **Q.** Did you clarify that point?

17  **A.** I said, "Is this necessary?" She said, "You

18  don't even know what we have been through today." I

19  said, "You don't know what you have been through? I just

20  got a call from my mother hysterical that my father has

21  been arrested for assault and battery and he's at the

22  Leominster emergency room." I think I recited, "You

23  don't know what you have been through?" From that point

27

1  forward I believe she talked to her superior, and I kind
2  of just waited in the balance just for the next step or
3  for the next thing to happen.
4     **Q.**  Did you raise your voice when you made that
5  statement to her?
6     **A.**  No.
7     **Q.**  Were you angry when you made that statement?
8     **A.**  Yes.
9     **Q.**  On reflection, did your tone reflect that
10 anger?
11    **A.**  I didn't raise my voice, but my tone may have
12 reflected that anger.
13    **Q.**  What is the next thing that you said to Officer
14 Kinirey or she said to you?
15    **A.**  I need a second. I haven't thought about this
16 in a while.
17    **Q.**  Take your time.
18    **A.**  I do remember her saying, "Let me see it," the
19 money.
20    **Q.**  Yes.
21    **A.**  And she made me physically show her I had the
22 money. That may have happened prior to me saying "Is
23 this necessary?" or afterwards.

1     **A.**  She said they had quite the scene, it was quite
2  the scene, and I believe she mentioned it was on the side
3  of the road, it took a few officers to restrain my
4  father.
5     **Q.**  Did you see any other police officers at the
6  station?
7     **A.**  No.
8     **Q.**  Was it your understanding while at the hospital
9  that your father was under arrest as Officer Kinirey's
10 prisoner?
11    **A.**  Yes.
12    **Q.**  Did she tell you that?
13    **A.**  I presumed that because she asked for money.
14 She didn't come out and say he was under arrest.
15    **Q.**  Did you debate with the officer the
16 appropriateness of your father having been arrested?
17    **A.**  At that point, I mean, I don't believe so.
18    **Q.**  Did you ask Officer Kinirey to discharge your
19 father to your custody?
20    **A.**  No. I was told they were going to discharge
21 him.
22    **Q.**  Where?
23    **A.**  At the emergency room.

26

1     **Q.**  Very well. Go ahead.
2     **A.**  But I don't recall how much interaction from
3  that point forward with her verbally other than her
4  saying, "You're going to have to follow me back to the
5  police station." I remember her saying to the effect
6  that, you know, I was giving her a hard time and I was
7  giving her an attitude. And, clearly, in my opinion, the
8  only attitude from when I walked in was coming from her.
9  And I was very kind in my gestures and almost confused
10 because I still didn't know any details about what had
11 transpired. So in my opinion -- Are you asking my
12 opinion or am I going off too far?
13    **Q.**  We can strike it later. Go ahead.
14    **A.**  In my opinion, I came in not knowing what to
15 expect, and I was received -- and I felt that she was
16 treating me, I don't know if maliciously is the word or
17 just she was very angry, and it was obvious from the
18 minute I walked through the door. She was tapping her
19 foot and had a really angry look on her face.
20    **Q.**  Did you ask Officer Kinirey what had happened
21 earlier?
22    **A.**  No.
23    **Q.**  Did she volunteer what had happened?

28

1     **Q.**  Who had told you that?
2     **A.**  My mother.
3     **Q.**  Did Officer Kinirey ever say she was thinking
4  about releasing your father to you from the hospital?
5     **A.**  That was the assumption that was happening.
6  That's why I was there.
7     **Q.**  I understand. My question is different. Did
8  she ever tell you she planned to release him to you from
9  the hospital?
10    **A.**  She never told me that.
11    **Q.**  In fact, what she said was it would be
12 necessary for you to follow her to the station. Correct?
13    **A.**  Yes.
14    **Q.**  Did you object to that?
15    **A.**  I don't know that I objected to it. No, I
16 didn't object to it. I was obviously upset. I was
17 upset, but I didn't object to it.
18    **Q.**  Was there any point in time when the two of you
19 were speaking with a raised voice towards each other?
20    **A.**  I wouldn't say they were raised voices. They
21 were more of stern.
22    **Q.**  How long did this discussion that we are now
23 discussing take?

