UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-40114-FDS

TIMOTHY L. LaFRENIER,  )
              Plaintiff  )
                        )
v                           )
                         )
MARY ANNE KINIREY, DANIEL  )
MORRISON, The CHIEF OF POLICE  )
"John Doe" and the TOWN OF  )
TOWNSEND,  )
              Defendants  )

PLAINTIFF'S L.R. 56.1 STATEMENT OF MATERIAL FACTS
DEMONSTRATING THERE ARE GENUINE ISSUES OF MATERIAL
FACT TO BE TRIED TO A JURY[1]

Timothy LaFrenier had been ill for two to three weeks when on on Friday June 15, 2001, at approximately noon, he left his place of employment, Compaq, in Nashua New Hampshire, intending to make a doctor's appointment in Fitchburg, Massachusetts. Exh. A at 16, 19, 42, 46, 49, 50. LaFrenier had been "very ill, very weak and very tired." Exh. A at 44. He had suffered from a fever and chills, and had been managing only two to three hours of sleep a night. Exh. A at 44-45. On the morning of the 15th, LaFrenier felt "very sick still, very tired." Exh. A at 48. Immediately upon leaving work, he started sweating; it was "coming down like a

---

[1] References to Timothy LaFrenier's Deposition are cited as Exh. A at p. ____. References to Mary Anne Kinirey's Deposition are cited as Exh. B at p. ___. References to John Johnson's deposition are cited as Exh. C. at _____. References to Daniel Morrison's Deposition are cited as Exh. D at _____. References to Kinirey's police report are cite as Exh. E.

shower." Exh. A at 53.

En route from Compaq to his appointment, LaFrenier pulled his car off to the side of the road; he was on Route 13 in Townsend. Exh. A at 46-47, 53-54. LaFrenier remembers being on Route 13, but he does not remember stopping. Exh. A at 46-47, 54. The last that he remembers is putting his head back and trying to take a deep breath. Exh. A at 54.

At approximately 12:40 p.m. on Friday June 15, 2001, a motorist walked into the Townsend police station and told Officer Mary Anne Kinirey (and a dispatcher) that there was a "gentleman who wasn't feeling well -- looked like he wasn't feeling well" -- in a car on the side of the road. Exh. B at 18

Kinirey located the car; it was parked "just off the side of the road (Route 13) ... as if somebody had just turned off to the side of the road." Exh. B at 22, 23. The car was approximately three feet from the fog line; there was no breakdown lane. Exh. B at 107. Kinirey approached the car. Exh. B at 23. LaFrenier was "pale" and "sweating profusely." Exh. B at 23, 25, 27. He was trying (and failing) to open a cigarette pack. Exh. B. at 29, 30. Kinirey thought he "seemed a little confused." Exh. B at 23. Because of her "first responder" training, Kinirey knew that profuse perspiration and a confused state are symptomatic of a person who is having a diabetic reaction. Exh. B at 32, 33, 34-35. Kinirey thought that maybe LaFrenier was a diabetic. Exh. B at 31.

Kinirey knew that profuse sweating and paleness are not signs of intoxication. Exh. B at 27-28.

When talking to Kinirey, LaFrenier's speech was understandable, but slow. Exh. B at 36. LaFrenier's eyes were not red or bloodshot. Exh. B at 25.

LaFrenier was still sweating and still pale. Exh. B at 31.

At some point, LaFrenier rolled down his window. Exh. B at 30. Kinirey asked LaFrenier if he was "all right." Exh. B at 31. LaFrenier did not respond. Exh. B. at 31. Kinirey asked LaFrenier if he was all right a couple of more times, before he answered that he was fine. Exh. B at 36. Kinirey asked LaFrenier if he was sure. Exh. B at 36. And she asked him if he needed medical attention. Exh. B at 36. LaFrenier again said that he was fine. Exh. B at 36.

Kinirey did not detect a odor of an alcoholic beverage. Exh. B at 45.

Kinirey's opinion was that LaFrenier was not fine. Exh. B at 36. She did not request medical assistance because LaFrenier did not ask for it. Exh. B at 36. Had he asked, she would have called an ambulance. Exh. B at 36. Kinirey called for police backup. Exh. B at. 36.

Kinirey asked LaFrenier to shut off the car's engine; LaFrenier responded that it was off. Exh. B at 37. LaFrenier told Kinirey that he had to leave. Exh. B at 38. Kinirey told

3

LaFrenier that he was not going anywhere. Exh. B at 38. LaFrenier asked Kinirey if there was some type of problem. Exh. B. at 39. Kinirey told him that she was trying to figure out if he was feeling well, if he needed her help. Exh. B at 39.

