**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |  |
|---|---|---|---|
| **TIMOTHY L. LaFRENIER,** | ) | | |
| | ) | | |
| **Plaintiff,** | ) | | |
| | ) | | |
| | ) | **Civil Action No.** | |
| **v.** | ) | **04-40114-FDS** | |
| | ) | | |
| **MARY ANNE KINIREY, DANIEL** | ) | | |
| **MORRISON, and the TOWN OF** | ) | | |
| **TOWNSEND,** | ) | | |
| | ) | | |
| **Defendants.** | ) | | |
| | ) | | |

_____

**MEMORANDUM AND ORDER**
**ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This is a civil rights action against two police officers and a municipality arising out of the arrest of a motorist who had stopped by the side of the road because he felt ill.

On June 15, 2001, at about 12:40 in the afternoon, plaintiff Timothy L. LaFrenier was driving from work to his doctor's office. While driving on Route 13 in Townsend, Massachusetts, LaFrenier felt ill and pulled his car over to the side of the road. A passing motorist reported to the police that there was a person in a car on Route 13 who "did not look well."

Defendant Mary Anne Kinirey, a police officer with the Town of Townsend, investigated the motorist's report and found LaFrenier sitting behind the wheel of his car. According to Kinirey, LaFrenier was disoriented and unresponsive. She asked him to get out of the car and step to the rear. At some point, he began to push her, and she placed him under arrest. He

resisted arrest and began to struggle with Kinirey.  Defendant Daniel Morrison of the Townsend

Police Department arrived during the struggle and helped arrest LaFrenier.  After his arrest,

LaFrenier was transported to the Townsend Police Department where a breathalyzer test revealed

no alcohol in his system.  He was then transported by ambulance to the hospital, where he was

examined by medical personnel, although no treatment was provided.  He was then taken back to

the police station, booked, and eventually released.

A criminal complaint was filed against LaFrenier charging (1) assault and battery on

Kinirey, a police officer; (2) assault and battery on Morrison, a police officer; (3) disorderly

conduct; and (4) resisting arrest.  After a trial, LaFrenier was found not guilty on all charges with

the exception of the charge of assault and battery on Morrison, which was dismissed.  Kinirey

later applied unsuccessfully to the Registry of Motor Vehicles to have LaFrenier's license

suspended.

LaFrenier filed this lawsuit in 2004, alleging various civil rights violations and common-

law torts.  Defendants have moved for summary judgment as to all counts.  For the reason set

forth below, defendants' motion for summary judgment will be granted.

## I.    Factual Background

The facts are set forth in the light most favorable to the plaintiff.

### A.    The Officer's Response to the Scene

Timothy LaFrenier is a resident of Fitchburg, Massachusetts.  In June 2001, he was 47

years old.  He was employed as a materials handler by Compaq Computer Corp. in Nashua, New

Hampshire.

On Friday, June 15, 2001, at approximately noon, he left Compaq in Nashua to drive to a

doctor's office in Fitchburg, Massachusetts.  He had been ill for two or three weeks and, according to his deposition testimony, he was "very ill, very weak, and very tired."  (LaFrenier Dep. at 44).  His primary care physician had recommended that he see a specialist in Fitchburg.

Immediately upon leaving work, LaFrenier started sweating profusely.  On the way to his appointment, LaFrenier pulled his car off to the side of the road.  He was on Route 13 in Townsend, Massachusetts.

At approximately 12:40 p.m, a motorist walked into the Townsend police station and told Officer Mary Anne Kinirey (and a dispatcher) that there was a "gentleman who wasn't feeling well – looked like he wasn't feeling well" in a car on the side of the road.  (Kinirey Dep. at 18).

Kinirey drove her cruiser to the location.  She located the car; it was parked on the shoulder, approximately three feet from the edge of the road.  The operator, who was alone, was seated in the driver's seat and appeared to be slumped over.  Kinirey pulled her cruiser behind the car and approached the driver's side.  She was in full uniform.

**B.      The Incident by the Side of the Road**

According to LaFrenier, he remembers being on Route 13, but does not remember pulling over; the last thing that he remembers is "putting his head back and trying to take a deep breath." (LaFrenier Dep. at 54).  He testified that he has no memory of any kind about the incident by the side of the road.  What follows, therefore, is the version of the incident given by the police officers.[1]

According to Kinirey's police report, the person behind the wheel of the car appeared to

---

[1] Kinirey's police report of the incident varies somewhat from her deposition testimony.  The text of the description of the incident will essentially follow the report, with certain differences in the testimony highlighted in footnotes.

be pale and sweating profusely, and he was attempting to open a cigarette package, with much difficulty.[2]  Kinirey asked if he was okay or needed some assistance.[3]  Kinirey thought he seemed confused by the question.[4]  She asked the question again; he still looked confused.  The automobile was running; Kinirey asked him to shut it off and step to the rear of the car.  LaFrenier did not seem to understand.

Officer Kinirey then radioed for backup.  Officer Daniel Morrison responded and headed to the scene.

Kinirey again asked LaFrenier to shut off the car's engine and to step to the rear; LaFrenier responded that it was off.[5]  Kinirey once again told LaFrenier that the vehicle was in fact still running and asked him to shut it off and step out.  LaFrenier asked Kinirey if there was some kind of problem.[6]  Kinirey asked him again to shut off the car and step out.  LaFrenier responded that the engine was off and he wanted to know why he was being stopped.