49

| | | |
|---|---|---|
| 1 | **Q.** | Did he sit in the front seat? |
| 2 | **A.** | Yes. |
| 3 | **Q.** | Did he get in the car on his own? |
| 4 | **A.** | Yes. |
| 5 | **Q.** | Did you speak with your father on the ride |
| 6 | home? | |
| 7 | **A.** | Yes. |
| 8 | **Q.** | Did you talk about the day's events? |
| 9 | **A.** | Yes. |
| 10 | **Q.** | Did he seem lucid and clear headed and coherent |
| 11 | to you at that point? | |
| 12 | **A.** | No. |
| 13 | **Q.** | Why not? What did you observe that led you to |
| 14 | feel he wasn't? | |
| 15 | **A.** | I remember when we were about a mile from home |
| 16 | he asked me where we were, and it made me nervous, and I | |
| 17 | asked him if he needed to go back to the hospital, and he | |
| 18 | said no. And I just -- The tone of his voice was very, | |
| 19 | can't think of a word, weak and dejected and frail. | |
| 20 | **Q.** | At the point your father asked you where you |
| 21 | were, were you at a point that you were very familiar | |
| 22 | with? | |
| 23 | **A.** | Yes. |

50

| | | |
|---|---|---|
| 1 | **Q.** | To your knowledge, is it a point he was very |
| 2 | familiar with? | |
| 3 | **A.** | Yes. |
| 4 | **Q.** | Did you explain to him at that point where you |
| 5 | were? | |
| 6 | **A.** | Yes. |
| 7 | **Q.** | What effect did that have, if any, that you |
| 8 | observed? | |
| 9 | **A.** | He thought about it for a few seconds, and then |
| 10 | we made a turn, and he realized where we were. | |
| 11 | **Q.** | Is there anything else that you recall about |
| 12 | the ride home? | |
| 13 | **A.** | I just recall that his arms and his legs were |
| 14 | just red, raw. I can't say his legs. His arms. I'm | |
| 15 | sorry. | |
| 16 | **Q.** | He had long pants on. Correct? |
| 17 | **A.** | Yes. |
| 18 | **Q.** | Did you observe any abraded areas to your |
| 19 | father's arms? | |
| 20 | **A.** | Can you define abraded? |
| 21 | **Q.** | Roughed up, irritated, red. |
| 22 | **A.** | Yes. |
| 23 | **Q.** | Where was that located? |

51

| | | |
|---|---|---|
| 1 | **A.** | His forearms. |
| 2 | **Q.** | Was it in the area where you had seen him |
| 3 | handcuffed -- | |
| 4 | **A.** | No. |
| 5 | **Q.** | -- area of his body? |
| 6 | **A.** | No. |
| 7 | **Q.** | Did you see any rings or indentations from the |
| 8 | handcuffs on your father's wrists -- | |
| 9 | **A.** | No. |
| 10 | **Q.** | -- at any time? |
| 11 | **A.** | No. Not that I recall. |
| 12 | **Q.** | Please paint me a verbal picture, as best you |
| 13 | can, because the reporter can't take an actual picture, | |
| 14 | of the areas that you saw on your father's arms that were | |
| 15 | abraded as we have discussed it. | |
| 16 | **A.** | I would say it was the center of his forearms, |
| 17 | from what I recall, where the majority of the meat and | |
| 18 | the flesh would be-on his arms. | |
| 19 | **Q.** | The palm side of his forehands? |
| 20 | **A.** | Yes. Palms up. And I don't recall anything |
| 21 | more than that. | |
| 22 | **Q.** | Would it be fair to say you saw no injuries to |
| 23 | his head area? | |

52

| | | |
|---|---|---|
| 1 | **A.** | No. |
| 2 | **Q.** | It would be fair to say that? |
| 3 | **A.** | It would be fair to say, yes. |
| 4 | **Q.** | At some point did your Dad take his pants off |
| 5 | and show you some areas of irritation on his legs? | |
| 6 | **A.** | Yes. |
| 7 | **Q.** | When did he do that? |
| 8 | **A.** | When he got home, I remember him coming out, |
| 9 | believe he was in his underwear, and he was showing us | |
| 10 | his leg. | |
| 11 | **Q.** | What did you observe? |
| 12 | **A.** | He just observed -- I didn't observe any |
| 13 | bruises at the time. Just observed his legs were red. I | |
| 14 | don't know if the word, almost, like, swelling. | |
| 15 | **Q.** | What areas of his legs? |
| 16 | **A.** | Only where you would have meat on your bones. |
| 17 | Not like your shins or your knees, but more like your | |
| 18 | thighs. | |
| 19 | **Q.** | Are you referring to the quadriceps area? |
| 20 | **A.** | Thighs, quadriceps, yes. |
| 21 | **Q.** | Was there general redness throughout those |
| 22 | areas? | |
| 23 | **A.** | Yes. |