The car's engine was still running; Kinirey asked LaFrenier shut it off. Exh. B at 39. LaFrenier faced forward. Exh. B at 39. Kinirey opened the door and asked LaFrenier to step from the car. Exh. B at 39, 41. LaFrenier asked whether there was a problem. Exh. B at 41. And he told Kinirey that he had to get going. Exh. B at 41. Kinirey grasped LaFrenier's left arm. Exh. B at 41-42. LaFrenier asked her if there was a problem. Exh. B at 42. Kinirey told him that she "wanted to check and see if he was okay, and see what his confusion was about." Exh. B at 42. As LaFrenier started to get out of the vehicle, Kinirey released her grip. Exh. B at 43.

Once outside of the car, LaFrenier fell to his left; only the car "stopped his fall." Exh. B at 43-44. Kinirey asked LaFrenier if he wanted medical assistance. Exh. B at 44. He said, No. Exhibit B at 41. Holding LaFrenier's elbow, Kinirey directed LaFrenier to the rear the car. Exh. B at 45. Kinirey did not smell and odor of alcohol coming from LaFrenier as she did this. Exh. B at 45.

Kinirey wanted LaFrenier to lean against the back of the car, because she thought he might otherwise fall. Exh B at 45, 46.

LaFrenier almost missed the trunk; Kinirey grabbed him and guided him to the trunk. Exh. B at 47-48. Had she not done this, LaFrenier would have fallen to the ground, backside first. Exh. B. at 46.

LaFrenier told Kinirey that he had to get going. Exh. B at 48. LaFrenier told Kinirey that he was in Nashua, New Hampshire, in the parking lot of his business. Exh. B at 49. Kinirey asked him if he understood that he was in Townsend. Exh. B at 49. LaFrenier said that he was not, and asked her if she was sure. Exh. B at 49.

Kinirey asked LaFrenier some more medical questions. LaFrenier told her that he had to get going. Exh. B at 51. Kinirey seized LaFrenier for the purpose of arresting him on the "suspicion" that he was driving under the influence of an intoxicating liquor. Exh. B at 54.

LaFrenier's memory picks up with the events at the police station. Exh. A at 56-57, 63-64.

Four officers were huddled around him, "basically screaming at him." Exh. A at 57, 63, 64. They were saying, "You keep thinking you're in New Hampshire... Are you with us?" Exh. A at 57. LaFrenier was trying to ask them, "What happened?" Exh. A at 57, 64. They told him, "Never mind what happened." Exh. A at 57 LaFrenier was very confused. Exh. A at 57.

LaFrenier took a breathalyzer test. Exh. A at 58. He blew

once - there was "dead silence" - an officer said, "Zero." Exh. A at 58. The room was "extremely quiet." Exh. A at 62-63.

<u>After</u> the Breathalyzer test, Kinirey consulted with Morrison and Johnson. Exh. B at 77-78. It was at this time that Kinirey "formed the idea" that she would charge LaFrenier (with two counts of assault and battery on a police officer, resisting arrest, and being disorderly person.) Exh. B at 77-78.

LaFrenier was asked if he wanted to go to the hospital. Exh. A at 63. The difference in how he was treated before the breathalyzer test and how he was treated after the breathalyzer test was "pretty amazing." Exh. A at 63. LaFrenier was "extremely, extremely in shock and upset." Exh. A at 64-65.

LaFrenier was taken to the hospital by ambulance. Exh. A at 61, 62. Kinirey found him there. Exh. A at 74, 76.

At the hospital, Frenier asked Kinirey about why he was so sore. Exh. A at 66; Exh. B at 76. Kinirey told LaFrenier that she had used her nightstick on him. Exh. A at 65. LaFrenier "hurt from head to toe." Exh. A at 80. "From top to bottom [his] body felt like it had been beaten up." Exh. A at 66, 80.

LaFrenier was given fluid through an IV; it felt like cold water rushing through his entire body. Exh. A at 66. He felt much better immediately. Exh. A at 66.

A doctor told LaFrenier, with Kinirey present, that he could not find anything wrong...then, all of sudden, he said, "I know

6

what it is. It's speed." Exh. A at 67, 69. Kinirey lit up like a "Christmas tree." Exh. A at 70. LaFrenier told the doctor that he had taken Nyquil gel caps. Exh. A at 67. The doctor said, "Oh, that will do it - Pseudophedrine." Exh. A at 67. Kinirey returned to her "regular look so to speak." Exh. A at 70.