Kinirey opened the driver's side door and asked LaFrenier to step from the car.  LaFrenier

---

[2] In her deposition, Kinirey testified that LaFrenier's eyes were "glassy."  (Kinirey Dep. at 25).  She also testified that she had to knock twice on the window before LaFrenier responded.  (*Id.* at 30).

[3] In her deposition, Kinirey testified that she asked him at that point if he needed "medical attention." (Kinirey Dep. at 36).  She testified that if he had indicated he wanted medical attention, she would have called an ambulance.  (*Id.*).

[4] In her deposition, Kinirey testified that his speech was "slow," although understandable.  (Kinirey Dep. at 36).

[5] In her deposition, Kinirey testified that at that point, LaFrenier said he had to leave, to which Kinirey responded that he wasn't going anywhere.  (Kinirey Dep. at 38).

[6] In her deposition, Kinirey testified that she "told him that [she] was trying to figure out if he was feeling well, if he needed [her] help."  (Kinirey Dep. at 39).  She also testified that at that point he "[s]aid he had to get going, and was trying to leave the scene."  (*Id.*).

4

then got out.[7]  As he stood up, he fell towards the car, which stopped his fall.  He had difficulty

walking.  LaFrenier asked again why he had been stopped.  Kinirey assisted LaFrenier to the rear

of the car and attempted to lean him against the trunk.[8]

At that point, LaFrenier became upset.  He began to push Kinirey and wanted to get back

into his car and stated that he wanted to "get going."  LaFrenier attempted to walk away from

Kinirey, pushing her away from him stating that he wanted to "go home."  She told LaFrenier that

he was in no condition to drive at this time and that she wanted to ask him a few questions to help

determine what kind of problem he may be having.[9]

LaFrenier became upset with Kinirey and began to push her.  She then attempted to

handcuff him.[10]  LaFrenier resisted having the handcuffs placed on him, and began to fight with

her.  Kinirey was able to get one handcuff on when LaFrenier began to pull away and swing at her

with his arms.  She then pushed LaFrenier face first toward the car in an attempt to throw him off

balance.  LaFrenier tried to turn around toward Kinirey and she again pushed him towards the car.

---

[7] In her deposition, Kinirey testified that LaFrenier hesitated getting out and asked her again if there was a problem.  (Kinirey Dep. at 41-42).  She also testified that she grabbed his left upper arm when he did not get out.  (*Id.*).

[8] In her deposition, Kinirey testified that she grabbed his elbow in order to assist him and guided him to the rear of the car.   (Kinirey Dep. at 44-47).  She also testified that he kept asking the same questions and that she kept giving the same response:  "[I] just want to make sure you're okay." (*Id.* at 44).

[9] In her deposition, Kinirey testified as to a somewhat different sequence of events.  She testified that after LaFrenier left the car and made his way to the trunk, he said that he "wanted to go home" and that "he had to get going." (Kinirey Dep. at 48).  She then asked him "if he was feeling well," "if he . . . felt sick," "if he had been drinking that day," "if he was on any medication," and "if he had a medical condition." (*Id.*).  LaFrenier did not understand why he was being stopped, and said at one point that he had to go home and at another point that he had to go to work.  (*Id.*).  He also thought he was in the parking lot of Compaq, in Nashua, New Hampshire.  (*Id.* at 49).  LaFrenier then "tried to get by [Kinirey] and get in his car and go," but Kinirey "told him he wasn't going anywhere, he had to stay there."  (*Id.* at 50-51).  LaFrenier "then pushed [her] out of the way.  (*Id.* at 51-52).

[10] In her deposition, Kinirey testified that LaFrenier pushed her left arm and side.  (Kinirey Dep. at 53).  She then grabbed both of his arms to keep him from leaving.  (*Id.*).

LaFrenier continued to attempt to strike Kinirey.  Kinirey then struck LaFrenier in his left upper leg with her knee.  LaFrenier lost his balance and Kinirey pushed him onto the side of the car.  She grabbed his left arm, brought it behind him and attempted again to finish placing the handcuffs on him.  LaFrenier tried to get up.  Kinirey again struck him on the side of his leg with her knee.  LaFrenier lost his balance again.  She pushed him onto the side of the car and again pulled his arm up behind him in an attempt to finish placing the handcuffs on him.  LaFrenier tried to get up and walk away.  Kinirey grabbed him and pushed him onto the vehicle again.[11]

At that point, Officer Morrison arrived at the scene.  He attempted to get LaFrenier to lean up against the car so that he could be handcuffed.  LaFrenier again attempted to walk away.  Morrison held LaFrenier and placed him onto the hood of the car, which LaFrenier resisted.  LaFrenier again attempted to walk away again; both Morrison and Kinirey grabbed LaFrenier by the arms and forced him toward the car.  According to Morrison, during the struggle LaFrenier elbowed him twice in the side of his chest, breaking a pair of sunglasses in his pocket.  Morrison then held LaFrenier and Kinirey was able to handcuff him.[12]

LaFrenier was brought to Kinirey's cruiser, where Morrison asked him to sit in the rear seat.  LaFrenier refused to cooperate.  Morrison and Kinirey tried to get LaFrenier into the cruiser, which he resisted.  Eventually, LaFrenier was placed in the cruiser.