# EXHIBIT F



# Townsend Police Department

272 Main Street
P.O. Box 137
Townsend, Massachusetts

01469-0137                              WILLIAM MAY, *Chief*

DATE:    September 5, 1985

TO:      All Officers

FROM:    William May, Chief

RE:      General Order #85-1 - Use of Force
         PR-24 Policy and Procedure

## GENERAL CONSIDERATIONS AND GUIDELINES

Townsend Police Officers are issued PR-24 Police Batons
and trained in their use, for self-protection and for the
protection of the public.  Townsend Police Officers, because
of their law enforcement and peace keeping role, may be re-
quired at times to resort to physical force to enable them
to fully carry out their responsibilities.  The use of force
by police officers is an issue of great concern to society,
individual officers, and police administrators alike.  All
too often cries of police brutality are heard throughout the
country and it has become more difficult for an officer to
effectively do their job without fear of reprisal.  This is
particularly true where a determination of the propriety of
the use of force is often after-the-fact and subjective in
nature.  Therefore, the lawful use of force must be controlled
and confined so that an officer will not subject themself to
civil and/or criminal liability through the un-necessary use
of force.  The procedures that follow are for the benefit of
both the citizen and police officer, and thus provide specific
standards of guidance in incidents which require use of force.

## DEFINITION OF TERMS

1.  "PR-24 Baton" - The PR-24 baton is a multi-purpose
    police instrument which is molded as one piece, and
    constructed of extra strong polycarbonate material.
    The PR-24 baton is black in color, twenty-four inches
    long, one and one quarter inches in diameter, weighs
    approximately twenty-seven ounces, having a handle
    form-fitted at right angles to the long extended
    portion.

General Order #85-1                                   Page Two

2. "Non-Deadly Force" - Physical force which in the
   circumstances is neither likely nor intended to
   cause death or great bodily harm.

3. "Deadly Force" - Physical force which, under the
   circumstances used, is readily capable of causing
   death or serious physical injury. Deadly force is
   most often inflicted by firearms and is treated in
   a separate policy. NOTE: See Written Order #84-2
   issued by the Townsend Police on July 31, 1984.

4. "Police Officer" - Any person appointed by the
   Townsend Board of Selectmen and dully sworn in
   by the Town Clerk of the Town of Townsend as
   either police officer, reserve police officer,
   or reserve recruit police officer.

## POLICY

Townsend Police Written Order #85-1 authorizes police officers
to carry PR-24 batons at all times when on duty.

1. Use of force as outlined in this written order means
   "non-deadly force", such as verbal commands, use of
   hands, handcuffs, and PR-24 batons.

2. It shall be the policy of the Townsend Police Depart-
   ment to allow for the use of "non-deadly force" by a
   police officer in the performance of their duties:

   a. When necessary to preserve the peace, prevent
      commission of offenses, or prevent suicide or
      self-inflicted injury; or

   b. When necessary to overcome resistance to lawful
      arrests, searches and seizures, and to prevent
      escapes from custody; or

   c. When in self-defense, or defense of another against
      unlawful violence to his/her person or property.

General Order #85-1                        Page Three

3. The force used shall be no greater than is necessary
   and reasonable in a given situation.  The amount and
   degree of force which may be employed will be deter-
   mined by the surrounding circumstances including, but
   not limited to:

   a.  the nature of the offense;

   b.  the behavior of the subject against whom force
       is to be used;

   c.  actions by third parties who may be present;

   d.  physical odds against the officer; and

   e.  the feasibility or availability of alternative
       actions.

4. An officer acting alone may be required to resort to
   a much greater degree of force than would be necessary
   if another officer had been present.  Therefore, when-
   ever possible, an officer should call for and await
   assistance, "unless immediate action is required".

5. The preferred means of using force are set forth below
   in ascending order from the least severe to the more
   drastic measures.  An officer should exhaust every
   reasonable means of employing the minimum amount of
   force before escalating to a more severe application
   of force except where it is necessary to protect him-
   self or another from serious bodily injury or death.

   a.  Voice or verbal command.

   b.  Physical strength or skill.

   c.  PR-24 police baton.

   d.  Firearm.