LaFrenier's son, Keith arrived at the hospital. Exh. A at 70. He asked Kinirey what happened and she asked him if he had the [bail] money. Exh. A at 72, 74

LaFrenier was handcuffed upon leaving the hospital. Exh. A at 74-75. He felt "extreme pain, extreme." Exh. A at 78. Keith asked Kinirey whether it was necessary to handcuff his father. Exh. A at 75. Keith told Kinirey, "Look at him...He can't even walk." Exh. A at 75. LaFrenier had difficulty getting into the cruiser, his legs were not functioning at all. Exh. A at 75.

LaFrenier was in extreme pain. Exh. A at 78. "It was upper extremities, form the waist up, all the way back." Exh. A at 78. "Everything was hurting." Exh. A at 78. "[E]specially the wrists...and the thumbs were extremely sore." Exh. A at 78. LaFrenier asked Kinirey to loosen the cuffs because he hurt so badly. Exh. A at 78. She did. Exh. A at 79.

On the way back to the station, LaFrenier felt very sick. Exh. A at 81. LaFrenier told Kinirey "I'm not sure what happened. If I've done anything, I'm sorry." Exh. A at 81. LaFrenier does not remember Kinirey saying too much in response to that. Exh. A

7

at 81.

Kinirey did not tell LaFrenier that he had struck her.  Exh. A at 86.

Once at the station, LaFrenier was put in a cell.  Exh. A at at 83.  When leaving the cell, a police officer, yelling at LaFrenier, asked:  Did my officers use excessive force on you?  Exh. A at 87.

Skip Bourque, a Leominster police detective, and LaFrenier's brother-in-law, called the Townsend police department.  Exh. A at 59-60.  The person on the other end of the line told him that this never should happened.  Exh. A at 60.

LaFrenier saw his primary care physician several days after the incident with the police.  Exh. A at 91.  LaFrenier mentioned to him "about the knees, the legs, the swelling, the bruising all over the body, the wrists [being] numb and sore, and the tingling in the thumb, of just being very, very sore everywhere."  Exh. A at 91.

LaFrenier took three ibuprofen in the morning and three at night.  Exh. A at 108.  They served as an anti-inflammatory.  Exh. A at 108.  He also treated with ice and heat.  Exh. A at 108-109.

It took months for LaFrenier's wrist pain and tingling to end.  Exh. A at 106.  The feeling in his thumb began to return when his wrist started to feel better.  Exh. A at 107.  It took approximately two months for the pain to leave his arm and elbow

8

and the same amount of time for his right knee to become fully functional. Exh. A at 108, 109. LaFrenier's "whole jaw was tight, very, very tight and sore." Exh. A at 109. This lasted about six to eight weeks. Exh. A at 111. LaFrenier's neck rigidity worsened after the arrest. Exh. A at 29, 30, 111, 112. And the pitch and sound of the ringing in his inner ear changed. Exh. A at 29, 112, 117. It was higher than it had been for a long time. Exh. A at 116-117.

When a Dr. Fino looked at an MRI of LaFrenier's back (taken some months later), he asked LaFrenier whether he had had any trauma lately, and what LaFrenier thought of was the Townsend incident. Exh. A at 31, 32, 113, 118.

Kinirey testified that she and LaFrenier wrestled on the ground and exchanged blows.[2] Exh. B at 50, 63.

Kinirey received no physical injuries; not a bruise, not a scrape. Exh. B at 64.

Once outside the car, LaFrenier would have fallen to the ground three separate times if not for some intervention; once the car stopped his fall, once Kinirey grabbed him, and once her body stopped him; had she stepped to one side, LaFrenier would have fallen on his face. Exh. B at 43-44, 47-48, 52.

Kinirey made no mention whatsoever in her police report that

---

[2] With respect to the physical encounter between the officers (Kinirey and Morrison) and LaFrenier, LaFrenier submits, as he argues in his memorandum, that the testimony of the officers is incredible on material facts.

she and LaFrenier had wrestled on the ground. Exh. E. That report was written within hours after LaFrenier's arrest. Exh. B at 55.

Kinirey charged LaFrenier with committing an assault and battery on Morrison. Exh. B at 104. During her deposition, Kinirey was asked, on direct examination, to provide an account of what happened between Morrison and LaFrenier. Exh. B at 64. She testified that Morrison picked LaFrenier off the ground, held his arms, and walked him to the front of the car. Exh. B at 64. Morrison then bent LaFrenier over the hood and cuffed him. Exh. B at 66-67. Here, Kinirey did not testify to an assault and battery on Morrison. Exh. B at 64-67.

There is no account of an assault and battery on Morrison in Kinirey's police report. Exh. E.