During the entire interchange, Kinirey did not detect an odor of alcoholic beverages.  There were no alcoholic beverages in the car.  LaFrenier's eyes were not bloodshot.

---

[11] In her deposition testimony, details of the struggle are somewhat different.  Most notably, Kinirey testified that LaFrenier hit her in the stomach with a closed fist and that the two of them wound up wrestling on the ground.  (Kinirey Dep. at 59-60, 62-64).

[12] As described below, LaFrenier states that Kinirey later told him that she used her nightstick on him.

At the beginning of the contact, Kinirey thought that LaFrenier may have been a diabetic with a medical problem. By the time she had asked him twice to turn off the car, she though he was either "having a medical condition" or under the influence of alcohol. (*Id.* at 38).

Kinirey received no bruises, scrapes or other physical injuries during the confrontation. Her height and weight are not reflected in the record; LaFrenier is approximately six feet tall and weighed approximately 170 pounds at the time of the incident. Morrison is approximately six feet three inches tall and weighed approximately 250 pounds at the time of the incident.

## C.    The Events at the Police Station and Hospital

LaFrenier was taken to the Townsend Police station for booking. While he was being booked, Kinirey, Morrison and a supervising officer questioned LaFrenier about his medical condition, and asked him if there was someone they could call for him. LaFrenier responded that he did not have a medical condition and he was not on any medication.

LaFrenier's first memory of his encounter with any member of the Townsend Police Department is of events at the police station after his arrest. He testified that he was seated in the police station with four officers standing around him. According to LaFrenier, the officers were "basically screaming" at him. (LaFrenier Dep. at 57). They were saying, "You keep thinking you're in New Hampshire, you keep thinking you're at work. . . . Are you with us?" (*Id.*). LaFrenier was very confused; he described his condition as "extremely, extremely in shock and upset." (*Id.* at 64-65).

At the request of the police, LaFrenier took a breathalyzer test. The test indicated that his blood alcohol level was 0.0. According to LaFrenier, the difference in his treatment by the police before the breathalyzer test and how he was treated afterward was "pretty amazing." (*Id.* at 63).

7

After the breathalyzer test, the officers again asked LaFrenier if he wanted medical assistance, and suggested that an ambulance be called. He suggested the officers speak with his wife, who was a nurse. Eventually, Kinirey spoke with his wife by telephone. An ambulance was then summoned, and LaFrenier was transported to Leominster Hospital. Kinirey followed the ambulance to the hospital in her cruiser. LaFrenier's adult son, Keith, also came to the hospital after having been informed that LaFrenier had been arrested and taken there.

At the hospital, LaFrenier was examined by medical personnel and was given intravenous fluids. A physician suggested that his condition could have been the result of his having taken cold medicine containing pseudoephedrine. LaFrenier was not given any other medical treatment, and was not prescribed any medication at the hospital.

After his discharge from the hospital, Kinirey again handcuffed LaFrenier and transported him back to the police station in her cruiser. According to LaFrenier, at that point "[his] whole body felt like it had been beat up," and "[he] hurt from head to toe." (LaFrenier Dep. at 80). He was not, however, cut or bleeding. In the cruiser, he and Kinirey had a brief conversation. According to LaFrenier, "I believe at that point she explained to me why my legs were so sore, that she had to use – I believe it was – I don't know if they call it a nightstick or whatever they call it – on me to get me down, whatever that meant." (*Id.* at 82).[13]

When they arrived at the station, LaFrenier was placed in a holding cell. According to LaFrenier, the police at the station were "angry." (*Id.* at 85). He was charged with assault and battery on police officers (both Kinirey and Morrison), being a disorderly person, and resisting

---

[13] Kinirey denies having used a nightstick on LaFrenier, but concedes this fact for purposes of summary judgment only.

arrest.  He was released on bail and driven home by his son.

**D.    The Injuries to LaFrenier**

LaFrenier saw his primary care physician several days after the incident with the police.

LaFrenier told him "about the knees, the legs, the swelling, the bruising all over the body, the

wrists numb and sore, and the tingling in the thumb, of just being very, very sore everywhere in

regards to all – head to toe type of thing."  (LaFrenier Dep. at 91).  LaFrenier took ibuprofen as

an anti-inflammatory and also treated his injuries with ice and heat.

According to LaFrenier, he had wrist pain and tingling and numbness in his thumb for

months afterwards.  He also suffered arm, elbow, and knee pain for two months, jaw tightness

and soreness for six to eight weeks, and increased neck rigidity and ringing in his inner ear.

**E.    The Prosecution of LaFrenier**

As a result of his encounter with the police, LaFrenier was charged with two counts of

assault and battery on a police officer (one each as to Kinirey and Morrison), resisting arrest, and

disorderly conduct.  He was not charged with operating under the influence.  After consulting

with her supervising officers, Kinirey determined the charges to be brought against LaFrenier and

initiated the criminal complaint against him.  The complaint was signed by Morrison as the "court

officer" for the police department.

The charge concerning Morrison was ultimately dismissed on motion of the

Commonwealth.  After a bench trial in the Ayer District Court on March 4, 2002, LaFrenier was

acquitted of the remaining charges.