General Order #85-1                              Page Four

6.  The PR-24 police baton may be used by an officer:

    a.  in self-defense or in the defense of another; or

    b.  when it is necessary to subdue a person <u>violently</u>
        resisting arrest; or

    c.  to deter persons violently engaged in riotous conduct.

    Because of the potential harm, the baton should only be
    utilized if lesser methods have failed or would be obviously
    futile.

7.  When the use of the PR-24 police baton is necessary, these
    guidelines shall be followed:

    a.  Blows capable of inflicting possibly fatal or perman-
        ent injury must be avoided.  For example, blows to the
        head, temple or throat can result in serious injury
        or even death; blows to the abdomen, groin or kidney
        areas can also be critical or fatal.

    b.  Blows from the baton shall be made in a short and
        snappy manner and shall be directed to the arms and
        legs.  This will temporarily incapacitate the aggressor
        but will not cause serious bodily harm.

    c.  Although the baton is a necessary police weapon, it was
        never intended to take the place of the service revolver.
        If deadly force is used or threatened, and human life is
        endangered, deadly force must be considered as a counter
        measure.  The baton will not suffice in such cases.

    d.  The baton should not be displayed or brandished as a
        threat unless its actual use in the situation would be
        proper.  This does not prohibit an officer from having
        a weapon readied when it is anticipated that a weapon
        may be required.

General Order #85-1                  Page Five

8. Furnishing, holding, maintaining, and inspection:

     a. The Chief of Police shall issue via the depart-
ment armorer a PR-24 police baton to all officers
of the Police Department.

     b. All officers of the Police Department shall carry
or have within their immediate control a PR-24
police baton at all times while on duty.

     c. All officers of the Police Department shall use
only those PR-24 batons supplied by the depart-
ment while on duty.

     d. This policy shall prohibit all officers from making
any changes, alterations, and/or repairs to depart-
ment PR-24 batons.

     e. If a PR-24 police baton issued to an officer is
defective or in need of repair, the baton should
be taken to the police armorer immediately, and,
if necessary, obtain a substitute weapon while
his/her weapon is being repaired.

     f. All officers are subject to periodic inspection of
their PR-24 police baton while on duty.

     g. All officers will be responsible for the safe
handling of their PR-24 police batons and must
properly secure them when not under their direct
control.

9. Proficiency in the use of the PR-24 Police Baton:

     a. All officers are to qualify and become proficient
in the use of the PR-24 police baton before being
authorized to carry and use it. Training is to
include but is not limited to the following schedule:

         1. Issuance of Townsend Police Written Order #85-1
which governs the use of "non-deadly force" and
the PR-24 police baton.

General Order #85-1                              Page Six

    2.  Issuance of the PR-24 Police Baton Training
        Manual, Library of Congress Card No. 76-6768,
        Sixth Printing dated June 1984, or the equivalent.

    3.  Issuance of a PR-24 Police Baton and baton ring
        holster.

    4.  Basic training by an instructor sanctioned by the
        Massachusetts Criminal Justice Training Council,
        or the equivalent, upon successful completion of
        which the officer becomes certified in the use of
        the PR-24 baton.

    5.  Re-certification annually by a certified instructor.

10.  Use of and Reporting:

The following procedure is to be followed whenever there
is an incident involving the use of force in which the
PR-24 is used.

    a.  Any police officer who injures any person as a result
        of the use of his/her PR-24 Police Baton will ensure
        that necessary steps are taken to provide the injured
        person with emergency medical treatment.

    b.  Following an incident involving the use of the PR-24
        Police Baton, all officers shall file a written report
        containing but not limited to the following information:

        1.  Names and address of victim/s and witnesses.

        2.  The extent and the treatment of injuries, if any.

        3.  The name of the treatment facility and doctor
           adminstering treatment if applicable.

        4.  The reasons and circumstances that required the
           use of the PR-24, and the use of force.

General Order #85-1                              Page Seven


11.  Possession:

    a.  PR-24 Police Batons are only to be used in con-
        junction with employment as a police officer for
        the Town of Townsend, and any other use is strictly
        prohibited.

    b.  PR-24 Police Batons are the property of the Town of
        Townsend Police Department and shall be turned into
        the Chief of Police upon termination of the individual
        police officer.

                              William E. May
                              Chief of Police