On cross examination, Kinirey's counsel asked her to state the facts that formed the basis of the assault and battery charge on Morrison. Exh. B at 105. Kinirey testified that "when he was pushing, swinging at Dan with his arms." Exh. B at 106. Morrison testified that LaFrenier elbowed him twice in the chest and that was the basis of the assault and battery on him. Exh. D at 39.

Morrison testified that he picked LaFrenier up by his armpits. Exh. D at 26. At that moment, LaFrenier was facing away from him. Exh. D at 26. Morrison testified that LaFrenier started to "fail[] his arm and elbows, like to try to get away." Exh. D at 27. Morrison walked LaFrenier toward the side of the car. Exh. D. at

28. It was a distance of three feet from where he had picked up LaFrenier. Exh. D at 28-29. Morrison testified that in that three feet he lost his grip on LaFrenier; his hands "just slipped off him." Exh. D at 29.

Morrison is 6'3". Exh. D at 16. On June 15, 2001, he weighed approximately two hundred and fifty pounds. Exh. D at 16. He had been lifting weights since he was age fifteen. Exh D at 17. He could press 350 pounds. Exh. D at 17. Morrison estimated that LaFrenier was 6', 170 lbs. Exh. D at 17.

Morrison read Kinirey's report before filing the complaint on June 18, 2001. Exh. D at 14. It was clear to him that there was nothing in it that indicated that there had been an assault and battery on him. Exh. D at 14-15. Morrison testified that that did not concern him. Exh. D at 15. Asked why he was not concerned, Morrison responded that "there was no reason." Exh. D at 15. Morrison did not appear in court for LaFrenier's trial. Exh. D at 33-34.

Morrison testified that LaFrenier was "combative" as he was being escorted to cruiser. Exh. D at 32. Asked to describe what he meant by combative, Morrison testified: "Just fidgety, excited." Exh. D at 32.

Morrison was did not receive any medical attention as a result of his part in LaFrenier's arrest; he did not receive a cut or a bruise. Exh. D at 16.

When Morrison handcuffed LaFrenier, LaFrenier's head and chest came into contact with the car. Exh. D at 30, 31.

The charge pertaining to Morrison was dismissed. Exh. B at 86. LaFrenier was acquitted of all the other charges. Exh. B at 86.

        Plaintiff
        Timothy L. LaFrenier
        By his attorney


        Respectfully submitted


        /s/ Sean J. Gallagher
        _____
        Sean J. Gallagher, Esq.
        74 Elm Street
        Worcester MA 01609
        Tel. no. 508 767-0500
        B.B.O. no. 551112
        Date: February 15, 2006

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. NO. 04-40114-FDS

| | |
|---|---|
| TIMOTHY L. LaFRENIER,<br>        Plaintiff<br><br>v<br><br>MARY ANNE KINIREY, DANIEL<br>MORRISON, The CHIEF OF POLICE<br>"John Doe" and the TOWN OF<br>TOWNSEND,<br>        Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

<u>ATTACHMENTS TO THE PLAINTIFF'S L.R. 56.1 STATEMENT OF MATERIAL<br>FACTS OF RECORD WHICH CREATE A GENUINE ISSUE OF MATERIA FACT TO<br>BE TO A JURY</u>

Attachments Exhibits A, B, D, E follow; C has been omitted.

Respectfully submitted

/s/ Sean J. Gallagher

Sean J. Gallagher, Esq.
74 Elm Street
Worcester MA 01609
Tel. no. 508 767-0500
B.B.O. no. 551112
Date: February 15, 2006

I, Sean J. Gallagher, Esq. certify that on February 15, 2006 I mailed, first class postage prepaid, that the above document served on Attorney Joseph J. Teehan, Koplelman and Paige, P.C., Attorneys at Law, 31 St. James Street, Boston MA 02116.

x/s/ Sean J. Gallagher

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. NO. 04-40114-FDS

| | |
|---|---|
| TIMOTHY L. LaFRENIER,<br>              Plaintiff<br><br>v<br><br>MARY ANNE KINIREY, DANIEL<br>MORRISON, The CHIEF OF POLICE<br>"John Doe" and the TOWN OF<br>TOWNSEND,<br>              Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### AFFIDAVIT OF SEAN J. GALLAGHER

1. I, Sean J. Gallagher, under oath do hereby depose and state as follows.

2. I am licensed to practice law in the Commonwealth of Massachusetts and in the United States District Court for the District of Massachusetts.

3. I prepared the opposition to the defendants' summary judgment motion.

4. The exhibits used in the opposition are true and accurate copies.

Signed under the pains and penalties of perjury on February 15, 2006.

*Sean J. Gallagher*
Sean J. Gallagher