At some point thereafter, LaFrenier received a notice from the Registry of Motor Vehicles

indicating that there would be a hearing to determine whether his driver's license should be

revoked.  The process had been initiated by Kinirey.  LaFrenier attended the hearing, and the

RMV did not revoke his license.

**II.     Procedural Background**

On June 14, 2004, LaFrenier filed a complaint alleging that (1) Morrison and Kinirey violated 42 U.S.C. § 1983 by making a false arrest, by using excessive force, by failing to provide medical treatment, and by lodging and prosecuting false charges against LaFrenier; (2) defendant Police Chief William May violated § 1983 by failing to properly train and supervise officers on the appropriate use of force; (3) all defendants violated LaFrenier's civil rights pursuant to Mass. Gen. Laws ch. 12, § 11I by force, intimidation, and violence; (4) defendant Town of Townsend violated Mass. Gen. Laws ch. 258, § 2 through its negligence; (5) Morrison and Kinirey committed assaults and batteries against LaFrenier; (6) Morrison and Kinirey committed a false arrest against LaFrenier; and (7) Morrison and Kinirey committed abuse of process against LaFrenier.  LaFrenier asked for compensatory and punitive damages.

Count 3, which asserted a claim against Police Chief May, was dismissed by agreement of the parties on October 20, 2005.  Defendants have moved for summary judgment as to all counts.

**III.     Analysis**

**A.     Standard of Review**

**1.     Summary Judgment Standard—Generally**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  The burden is upon the moving party to show, based upon the pleadings, discovery, and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The court must view the entire record in the

11

light most hospitable to the non-moving party and indulge all reasonable inferences in that party's

favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).

### 2. Whether the Court Must Accept the Officers' Version of the Roadside Incident

This case presents a somewhat unusual circumstance. Because plaintiff contends that he

has no recollection of the events, he has offered no affirmative evidence as to the encounter by the

side of the road; the record contains only the police officers' account of the incident. LaFrenier,

however, contends that their version of events is not credible. First, he contends that Kinirey's

allegation that he attacked her is "incredible," given his physical condition at the time of the

encounter. Second, he contends that Kinirey's version of events—that LaFrenier assaulted her,

and that they wrestled on the ground—is undermined by the fact that she did not suffer any

injuries, while his whole body was sore. Third, he points to various discrepancies between the

police report and the officers' deposition testimony. The question is whether, on summary

judgment, plaintiff's contentions are enough to create a genuine issue of material fact.

Cases involving claims of deadly force are instructive in this regard, as these cases often

involve a defendant police officer as the only surviving eyewitness. In such cases,

> [t]he judge must carefully examine all the evidence in the record, such as medical
> reports, contemporaneous statements by the officer and the available physical
> evidence, as well as any expert testimony proffered by the plaintiff, to determine
> whether the officer's story is internally consistent and consistent with other known
> facts. In other words, the court may not simply accept what may be a self-serving
> account by the police officer. It must also look at the circumstantial evidence that,
> if believed, would tend to discredit the police officer's story, and consider whether
> this evidence could convince a rational factfinder that the officer acted
> unreasonably.

*Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) (internal citation omitted); *see also Ingle ex*

*rel. Estate of Ingle v. Yelton*, 439 F.3d 191, 195-96 (4th Cir. 2006). The First Circuit has noted, however, that even where "virtually all relevant evidence derives exclusively from the officers at the scene, summary judgment nonetheless must be granted absent a genuine dispute as to a material issue." *Hegarty v. Somerset County*, 53 F.3d 1367, 1376 n.6 (1st Cir. 1995) (internal citation omitted).

The evidence here—even when viewed in the light most favorable to plaintiff— is not sufficient to convince a rational factfinder that the officers acted unreasonably.

First, plaintiff's physical condition at the time of the incident—he was stumbling, off-balance, and confused—does not prove, or even suggest, that he was incapable of physical force. He was not comatose, or feeble, or incapable of movement. Furthermore, he has failed to offer medical records, expert testimony, or any other evidence to establish that at the time of the incident, his physical condition rendered him incapable of pushing or striking the officers. The mere fact that he was weakened or disoriented is not enough for a reasonable jury to conclude that he could not have struck either officer.

Second, the fact that Kinirey did not suffer injuries in the encounter does not refute her version of events. Indeed, it is entirely consistent with it. Plaintiff himself alleges that he was weak, confused, and uncoordinated, whereas Kinirey was an able-bodied police officer in full possession of her faculties. The fact that she was able to effectively repel plaintiff's attack, leaving him sorer for the experience, is not sufficient to discredit her account.

Finally, plaintiff notes that certain details set forth in Kinirey's deposition are absent from her police report of the incident, or are presented in a somewhat different order. The Court has highlighted these differences above. On a motion for summary judgment, the record must be

13

viewed in the light most hospitable to the non-moving party.  *See O'Connor*, 994 F.2d at 907.

Accordingly, any discrepancies between the deposition testimony and the police report will be

resolved in LaFrenier's favor.  In all other respects, however, the Court will accept the officers'

version of the roadside encounter.

### B.    Section 1983 Claims Against Kinirey and Morrison (Unlawful Arrest, Excessive Force, Denial of Medical Treatment)

Count 1 alleges that defendants, acting under color of state law, deprived LaFrenier of his

rights under the Fourth and Fourteenth Amendments in violation of 42 U.S.C. § 1983.  Plaintiff

alleges three separate theories:  (1) that he was deprived of his right to be free from unreasonable

seizure under the Fourth Amendment when he was arrested without probable cause; (2) that he

was similarly deprived of his right to be free from unreasonable seizure under the Fourth

Amendment when the officers used excessive force against him; and (3) that he was deprived of

his right to due process under the Fourteenth Amendment when the officers denied him medical

treatment at the scene of the arrest.   The Court will consider each argument in turn.

### 1.    Unlawful Arrest

Count 1 of the complaint first alleges that Officers Kinirey and Morrison violated

plaintiff's Fourth Amendment rights by arresting him without probable cause.  Specifically,

LaFrenier contends that the officers lacked probable cause to arrest him for operating under the

influence of alcohol.[14]

A warrantless arrest "is reasonable under the Fourth Amendment where there is probable

---

[14] Among other things, LaFrenier notes that (1) his profuse perspiration, pallor, confused state of mind, and difficulty walking were signs of illness, not intoxication; (2) Kinirey did not smell any odor of alcohol; (3) Kinirey did not see alcoholic beverage containers in the car; (4) his speech, though slow, was still understandable; and (5) his eyes were not bloodshot.

cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *see also Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 254 (1st Cir. 1996). Probable cause exists if "at the time of the arrest, the facts and circumstances known to the arresting officers were sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." *United States v. Bizier*, 111 F.3d 214, 217 (1st Cir. 1997) (quotation and internal citation omitted). The inquiry into probable cause focuses on what the officer knew at the time of the arrest, and must take into account the totality of the circumstances. *See United States v. Brown*, 169 F.3d 89, 91 (1st Cir. 1999); *United States v. Reyes*, 225 F.3d 71, 75 (1st Cir. 2000).

The inquiry is objective, not subjective: "the probable cause inquiry is not necessarily based upon the offense actually invoked by the arresting officer but upon whether the facts known at the time of the arrest objectively provided probable cause to arrest." *United States v. Jones*, 432 F.3d 34, 41 (1st Cir. 2005) (citing *Devenpeck*, 543 U.S. at 153). In other words, "probable cause need only exist as to *any* offense that *could be* charged under the circumstance." *Bizier*, 111 F.3d at 219 (emphasis added). Here, Kinirey and Morrison had ample probable cause to arrest plaintiff, even assuming that they had no objective reason to believe that he was intoxicated.

First, Kinirey and Morrison had probable cause to arrest plaintiff for assault and battery on a police officer. Under Mass. Gen. Laws ch. 265, § 13D, a person commits the offense of assault and battery on a police officer if he engages in "purposeful and unwelcomed contact with a person the defendant knows to be a law enforcement officer actually engaged in the performance of official duties." *United States v. Santos*, 363 F.3d 19, 23 (1st Cir 2004) (quoting *United States v. Fernandez*, 121 F.3d 777, 778 (1st Cir. 1997)). Neither violence nor the use of force is an

15

essential element of the offense.  *Id.*  Here, the unrebutted evidence demonstrates that (1) at the time of the incident, Kinirey was in uniform; (2) after Kinirey asked LaFrenier to step from his vehicle, LaFrenier attempted to get back into his car and stated that he wanted to "get going;" and (3) when Kinirey prevented him from leaving, LaFrenier became upset and began to push her.  At that point, Kinirey clearly had probable cause to arrest plaintiff for assault and battery on a police officer.  *See Brown*, 169 F.3d at 92 (holding that after suspect pushed officer, officer had probable cause to arrest suspect for assault and battery on a police officer).[15]

Defendants also had probable cause to arrest plaintiff for resisting arrest.  Under Mass. Gen. Laws ch. 268, § 32B, a person commits the offense of resisting arrest "if he knowingly prevents or attempts to prevent a police officer, acting under color of his official authority, from effecting an arrest . . . by:  (1) using or threatening to use physical force or violence against the police officer or another; or (2) using any other means which creates a substantial risk of causing bodily injury to such police officer or another."  Here, the record shows that as Kinirey attempted to handcuff plaintiff, he resisted having the handcuffs placed on him; began to fight with Kinirey; swung his arms and attempted to strike her; and tried to get up and walk away.  After Morrison arrived on the scene and attempted to arrest LaFrenier, plaintiff resisted and elbowed him twice in the chest; even after defendants were able to handcuff him, LaFrenier resisted being placed in the police cruiser.

Finally, defendants also had probable cause to arrest plaintiff for disorderly conduct in violation of Mass. Gen. Laws ch. 272, § 53.  The Massachusetts Supreme Judicial Court has

---

[15]  Of course, LaFrenier's further attempts to strike Kinirey, as well as the fact that he twice elbowed Morrison in the side of the chest, demonstrate the reasonableness of the arrest.

interpreted the statute to incorporate the Model Penal Code's definition of disorderly conduct.

*See Abraham v. Nagle*, 116 F.3d 11, 13 (1st Cir. 1997) (citing *Alegata v. Commonwealth*, 353

Mass. 287, 303 (1967)).  That definition states:

> A person is guilty of disorderly conduct if, with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he . . . engages in fighting or threatening, or in violent or tumultuous behavior; or  . . . creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

*Model Penal Code* § 250.2.  "The public element of the offense is readily met in cases where the

proscribed conduct takes place on public streets, or by the side of a highway."  *Commonwealth v.*

*Mulvey*, 57 Mass. App. Ct. 579, 582-83 (2003) (internal citations omitted).  Furthermore, as the

First Circuit has noted, "a number of Massachusetts cases have upheld disorderly conduct arrests

where a refusal to obey police orders created a safety threat."  *Abraham*, 116 F.3d at 14 (internal

citations omitted).  Plaintiff's behavior falls directly within the definition of "disorderly conduct,"

as it constitutes "fighting or . . . violent or tumultuous behavior," and it created "a hazardous . . .

condition by any act which serves no legitimate purpose of the actor."  *Model Penal Code* §

250.2; *see also Abraham*, 116 F.3d at 14.

For the reasons stated above, defendants clearly had probable cause to arrest plaintiff.

Moreover, because probable cause need only exist as to *any* crime that *could have been* charged

under the circumstances, the arrest was valid, regardless of whether defendants had probable

cause to believe that plaintiff was operating a vehicle under the influence of alcohol.  *See Bizier*,

111 F.3d at 219.[16]  Accordingly, defendants are entitled to summary judgment on plaintiff's

---

[16] The Court makes no finding as to whether defendants in fact had probable cause to believe that plaintiff was operating a vehicle under the influence of alcohol.

unlawful arrest claim.

### 2.    Excessive Force

Count 1 next alleges that defendants deprived plaintiff of his right to be free from unreasonable seizure, as guaranteed by the Fourth Amendment, by using excessive force against him.

Where an excessive force claim arises in the context of an arrest, the claim "must be analyzed in light of the Fourth Amendment's prohibition of unreasonable searches and seizures." *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 205 (1st Cir. 1990). In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court established a balancing test for determining the constitutionality of a particular use of force. Specifically, the Court stated that

> [d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interest at stake.

*Graham*, 490 U.S. at 396 (quotation and internal citation omitted). The test for reasonableness

> requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id.* Furthermore, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

> [The court] must keep in mind that not every push or shove rises to the level of a constitutional violation, and that police officers making arrests are often forced to make split-second decisions about the amount of force needed to effect an arrest while operating under tense, dangerous and rapidly-changing circumstances."

*Gaudreault*, 923 F.2d at 205; *see Graham*, 490 U.S. at 396-97.

"Without excluding the importance of other factors, the *Graham* Court focused its reasonableness inquiry on three factors in particular:  1) whether the suspect is actively resisting arrest or attempting to evade arrest by flight, 2) whether the suspect poses an immediate threat to the safety of the officers or others, and 3) the severity of the crime at issue."  *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 150 (1st Cir. 2003).  Applying these factors to the present case, the Court concludes that no genuine dispute exists as to the objective reasonableness of defendants' use of force.  As to the first factor, it is undisputed that LaFrenier actively resisted arrest and attempted to flee the scene throughout the encounter.  Indeed, plaintiff continued resisting, even after the officers managed to get handcuffs on him and attempted to place him into the cruiser.  Second, plaintiff's violent behavior clearly posed an immediate threat to himself and the officers, particularly given the fact that the incident took place on the side of the road, thereby creating the risk that LaFrenier or defendants would be hit by oncoming traffic.  And finally, the record shows that the crimes at issue here—assault and battery on a police officer, resisting arrest, and disorderly conduct—are sufficiently serious to warrant the exercise of force.  *See Abraham*, 116 F.3d at 14 ("An arrest of a struggling defendant . . . is a serious business. . . . [as] there is a potential for serious violence and of injury both to the suspect and to the police.").  In light of these facts, the Court finds that defendants' use of force—including Kinirey's alleged use of her nightstick—was objectively reasonable as a matter of law.  *Cf. Gaudreault*, 923 F.2d at 206 (arrestee's active resistance justified use of force).[17]

---

[17] In her deposition, Kinirey testified that, in accordance with her training, she applied a "force continuum."  That is, she began by using verbal commands, then escalated to physical maneuvers, including knee strikes, when plaintiff continued to resist.  Plaintiff has offered no evidence to contradict that testimony.

It is not enough, however, for the Court to conclude the particular use of force—here knee strikes and use of the nightstick—was itself reasonable under the circumstances. "[E]ven where some force is justified, the amount actually used may be excessive." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). The Court must therefore determine whether a genuine dispute exists as to the reasonableness of the degree of force actually employed.

Plaintiff contends that the injuries he suffered during the incident raise a genuine issue as to whether a reasonable amount of force was used. Specifically, he notes that he was sore from head to toe; that he could hardly walk as he left the hospital; that he had bruises and swelling on his arms, legs, and wrists; that there was numbness in his wrist and tingling in his thumb; his jaw was very tight; and it took him two to three months to recover. But there is no dispute that plaintiff resisted arrest, and that substantial force was necessary to subdue him. Furthermore, plaintiff received no medical treatment of any kind for his injuries. His allegations of injury, unsupported by medical records or other evidence, are insufficient to avoid summary judgment. *See Foster v. Metropolitan Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990) (concluding allegations of injury without medical records or other evidence of injury insufficient to establish excessive force); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) ("[Plaintiff's] claim of injury is equally unsupported as she does not provide any medical records to support her claim that she suffered injury as a result of being handcuffed.").

The Court thus concludes that no genuine dispute exists as to the objective reasonableness of defendants' use of force, or as to the amount of force actually applied to plaintiff. Accordingly, defendants are entitled to summary judgment on the excessive force claim.

### 3.    Denial of Medical Treatment

Finally, Count 1 alleges that plaintiff's due process rights under the Fourteenth Amendment were violated by defendants' failure to provide him medical treatment at the scene of his arrest.

"The due process clause of the Fourteenth Amendment does require the responsible governmental authorities to provide medical care to persons who have been injured while being apprehended by the police." *Gaudreault*, 923 F.2d at 208 (citing *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983)). While "[t]he boundaries of this duty have not been plotted exactly . . . it is clear that they extend at least as far as the protection that the Eighth Amendment gives to a convicted prisoner." *Id.*; *see also Burrell v. Hampshire County*, 307 F.3d 1, 7 (1st Cir. 2002). "The Eighth Amendment, in turn, imposes a duty to attend to a prisoner's 'serious medical needs.'" *Gaudreault*, 923 F.2d at 208 (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). The First Circuit has defined a "serious medical need" as "one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gaudreault*, 923 F.2d at 208.

Law enforcement officers violate the Constitution if they exhibit a "deliberate indifference" to a prisoner's serious medical needs. *Gaudreault*, 923 F.2d at 208 (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). To establish deliberate indifference, the plaintiff must prove that the officers "had a culpable state of mind and intended wantonly to inflict pain." *DesRosiers v. Moran*, 949 F.2d 15, 19 (1st Cir. 1991). "The requisite state of mind may be manifested by the officials' response to an inmate's known needs or by denial, delay, or interference with prescribed health care." *Id.* Moreover, "inadvertent failures to provide medical care, even if negligent, do

21

not sink to the level of deliberate indifference." *Id.* Rather, to be deliberately indifferent, the officials must have "actual knowledge of impending harm, easily preventable." *Id.*

The record in this case cannot support a finding that the officers were deliberately indifferent to LaFrenier's serious medical needs. First, there is no evidence that plaintiff had a serious medical need of any kind. It is undisputed that the physician who examined plaintiff following his arrest did not diagnose him with *any* condition or injury requiring medical treatment. Aside from intravenous fluids, LaFrenier was not given any medical treatment and was not prescribed any medication at the hospital. Nor has plaintiff submitted medical records to establish that he was later diagnosed with or treated for any condition or injury stemming from his encounter with defendants. If the examining physician did not give or prescribe any treatment, plaintiff could not have been suffering from a condition that was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gaudreault*, 923 F.2d at 208.

Furthermore, even assuming the existence of a serious medical need, the record cannot support a claim that defendants were deliberately indifferent to that need. Kinirey repeatedly asked plaintiff whether he was "okay" or if he "needed some assistance." Rather than responding that he was ill or requesting medical treatment, he responded that he need to "get going" and attempted to leave the scene. The officers continued to offer plaintiff medical assistance after he was arrested and taken to the police station. There, the officers again asked if he wanted medical assistance and suggested that an ambulance be called. Kinirey consulted with LaFrenier's wife, a nurse, at his suggestion. An ambulance was then summoned and plaintiff was transported to Leominster Hospital. Under any view of the evidence, defendants' conduct simply cannot be

characterized as deliberate indifference to plaintiff's medical needs.[18]

In summary, there is no evidence that plaintiff had a serious medical need or that defendants Kinirey and Morrison were deliberately indifferent to any such needs. Their conduct therefore did not rise to the level of a constitutional violation.[19]

### C.    Section 1983 Claims Against Kinirey and Morrison (False Prosecution)

Following his arrest, LaFrenier was prosecuted on two charges of assault and battery on a police officer, resisting arrest, and disorderly conduct. Count 2 of the complaint alleges that Kinirey and Morrison knew these charges to be false, and that they therefore violated § 1983.

To establish a claim of common-law malicious prosecution, plaintiff must show "(1) the commencement or continuation of a criminal proceeding against the eventual plaintiff at the behest of the eventual defendant; (2) the termination of the proceeding in favor of the accused; (3) an absence of probable cause for the charges; and (4) actual malice." *Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir. 2001) (citing *Correllas v. Viveiros*, 410 Mass. 314, 318 (1991)). To transform malicious prosecution into a claim cognizable under § 1983, "the plaintiff also must show a deprivation of a federally-protected right." *Nieves*, 241 F.3d at 53.

Here, summary judgment is appropriate because (1) as noted above, there was probable cause to believe that LaFrenier had committed the charged offenses; and (2) there is no evidence

---

[18] There is likewise no evidence in the record to suggest that the time period between plaintiff's arrest and the summoning of the ambulance was unreasonably long, or that any such delay exacerbated any of plaintiff's injuries. *See Gaudreault*, 923 F.2d at 208 (no constitutional violation where medical treatment was delayed ten hours, as there was no evidence that prisoner's "injuries were exacerbated in the slightest by the delay in providing treatment").

[19] Defendants Kinirey and Morrison contend that they are entitled to qualified immunity even assuming that plaintiff could make out a violation of § 1983. Because the Court has found no constitutional violations, it does not reach the issue.

that either officer acted with malice or other improper motive. *See Franco-de Jerez v. Burgos*, 876 F.2d 1038, 1040 (1st Cir. 1989) (holding that the filing of a criminal complaint does not violate the Constitution if the prosecutor had probable cause to believe the defendant had committed the crime).[20]

### D.    The MCRA Claim

In Count 4, plaintiff alleges violations of the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, § 11I. Specifically, it alleges that defendants violated his civil rights "by force, intimidation, and violence."

Although it is not entirely clear, it appears that plaintiff's MCRA claim is grounded on defendants' alleged violations of his rights to be free from unreasonable seizure, excessive force, and improper denial of medical care. For the reasons stated above, the Court concludes that the undisputed facts of this case do not support such violations. Accordingly, defendants will be granted summary judgment as to Count 4. *See Jiles v. Department of Corr.*, 55 Mass. App. Ct. 658, 664 (2002).

### E.    Assault and Battery

Massachusetts law defines assault and battery as "the intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another." *Jesionowski v. Beck*, 937 F. Supp. 95, 105 (D. Mass. 1996) (quoting Commonwealth v. McCan, 277 Mass. 199, 203 (1932)). Massachusetts courts have held that "an officer authorized to make an arrest may use such force as is reasonably

---

[20] Morrison's only apparent role in the prosecution was to sign the complaint as the "court officer" for the department.

necessary to effect the arrest." *Julian v. Randazzo*, 380 Mass. 391, 396 (1980) (internal quotation omitted).  In the circumstances of this case, the standard for determining whether a use of force was reasonable for purposes of an assault and battery claim, are "essentially the same" as the Fourth Amendment reasonableness analysis required for an excessive force claim.

As noted above, defendants had probable cause to believe that plaintiff was committing a crime at the time of the encounter, and therefore were authorized to make an arrest.  Accordingly, defendants could lawfully employ such force as would be "reasonably necessary" to effect that arrest.  *Randazzo*, 380 Mass. at 396.  Because the Court has already determined that the force used by defendants was objectively reasonable for excessive force purposes, it concludes that plaintiff's assault and battery charge cannot be sustained.

### F.    <u>False Arrest</u>

Under Massachusetts law, "[i]f the police had sufficient information to constitute probable cause to believe, and did believe, that a person had committed a felony . . . they had the right to arrest him without a warrant."  *Randazzo*, 380 Mass. at 395.  Similarly, Mass. Gen. Laws ch. 231, § 94A states that

> [i]f a person authorized to make an arrest shall have probable cause to believe that a misdemeanor for which he may make an arrest is being committed in his presence, such probable cause shall be a defence [sic] in an action brought against him for false arrest or imprisonment.

Again, defendants had probable cause to arrest plaintiff for crimes committed in their presence.  Plaintiff's common-law false arrest claim therefore cannot stand.

### G.    <u>Abuse of Process</u>

The elements of the tort of abuse of process are (1) that "process" was used against

plaintiff (2) for an "ulterior or illegitimate purpose" and (3) that some harm occurred as a result. *Vittands v. Sudduth*, 49 Mass. App. Ct. 401, 406 (2000).[21] "The essence of this tort is the malicious use of legal process to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed." *Carroll v. Gillespie*, 14 Mass. App. Ct. 12, 26 (1982) (quotation and internal citation omitted).

There is no evidence of any kind in the record to suggest that either officer acted with an "ulterior or illegitimate purpose" in pursuing the criminal prosecution. Summary judgment will thus be granted for both defendants as to the abuse of process claim.

### H.    Municipal Negligence

Finally, LaFrenier asserts a claim of negligence against the Town of Townsend under the Massachusetts Tort Claims Act, which provides in relevant part: "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment." Mass. Gen. Laws ch. 258, § 2; *Spring v. Geriatric Auth. of Holyoke*, 394 Mass. 274, 285 (1985) (noting that the Act effectively removes the defense of immunity in certain tort actions against public employers).

"Negligence is the failure to exercise that degree of care which a reasonable person would exercise in the circumstances." *Morgan v. Lalumiere*, 22 Mass. App. Ct. 262, 267 (1986). Thus, to prevail on his claim against the Town, plaintiff must show that the Town's employees—here, defendants Kinirey and Morrison—failed to exercise reasonable care.

---

[21] "More precisely the word 'process' in the context of abuse of process means causing papers to be issued by a court to bring a party or property within its jurisdiction." *Vittands*, 49 Mass. App. Ct. at 406 n.9 (quotation and internal citation omitted).

As discussed above, Kinirey and Morrison's actions were reasonable in the circumstances of this case. Specifically, the Court has concluded (1) that the arrest and prosecution of plaintiff were based on probable cause, and therefore lawful; (2) that defendants' use of force was objectively reasonable; and (3) that defendants' actions with regard to providing medical treatment to plaintiff were not unreasonable under the circumstances. Plaintiff therefore cannot establish that the defendant officers were negligent, and his claim against the Town must necessarily fail.

**IV.**     **Conclusion**

For the foregoing reasons, defendants' motion for summary judgment is GRANTED.

**So Ordered.**

                                        /s/ F. Dennis Saylor
                                        F. Dennis Saylor IV
Dated: March 20, 2007                   United States District Judge